**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
**Alex Meggitt**, OSB #174131
**Amanda Lamb**, OSB #222284
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

    Of Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| SKYLER DELGADO, in his capacity and as personal representative of the Estate of Robert Delgado; ROBERT DELGADO, deceased,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF PORTLAND; ZACHARY DELONG; and JOHN DOES 1-5.<br><br>    Defendants. | Case No.<br><br>COMPLAINT<br><br>Civil Rights Action (42 U.S.C. § 1983); Wrongful Death and Battery (State Tort)<br><br>JURY TRIAL DEMANDED |

    This is a civil rights and state tort law action against the above-named parties for the shooting death of Mr. Robert Delgado, Plaintiff Skyler Delgado's father. Officer Zachary DeLong failed to follow police directives, training, and the United States Constitution when he shot and killed Mr. Delgado in Lents Park, Portland, Oregon. Defendant DeLong paid no mind to Mr. Delgado's apparent signs and symptoms of mental illness and/or impairment, and, without any information that Mr. Delgado had posed a threat to anyone, aggressively approached Mr.

Delgado with a rifle, shouting commands and threats. Defendant DeLong then shot Mr. Delgado with his long-barreled rifle without lawful justification from nearly 90 feet away. He had available alternatives. He used none. Defendant City of Portland has demonstrated that they maintain a pattern and practice of failing to train officers to follow police directives and to not use excessive force when detaining persons undergoing recognizable mental health crises—particularly if those persons are experiencing houselessness. This is coupled with a pattern and practice of failing to properly investigate, monitor, and discipline officers for those violations, and resorting to militarized violence to respond to people in crisis. Had Defendants not violated Mr. Delgado's rights, he would be alive today.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4). The court has supplemental jurisdiction over the State tort claims pursuant to 28 U.S. Code § 1367(a).

## VENUE

2. Venue is proper within the District of Oregon because all of the events giving rise to this claim occurred in this judicial district, and all defendants reside in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Portland, Multnomah County, Oregon.

## PARTIES

3. Skyler Delgado, Plaintiff, is a citizen of the State of Arizona, is the decedent's son, and has been appointed as the personal representative of Robert Delgado's estate.

4. Robert Delgado was a 46-year-old man who lived in Portland. He was shot and killed by Portland Police Officer Zachary DeLong on April 16, 2021, and died intestate.

5.      Defendant City of Portland (hereinafter, "City") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau.

6.      Defendant Zachary DeLong is a detective with the Portland Police Bureau (hereinafter, "PPB").

7.      Plaintiff does not know the names of Defendants John Does 1-5, and thus sues them under fictitious names. John Does 1-5 are any City employees who exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in Plaintiff's deprivation of civil rights as hereinafter alleged.

## FACTUAL ALLEGATIONS

### Background

8.      In 2012, a United States Department of Justice (hereinafter, "US DOJ") investigation found that Defendant City of Portland's PPB had engaged in a "pattern and practice of unnecessary or unreasonable force during interactions with people who have or are perceived to have mental illness." The US DOJ found the pattern and practice of using unconstitutional force against people with mental illness was a result of deficiencies in PPB policies, training, and supervision.

9.      The US DOJ investigation was prompted by a "high number of officer involved shootings that involved people with mental illness." Between 2008 and 2018, 33 of 57 (58 percent) of PPB's officer-involved shootings and in-custody involved people in mental health crisis. More recently, between 2018 and 2019, nearly 70 percent of PPB's officer-involved shootings involved someone with a history of mental illness or experiencing a mental health crisis.

10.     The US DOJ entered into a settlement agreement with Defendant City of Portland requiring improvements in use of force policy, training, and oversight. Because Defendant City of Portland has not been able to comply with the terms of the settlement agreement for a sufficient period of time, the settlement agreement is still in effect at the time this lawsuit was filed and points of non-compliance continue to be litigated.

11.     In addition to having a history of excessive force against persons with mental illness, PPB engages in a pattern and practice of over-policing people experiencing houselessness. Between 2018 and 2022, about half of arrests made in Portland were of people experiencing houselessness, despite representing approximately less than 2% of Portland's population.[1] From 2017 to 2020, 91% of arrests of people experiencing houselessness were for non-violent crimes.

12.     The Portland Police Bureau promulgates policies, or "directives," for its officers to follow, and gives notice to the public of these directives on their website. These directives define when and how officers can use force. Officers are to "place[ ] a high value on resolving confrontations, when practical, with less force than the maximum that may be allowed by law." PPB Directive 1010.00 Policy 8. The Directives further demand that their officers "recognize that their approach to an incident…may influence whether force becomes necessary and the extent to which force must be used." *Id.* at 1010.00 Policy 3.

13.     PPB's directives also require members only use a level of force "necessary to accomplish a lawful objective." *Id.* at 1010.00.2.1.1.

---

[1] Melissa Lewis, *Police Know Arrests Won't Fix Homelessness. They Keep Making Them Anyway*, Reveal News (June 23, 2022), available at https://revealnews.org/article/homeless-unhoused-police-arrests-west-coast-cities/?utm_source=reveal-twitter&utm_medium=social&utm_campaign=criminalizing-homelessness.

14. PPB's directives also prohibit officers from engaging in "biased-based policing." *See id.* at 0344.05. Particularly, an officer is "prohibited from taking or not taking any police-action motivated by bias or profiling." *Id.* at Policy 4.

15. PPB's directives also inform Bureau members that they "are expected to recognize signs and symptoms that may suggest a mental illness as well as behaviors that are indicative of mental health crisis." *Id.* at 850.20 Policy 3. Officer are to "de-escalate" in such circumstances "to maximize the likelihood of a safe outcome for members, individuals, and the community." *Id.*

16. PPB's directives also require Bureau members to provide emergency medical aid to an injured person once "any immediate threat has been neutralized." *Id.* at 630.50.1.1.1.1.

17. PPB's directives underscore the standards announced in *Graham v. Connor* and directs officers to rely on that case's analysis when judging when to use force. *Id.* at 1010.2. "When determining whether to use force, members must balance the individual's Fourth Amendment rights against the government's interest. At a *minimum*, members shall consider the following three factors prior to using force: Threat…, Severity [of crime at issue], and Active Resistance or Evading…" *Id.* at 1010.212.1-3 (emphasis added).

18. PPB officers are also expected to consider the following before using force:

- "Observed behavior (e.g., perceived mental illness or mental health crisis);
- Reports from other members or witnesses;
- Whether the person's lack of compliance is a deliberate attempt to resist or is affected by an inability to comply based on factors including, but not limited to:
    - Medical conditions;
    - Cognitive impairment;
    - Drug or alcohol impairment; or

  o Mental health crisis."

*Id.* at 1010.2.2.1.–1010.2.2.1.2.6.

### Robert Delgado

19. Robert Delgado was 46 years old at the time of the incident. At that time, he was experiencing houselessness and suffered from mental health issues.

20. On the morning of April 16, 2021, Mr. Delgado was living in a tent in Lents Park, Portland, Oregon. He owned a BB gun in the shape of a handgun. The gun had an orange tip consistent with fake guns.

21. Later that morning, witnesses observed Mr. Delgado with his BB gun in the park.

22. All witnesses say that Mr. Delgado was not pointing the gun at people or behaving in a threatening manner toward anybody. He was pointing his BB gun at a fence line of an empty baseball stadium.

23. At approximately 9:30 am, one witness who had observed Mr. Delgado called Portland's non-emergency number. The witness told the non-emergency phone operator that Mr. Delgado had not been pointing the object at anyone, but instead had been "wielding it at the fence and, you know, he thinks he's some kind of cowboy, gun play or James Bond."

24. At approximately 9:30 am, Defendant DeLong was dispatched to the call. Defendant DeLong is a member of the Enhanced Crisis Intervention Team (ECIT), a team of officers "specially trained and vetted" to respond to and de-escalate situations involving people in mental health crises.[2] The dispatch told Defendant DeLong that Mr. Delgado had not been threatening anyone, but just holding a gun.

---

[2] Portland Police Bureau, *Behavioral Health Unit (BHU) News* (Quarters 2-3 2021), available at https://www.portlandoregon.gov/police/article/798152

25.     Defendant DeLong then called the witness who had made the call to non-emergency to get more information. The witness again relayed that the individual had been practicing quick draws with the gun but had only been pointing it away from the street and into the empty baseball field. Defendant DeLong relayed this information to another responding officer, Samantha Wuthrich.

26.     As Defendant DeLong approached Lents Park in his car, he observed Mr. Delgado wearing no shirt and standing by himself in the park. He observed a tent and other materials such as clothing scattered on the ground. Defendant DeLong also saw that both of Mr. Delgado's hands were empty, and Defendant DeLong did not see a gun.

27.     Upon approaching Lents Park, Defendant DeLong also immediately retrieved his PPB-issued Colt AR-15 rifle from the car.

28.     The Colt AR-15 rifle is a weapon of war, used with notoriety in mass shootings across the United States of America. Bullets from an AR-15 eviscerate human tissue in a manner different than that of a 9mm bullet used in handguns, which more often puncture and travel through the body.[3] AR-15 bullets tear, rip, and tumble through the human body. PPB has killed other individuals in mental health crises with AR-15s.

29.     Defendant DeLong confronted Mr. Delgado from a distance and began yelling at Mr. Delgado. Mr. Delgado, in reaction, started pacing and yelling when confronted by DeLong. His hands were still clearly empty, as he was waving his arms around.

30.     Because of Mr. Delgado's tent and belongings in the park, and his response to police presence, erratic behavior, and shouting at officers to shoot him after threats from Defendant

---

[3] N. Kirkpatrick, Atthar Mirza and Manuel Canales, *The Blast Effect: This is how bullets from an AR-15 blow the body apart*, The Washington Port (March 27, 2023), https://www.washingtonpost.com/nation/interactive/2023/ar-15-damage-to-human-body/.

DeLong, Defendant DeLong knew or should have known that there was a substantial probability that Mr. Delgado was experiencing houselessness and suffering from serious emotional or mental distress. Per PPB policy, as outlined above, Defendant DeLong had to consider these factors before using force.

31. Instead of recognizing Mr. Delgado's clear distress and need for de-escalation and assistance, Defendant DeLong assumed that Mr. Delgado's behavior was due to drugs, and that those drugs made him dangerous, despite Mr. Delgado having done nothing to endanger or pose any risk to a person. Even if DeLong's assumption were true, again, per PPB policy Defendant DeLong needed to consider whether Mr. Delgado's seeming non-compliance was potentially due to impairment.

32. Instead of attempting to de-escalate, Defendant DeLong decided to be more aggressive towards Robert Delgado. Defendant DeLong and Officer Wuthrich both took cover behind a tree approximately 90 feet from Mr. Delgado. Both Defendant DeLong and Officer Wuthrich pointed their weapons at Mr. Delgado and shouted conflicting orders at him, even though he was not armed and had done nothing to threaten the officers. Defendant DeLong was pointing his AR-15 rifle and Officer Wuthrich a 40 mm launcher. Mr. Delgado at least briefly put his hands up with nothing in them when ordered to. Defendant DeLong began yelling commands that showed that he did not believe that Mr. Delgado was holding a gun when approached, such as "If you reach for a gun, I'm going to fucking shoot you!" and "Get your ass on the ground!"

33. Mr. Delgado continued pacing and began to throw his belongings around, including his tent and other items, in the direction of the officers behind the tree who were pointing their weapons at him from 90 feet away. Robert Delgado also responded to Defendant DeLong's shouted commands by yelling "get the fuck away from me" and to "just fucking shoot me."

34. Informing Defendant DeLong that he should "just fucking shoot" him would be another sign of suicidal ideation, mental illness, and a factor to counsel de-escalation.

35. After approximately 30 seconds of Defendant DeLong and Mr. Delgado yelling at each other, Mr. Delgado walked back near his tent, bent over, grabbed something, began to stand up, and Defendant DeLong fired two shots from his rifle, one hit Mr. Delgado, and Officer Wuthrich fired one shot from her 40 mm less lethal.

36. Mr. Delgado fell where he stood. Witnesses and other officers observed Mr. Delgado moving, but he made no attempt to get up, reach for a weapon, or speak.

37. After the shooting, PPB removed Defendant DeLong and Officer Wuthrich from the scene.

38. Mr. Delgado died from that single gunshot wound from Defendant DeLong.

39. The bullet entered his left side, moved in a front to back direction, and slightly downward. It passed through his muscles, spleen, stomach, the left side of his diaphragm, and the lower lobe of the left lung. It then passed through his ribs, pieces fracturing throughout. His injured organs hemorrhaged.

40. More officers arrived. An officer on the bullhorn began announcing that if Mr. Delgado reached for a gun he would be shot again. Approximately 5 minutes and 45 seconds after being shot, as Mr. Delgado lay unmoving in the grass, Officer Smith shot Mr. Delgado with a 40mm launcher without any provocation, and Mr. Delgado did nothing in response to being hit by the 40mm launcher. Officers did not approach Mr. Delgado or offer medical assistance to Mr. Delgado until seven minutes after he was shot. By that point, Mr. Delgado had stopped moving, had no pulse, and was not breathing. Attempts at CPR and medical aid were not successful.

41.     The City of Portland has since promoted Defendant DeLong to Detective. This follows a pattern of promoting PPB officers who kill people in mental health crisis, a non-exhaustive list of whom includes Samson Ajir who shot and killed Terrell Johnson, Assistant Chief Jeffrey Bell who shot and killed José Santos Victor Mejía Poot and in another incident Eddie Homsombath, Leo Besner who shot and killed Raymond Dwayne Gwerder, and Robert King who shot and killed a suicidal man in 1997.

42.     The City of Portland has shot and killed other people in crisis with an AR-15: a non-exhaustive list includes Aaron Campbell in 2010, Marcus Lagozzino in 2010, and David Earl Hughes in 2006.

43.     Upon information and belief, no officer has been disciplined or had a sustained job termination for shooting and killing a person undergoing a mental health crisis.

44.     Defendant DeLong's actions speak to a long history in the City of Portland of police officers ignoring their training, ignoring their directives, and facing no consequences. Or, as in Defendant DeLong's case, receiving a promotion after fatally shooting a person in crisis.

45.     As a member of the ECIT, Defendant DeLong knew from his role and training that de-escalation should have been utilized. Instead, Defendant DeLong immediately reached for a high-powered, notoriously lethal rifle, shouted obscenities, shouted that he was going to kill Mr. Delgado, and shot and killed Mr. Delgado from a great distance from behind cover.

46.     A recent review of ECIT training data by the Compliance Officer/Compliance Liaison (COCL), a group tasked with measuring compliance with the City of Portland's aforementioned settlement agreement with the United States government, noted that "after examining more than 2,000 ratings, the COCL found that not a single patrol officer received a 'Needs Improvement'

rating on any of the metrics used in the annual performance evaluation."[4] This is consistent with a bureau that fails to train and discipline its officers, including Defendant DeLong.

47. As Mr. Delgado's body lay in the park after being killed, a large number of Portland Police officers feasted on pizza nearby in plain view of the public.

48. As the above demonstrates, the City of Portland maintains a pattern and practice of unchecked violence, particularly against those suffer from mental illness and experiencing houselessness.

49. Mr. Delgado is survived by his children and siblings, including his son Plaintiff Skyler Delgado. They love and miss him very much.

### Claim 1: Fourth Amendment – Unlawful Use of Force – Individual Liability
### (42 U.S.C. § 1983)

50. Plaintiffs reallege and incorporate Paragraphs 1 through 49.

51. It is clearly established law that an officer may not use force that, in light of the circumstances and as perceivable by a reasonable, objective officer, is excessive, unreasonable, and unnecessary.

52. At all material times, Defendant DeLong was in possession of facts that would cause a reasonable law enforcement officer to believe that Mr. Delgado's behavior was attributable to emotional disturbance or mental illness.

53. In taking the actions described above, including but not limited to escalating a circumstance by brandishing a rifle and shouting commands with obscenities when Mr. Delgado was clearly demonstrating signs of mental illness and distress, and in shooting a man in distress

---

[4] Rosenbaum & Associates, LLP, *Quarterly Report: Quarter 3 Updates and Analysis*, Compliance Officer/Community Liaison (March 9, 2023), available at https://static1.squarespace.com/static/5a319f76a9db0901e16c6433/t/640988871e261f3a5c0dcbd3/1678346382467/Q3+2022+FINAL+COCL+Compliance+and+Outcome+Assessment+Quarterly+Report+03092023.pdf.

with a high-powered rifle from a great distance before knowing what Mr. Delgado was doing, Defendant DeLong intentionally violated Mr. Delgado's right to be free from excessive force, guaranteed by the Fourth Amendment to the United States Constitution.

54. Defendants City of Portland and John Does 1-5 failed to train, discipline, and supervise its officers, including Defendant DeLong, in encountering people with mental illness and de-escalating situations to avoid the use of force, as described above. As a result, Defendant DeLong engaged in excessive force without using de-escalation, which resulted in the killing of Robert Delgado. Their actions and inactions constitute substantial personal participation in the violations of Mr. Delgado's rights, or at minimum condoned or acquiesced to those violations.

55. The actions of Defendant DeLong, as described in this complaint, were embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Mr. Delgado. As a result of said intentional conduct, Mr. Delgado is entitled to punitive damages against Defendant DeLong, in his individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

56. The unreasonable seizure of Mr. Delgado was the direct and proximate cause of his death, bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, expenses, worry, fear, anguish, shock, anxiety, and nervousness. The unreasonable seizure of Mr. Delgado was also the direct and proximate cause of Mr. Skyler Delgado's emotional suffering, worry, anxiety, shock, and loss of companionship. Plaintiffs are entitled to all of their damages in an amount to be ascertained according to proof at trial.

### Claim 2: Fourth Amendment – Unlawful Pattern and Practice – Municipal Liability (42 U.S.C. § 1983)

57. Plaintiff realleges paragraphs 1 through 56.

58. As described in Claim 1, Defendant DeLong violated Mr. Delgado's constitutional right to be free from unconstitutional excessive force.

59. Defendant DeLong's conduct illustrates a pattern and practice of Defendant City of Portland's PPB officers violating the Fourth Amendment rights of individuals experiencing mental illness and houselessness.

60. Defendant City of Portland does not have adequate supervisory review of incidents where officers use force that would correct patterns of excessive force in a timely fashion, and rarely categorizes excessive force as out of policy even when the force is clearly excessive, as found by the USDOJ, who released the findings from its investigation of Defendant City of Portland's PPB in September 2012. Defendant DeLong received no training or discipline for violating clearly established constitutional law and PPB directives in place to prevent excessive force situations like what happened to Mr. Delgado. Defendant City of Portland has effectively condoned this practice by repeatedly failing to correct it.

61. Defendants City of Portland and John Does 1-5 failed to train and discipline its officers, including Defendant DeLong, in encountering people with mental illness and de-escalating situations to avoid the use of force, as described above. As a result, Defendant DeLong engaged in excessive force without using de-escalation, which resulted in the killing of Robert Delgado.

62. The unreasonable seizure of Mr. Delgado was the direct and proximate cause of his death, bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, expenses, worry, fear, anguish, shock, anxiety, and nervousness. The unreasonable seizure of Mr. Delgado was also the direct and proximate cause of Mr. Skyler Delgado's emotional suffering, worry, anxiety, shock, and loss of companionship. Plaintiffs are entitled to all of their damages in an amount to be ascertained according to proof at trial.

**Claim 3: 14th Amendment – Interference with Familial Relationship – Individual Liability (42 U.S.C. § 1983)**

63. Plaintiffs reallege paragraphs 1 through 62.

64. As alleged above, Defendants violated Robert Delgado's rights under the Fourth Amendment, resulting in his death.

65. Plaintiff Skyler Delgado possesses a Fourteenth Amendment liberty interest in his familial association with his father, Robert Delgado.

66. Defendants acted with deliberate indifference to Robert Delgado's right to be free from unnecessary and excessive force, and the familial association rights of Skyler Delgado, by deliberately choosing an approach that escalated the encounter instead of de-escalating it and then shooting Robert Delgado without lawful justification, resulting in Robert Delgado's death.

67. Because of this violation, Plaintiff Skyler Delgado has been deprived of his father's love, assurances, comfort, and companionship.

68. This violation of Mr. Skyler Delgado's rights was the direct and proximate cause of his emotional suffering, worry, anxiety, shock, and loss of companionship. Plaintiff Skyler Delgado is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**Claim 4: State Torts**

**Count 1: Battery**

69. Plaintiffs reallege paragraphs 1 through 68.

70. As alleged above, Defendant City of Portland's agent intentionally engaged in harmful and offensive contact with Mr. Delgado.

71. This intentional conduct harmed and killed Mr. Delgado.

72. Plaintiffs are entitled to all of their damages in an amount to be ascertained according to proof at trial.

**Count 2: Wrongful Death**

73. Plaintiffs reallege paragraphs 1 through 72.

74. As alleged above, because the City of Portland failed to train and discipline its officers, including Defendant DeLong, it was foreseeable that Defendant DeLong would engage in an unreasonable practices or excessive force that would end in Mr. Delgado's death.

75. Failing to train and discipline its officers is unreasonable given the grave risk of severe harm to the public, and to Mr. Delgado.

76. It was reasonably foreseeable that Defendant DeLong's immediate escalation of the encounter with Robert Delgado while he was experiencing emotional disturbance or mental illness, without attempting de-escalation, would create a substantial risk of injury or death to Robert Delgado.

77. Defendant DeLong was negligent in failing to de-escalate and instead actively escalating the encounter in his manner of approach, immediate aiming of his rifle, and by shouting commands.

78. As a result, Robert Delgado was fatally shot.

79. Defendant City is liable for Defendant DeLong's conduct.

80. Plaintiffs are entitled to all of their damages in an amount to be ascertained according to proof at trial.

### REASONABLE ATTORNEY'S FEES AND COSTS

81. 42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

82. Plaintiffs request that the Court grant a reasonable attorney's fee in this action.

///

**DEMAND FOR JURY TRIAL**

83. For all claims alleged in this Complaint, Plaintiffs demand a jury trial.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

    A.    For economic and non-economic damages in an amount to be determined at trial;

    B.    For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988; and

    C.    Such other relief as the court deems just and proper.

DATE: April 11, 2023.

    /s/ *Juan C. Chavez*
    Juan C. Chavez, OSB #136428
    Oregon Justice Resource Center
    Of Attorneys for Plaintiff
    *LEAD ATTORNEY*