CAREY CALDWELL, OSB #093032
Senior Deputy City Attorney
carey.caldwell@portlandoregon.gov
LUCY OHLSEN, OSB #184198
Deputy City Attorney
lucy.ohlsen@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR  97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendants City of Portland and Zachary DeLong*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **SKYLER DELGADO, in his capacity and as personal representative of the Estate of Robert Delgado; ROBERT DELGADO, deceased,**<br><br>**PLAINTIFFS,**<br><br>v.<br><br>**CITY OF PORTLAND; ZACHARY DELONG; and JOHN DOES 1-5,**<br><br>**DEFENDANTS.** | **3:23-cv-00529-AR**<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(REQUEST FOR ORAL ARGUMENT)** |

Page  i –DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

L.R. 7–1 CERTIFICATION ...................................................................................... 1

MOTION ................................................................................................................... 1

MEMORANDUM OF LAW ..................................................................................... 1

   I.   INTRODUCTION .......................................................................................... 1

   II.   FACTUAL BACKGROUND ......................................................................... 2

      A.    Witnesses ................................................................................................ 2

          *i.   Chase Hagen* ................................................................................. 2

          *ii.   Kaela Ingle* .................................................................................. 3

          *iii.   David Hernandez* ......................................................................... 4

          *iv.   Michael Naas* .............................................................................. 6

          *v.   Jacqueline Lehrman* .................................................................... 6

          *vi.   Zachary DeLong* .......................................................................... 7

          *vii.   Samantha Wuthrich (now Cater)* ............................................... 10

          *viii.  Richard Bailey* .......................................................................... 13

          *ix.   Consider Vosu* ............................................................................ 14

          *x.   Ken Le* ........................................................................................ 15

      B.    Delgado's History ................................................................................ 16

      C.    Subsequent Investigation and Discipline ............................................ 16

      D.    Training ................................................................................................ 18

   III.   LEGAL STANDARD ................................................................................... 18

   IV.   ARGUMENT ................................................................................................ 20

      A.    Officer DeLong's Use of Force Was Reasonable. ............................... 21

          *i.   Delgado Represented an Immediate Threat.* ............................. 22

          *ii.   Delgado Attempted a Serious Crime* ......................................... 26

          *iii.   Delgado Refused to Comply* ...................................................... 26

          *iv.   More Warnings and Less Force Was Not Feasible.* .................... 27

          *v.   Any Mental Health or Intoxication Was not Material.* ............... 27

     B. Officer DeLong is Entitled to Qualified Immunity. ............................... 27

      C.    Plaintiffs Cannot State a *Monell* Claim. ............................................. 30

      D.    DeLong did not Interfere with Plaintiff's Familial Relationship. ........... 32

CONCLUSION ....................................................................................................... 34

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

## TABLE OF AUTHORITIES

Page(s)

Cases

*Addison v. City of Baker City,*
258 F. Supp.3d 1207 (D. Or. 2017) ...................................................................... 19

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).............................................................................................. 19

*Arpin v. Santa Clara Valley Transp.Agency,*
261 F.3d 912 (9th Cir. 2001) ............................................................................... 19

*Bryan v. MacPherson,*
630 F.3d 805 (9th Cir. 2010) ............................................................................... 27

*Celotex Corp.v. Catrett,*
477 U.S. 317 (1986).............................................................................................. 19

*City & Cnty. of San Francisco, Calif. v. Sheehan,*
135 S. Ct. 1765 (2015)..................................................................................... 27, 28

*City of Escondido v. Emmons,*
139 S. Ct. 500 (2019)............................................................................................ 28

*City of Los Angeles v. Heller,*
475 U.S. 796 (1986).............................................................................................. 30

*Crawford–El v. Britton,*
523 U.S. 574 (1998).............................................................................................. 19

*Cruz v. City of Anaheim,*
765 F.3d 1076 (9th Cir. 2014) ............................................................................. 23

*District of Columbia v. Wesby,*
138 S. Ct. 577 (2018)............................................................................................ 28

*Dougherty v. City of Covina,*
654 F.3d 892 (9th Cir. 2011) ............................................................................... 30

*Elifritz v. Fender,*
460 F. Supp.3d 1088 (D. Or. 2020) ...................................................................... 32

*Est. of Strickland v. Nevada Cnty.,*
69 F.4th 614 (9th Cir. 2023) ..................................................................... 23, 24, 25

Page  iii – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Estate of Lopez ex rel. Lopez v. Gelhaus,*
  871 F.3d 998 (9th Cir. 2017) ................................................................. 23, 27

*Forrester v. City of San Diego,*
  25 F.3d 804 (9th Cir. 1994) ......................................................................... 21

*Foster v. City of Indio,*
  908 F.3d 1204 (9th Cir. 2018) ..................................................................... 33

*George v. Morris,*
  736 F.3d 829 (9th Cir. 2013) ....................................................................... 23

*Glenn v. Wash. Cty.,*
  673 F.3d 864 (9th Cir. 2011) .................................................................. 21, 22

*Gonzalez v. City of Anaheim,*
  747 F.3d 789 (9th Cir. 2014) ............................................................ 22, 23, 33

*Graham v. Connor,*
  490 U.S. 386 (1989).......................................................................... 21, 22, 23

*Hanington v. Multnomah Cnty.,*
  593 F. Supp. 3d 1022 (D. Or. 2022) ............................................................. 32

*Hicks v. City of Portland,*
  No. CV 04–825–AS, 2006 WL 3311552 (D. Or. Nov. 8, 2006) ................... 19

*Horton v. City of Santa Maria,*
  915 F.3d 592 (9th Cir. 2019) ....................................................................... 30

*Hughes v. Kisela,*
  841 F.3d 1081 (9th Cir. 2016) ..................................................................... 23

*Jimmie's Limousine Service, Inc. v. City of Oakland*, No. C,
  04–03321 WHA, 2005 WL 2000947 (N.D. Cal. Aug. 18, 2005) ................. 20

*Jones v. Las Vegas Metro Police Dept.,*
  873 F.3d 1123 (9th Cir. 2017) ..................................................................... 33

*Keenan v. Allen,*
  91 F.3d 1275 (9th Cir. 1996) ....................................................................... 20

*Kisela v. Hughes,*
  584 U.S. 100 (2018)............................................................................... 23, 28

*Lal v. California,*
  746 F.3d 1112 (9th Cir. 2014) ..................................................................... 27

Page  iv – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Los Angeles v. Mendez,*
   137 S. Ct. 1539 (2017) ................................................................................................ 22

*Martinez v. City of Los Angeles,*
   No. 2:23–cv–09491–SVW–SK, 2024 WL 4438889 (C.D. Cal. June 20, 2024) ...................... 20

*Mattos v. Agarano,*
   661 F.3d 433 (9th Cir. 2011) ...................................................................................... 22

*Miller v. Clark Cty.,*
   340 F.3d 959 (9th Cir. 2003) ...................................................................................... 22

*Moreland v. Las Vegas Metro Police Dep't.,*
   159 F.3d 365 .............................................................................................................. 32

*Mullenix v. Luna,*
   136 S. Ct. 305 (2015) .................................................................................................. 29

*Napouk v. Las Vegas Metro. Police Dep't,*
   123 F.4th 906 (9th Cir. 2024) ................................................................... 26, 29, 30

*Ochoa v. City of Mesa,*
   26 F.4th 1050 (9th Cir. 2022) ........................................................................... 20, 32

*Porter v. Osborn,*
   546 F.3d 1131 (9th Cir.2008) .................................................................................... 33

*Portland Police Ass'n v. City of Portland,*
   275 Or. App. 700 (2015) ............................................................................................ 31

*S.B. v. Cty. of San Diego,*
   864 F.3d 1010 (9th Cir. 2017) .......................................................................... 22, 28

*Sabbe v. Washington Cnty. Bd. of Commissioners,*
   84 F.4th 807 (9th Cir. 2023) ............................................................................. 22, 23

*Saucier v. Katz,*
   533 U.S. 194 (2001) ................................................................................................... 29

*Scott v. Harris,*
   550 U.S. 372 (2007) ................................................................................................... 22

*Scott v. Henrich,*
   39 F.3d 912 (9th Cir. 1994) ....................................................................................... 23

*Sereno–Morales v. Cascade Food Inc.,*
   819 F. Supp.2d 1148 (D. Or. 2011) .......................................................................... 19

Page  v – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Smith v. City of Hemet,*
  394 F.3d 689 (9th Cir. 2005) ................................................................. 22

*Smith v. City of Los Angeles,*
  686 F. App'x 509 (9th Cir. 2017) .......................................................... 20

*Smith v. Scott,*
  --S. Ct.--, 224 L. Ed. 2d 493 (Apr. 20, 2026) ...................................... 29

*Soremekun v. Thrifty Payless, Inc.,*
  509 F.3d 978 (9th Cir. 2007) ................................................................. 20

*State v. Smith,*
  21 Or. App. 270 (1975) .......................................................................... 26

*Sternberg v. Town of Danville,*
  2015 WL 9024340 (N.D. Cal. Dec. 16, 2015) ...................................... 30

*Tennessee v. Garner,*
  471 U.S. 1 (1985) ............................................................................. 21, 24

*Vesta Corp. v. Amdocs Mgmt. Ltd.,*
  80 F. Supp. 3d 1152 (D. Or. 2015) ........................................................ 16

*White v. Pauly,*
  137 S. Ct. 548 (2017) ............................................................................. 28

*Wilkinson v. Torres,*
  610 F.3d 546 (9th Cir. 2010) ................................................................. 33

*Zorn v. Linton,*
  607 U.S. ___, 146 S.Ct. 926 (2026) ................................................. 28, 29

Statutes

ORS 161.405(2)(b) ...................................................................................... 26

ORS 163.107(1)(g)(a) .................................................................................. 26

ORS 163.118(1)(a), (b) ............................................................................... 26

ORS 163.185(1)(a) ...................................................................................... 26

Rules

Fed. R. Civ. P.56 ........................................................................................... 1

Fed. R. Civ. P.56(a) ........................................................................... 1, 18, 19

Page  vi – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Fed. R. Evid. 201(b).................................................................................................................. 16

Fed. R. Evid. 702 ..................................................................................................................... 32

Other Authorities

L.R. 7–1 .............................................................................................................................. ii, 1

Page  vii – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## L.R. 7–1 CERTIFICATION

Pursuant to L.R. 7–1(a), counsel for Defendants City of Portland and Zachary Delong ("Defendants") certify conferral with Plaintiffs' counsel to resolve the issues presented in this Motion but were unable to do so.

## MOTION

Pursuant to Fed. R. Civ. P.56(a), Defendants move the Court for Summary Judgment in their favor because there is no genuine issue of material fact and they are entitled to summary judgment as a matter of law. The Court should dismiss all of Plaintiffs' claims against Defendants for the following reasons:

1. Defendant DeLong acted objectively reasonably when using force against Mr. Delgado and did not violate Mr. Delgado's Fourth Amendment rights (Claim 1);

2. Defendant DeLong acted objectively reasonably and did not violate any clearly established rights of Mr. Delgado so he is entitled to Qualified Immunity (Claim 1);

3. Defendant DeLong did not violate Mr. Delgado's Fourth Amendment rights and Plaintiffs have no evidence the City has a pattern or practice of deliberate indifference that caused injury (Claim 2); and

4. Defendant DeLong did not violate any clearly established rights of Plaintiff Skyler Delgado.

This Motion is based on Fed. R. Civ. P.56, the Court's file and records, the Memorandum of Law, below, and the Declarations of Zachary DeLong, Samanth Cater, Richard Bailey, Consider Vosu, Ken Le, Christopher Lindsey, and Carey Caldwell. This Motion also relies on the accompanying Motion to exclude the testimony of lay witness Renauld.

## MEMORANDUM OF LAW

## I.     INTRODUCTION

On the morning of April 16, 2021, in Lents Park, a popular city park in a densely populated area of Southeast Portland, Robert Delgado decided to perform "quick draws" and "act

Page  1 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

like James Bond," pulling a handgun from his waist over and over and pointing it. His actions

scared a couple in the park who called the police to report him. When police arrived minutes

later, another person in the park warned officers that Mr. Delgado had a gun. Shortly after the

officers attempted to talk to Delgado and find out if he had a gun, he suddenly produced the gun

and pointed it directly at the officers. Fearing for their lives, and the lives of the many people in

the park, two officers used lethal force against Delgado. A single bullet from Officer Zachary

DeLong's AR–15 struck Mr. Delgado, killing him.

## II.    FACTUAL BACKGROUND

### A.    Witnesses

#### i.    *Chase Hagen*

At approximately 9:00 am on the morning of April 16, 2021, Chase Hagen and his now

wife, Kaela Ingle, took their dog for their routine morning walk through Lents Park. (Declaration

of Carey Caldwell ("Caldwell Dec."), Ex. 1, p.4 (14:14–25)). As they looped around the park

Mr. Hagen noticed a man in a field between SE 92nd and the baseball diamond. (*Id.*, p.5 (15:2–6);



*see* left, excerpt Depo Ex. 1 (p.18); "C" near 92nd indicating Hagen and "D" to left near trees indicating Delgado). There were cars and people in the parking lot at that time. (*Id.*, p.12 (45:8–13)).

Hagen and his wife frequented that area of the park and had never seen the man before. (*Id.*, p.15 (50:14–22)). He did not think the man was homeless. (*Id.*, (50:8–10)). His wife prompted him to look closer and he saw the man doing "quick draws, essentially like a cowboy–drawing

from the side [and] pointing [] what appears to be a firearm towards the baseball fields." He was

about 60–100 feet away at the time. (*Id.*, p.6 (15:7–8)). The color of the gun, the way the man

handled it, how he would draw it, grip it, and the shape of it made Hagen believe the man had a

Page  2 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

firearm. (*Id.*, pp.5, 11 (15:18–21; 31:1–13, 11–13)). He could not see an orange tip on the gun. (*Id.*, p.10 (30:17–19)).

Hagen saw the man do five or six quick draw types of moves pointing toward the baseball diamond and two James Bond style quick draws where he would turn around and quickly point the gun into the park. (*Id.*, pp.13–14 (48:21–49:6, 9)). Most of the time the man used one hand, but he also used two hands. (*Id.*, p.13 (48:14–15)).

The man's actions scared Hagen and his wife so they turned and started walking away. (*Id.*, p.8 (20:19–20, 22–23 ("we were both quite concerned. Fearful."));  p.7 (18:16–18)). They also called PPB's non–emergency line to report the man. (*Id.*, (18:21–23)).[1] Hagen told the operator that that he was not sure if it was a real gun, but he thought it was a gun. (*Id.*, p.8 (20:11–13)). Shortly after he spoke with non–emergency, an officer called him to ask him about the call and Hagen repeated his description for the officer. (*Id.*, p.9 (23:3–5)).

Hagen provided his reasons for calling non–emergency that day:

> But given everything that I know, I feel like I acted in good sound judgment with the concept of trying to keep myself, my wife, everyone in that neighborhood safe with what somebody, you know, appeared to have a firearm.

(*Id.*, pp.16–14 (60:21–61:3)). In keeping, the fear that he felt seeing Delgado handle the gun was a motivator for he and his wife to move out of the neighborhood. (*Id.*, pp.2–3 (11:24–25; 12:15–18)).

### ii.    *Kaela Ingle*

Like her husband, Ms. Ingle testified that around 9:00am she and her husband took their



dog for a walk through Lents Park. (Caldwell Dec., Ex. 3, p.3 (13:10–13)). As they began, she noticed a man in the park, pacing with "a pile of things next to him." (*Id.*, p.4 (15:4–6, 9–17); Depo Ex. 5 (p.10), "D" marked by Ingle)). She did not know if he was a homeless person or somebody who had a fight with their spouse. (*Id.*, p.5 (17:18–21)).

---

[1] Attached as Ex. 2 is the recording of Hagen's call.

Page 3 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As they were completing a loop of the park, Ingle again noticed the same man with what looked like a gun in his hand. (*Id*., p.6 (18:11–15)). He was doing a reaching motion then the gun was just in his hand. (*Id*., p.6 (18:18–20)). "It was very dark colored. The way that he was holding it was the same that you would be holding a firearm." (*Id*., p.6 (18:23–25)). He was pointing the gun along the fence line toward an area that bordered a large portion of the park. (*Id*., pp.7–8 (19:18–20:2)). She saw him doing quick draws, asked her husband to confirm what she was seeing, and then turned around and "tried to get as far away as possible." (*Id*., pp.7–8 (19:8-12; 20:19–22)). Seeing the man wielding a gun made her feel "anxious and nervous." (*Id*., p.8 (20:4–8)). Her husband called non-emergency and reported the man." (*Id*., p.9 (21:8)). Seeing Delgado with a gun made her feel unsafe and want to move. (*Id*., p.2 (12:1–2)).

### iii.    *David Hernandez*

Earlier that morning, a homeless man, David Hernandez, and his partner, pulled into the parking lot of Lents Park. They had lived in their Suburban near the park for four years and every morning around 6:00 or 6:30am they would pull into the same area of the parking lot. Caldwell Dec., Ex. 4, pp.2–3 (14:7–10; 15:8–11); pp.5–6 (21:22–22:5 (homeless services provided in park))). The morning of April 16, 2021, they pulled into their regular spot and immediately noticed a tent; they knew tents were not allowed in the park. (*Id*., p.4 (19:6–13)). Before they could get out to let the camper know the rule, a man Mr. Hernandez now knows to be Robert Delgado, came to the car and asked them if they had a cigarette. (*Id*.). His partner gave Mr. Delgado a few cigarettes and they offered to smoke marijuana with him. (*Id*.).

As Delgado approached the vehicle, Hernandez noticed the butt of a handgun sticking out of the lapel of Delgado's jacket. (*Id.*, p.6 (22:18–25)). Hernandez thought it looked like a .45 caliber handgun, grew concerned, grabbed his own .45 handgun and put it on his lap "in case [Delgado] decide[d] to pull it out." (*Id*., pp.6–11, 19 (22:18–25; 23:18–25; 24:4–12; 25:20–25; 29:22–30:3; 73:9–20)). Delgado told Hernandez that it was not real, but Hernandez did not believe him and kept his own gun on his lap. (*Id*., pp.9, 19 (25:16–18; 73:9–20)).

Page  4 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Later that morning, Hernandez saw Delgado pointing the gun toward the baseball stadium with what he still believed to be a real gun. (*Id.*, p.14, 18 (50:1–19; 71:4)). At no point did Hernandez ever see an orange tip or any marking to make him believe it was anything other than a real gun. (*Id.*). Consistent with that, when officers showed up at the park and began to interact with Delgado, Hernandez made an effort to get their attention and tell them Delgado had a gun. (*Id.*, pp.21–22 (90:20–91:5)). He was concerned it was a dangerous weapon. (*Id.*, p.17 (60:7–12)).

That morning "the parking lot was pretty full." (*Id.*, p.5 (21:22)). When officers arrived, it was clear to Hernandez that they were PPB officers based on their uniforms and cars. (*Id.*, p.18 (71:18–22)). Again, upon their arrival, Hernandez warned them that Delgado had a gun. At some point, the officers began giving Delgado commands. (*Id.*, p.17 (60:7–19)). Delgado then became violent and did not listen to the officers. (*Id.*, p.18 (71:16–17)). Delgado was shouting "I'll kill you" or "I'll shoot you" at the officers. (*Id.*, p.15 (54:4–15)).

As officers continued commands, Delgado bent down and began digging around in his "stuff." (*Id.*, pp.16, 20 (57:11–12; 88:12–16)). Delgado grabbed something from the ground that Hernandez could not discern and started to stand up. (*Id.*, pp.16, 20, 23, 24 (57:16–18; 88:8–16; 101:8–10; 102:1–13)). Then the officers shot him. (*Id.*).[2]

At the time of his deposition, Hernadez admitted that parts of his testimony was different from his grand jury testimony and interview with detectives on the day of the event. (*Id.*, p.13 (37:4–10)). Hernandez explained, saying he "had time to study it," "got to know [Delgado's] family real well" and "always wanted to do the family right." (*Id.*, p.13 (37:12–13, 20–21)). Despite his new, retrospective bias, he still admitted that at the time, he thought Delgado had a real gun and it was Delgado's decisions that led to his shooting. (*Id.*, p.12 (31:20–24)).

/ / /

---

[2] Hernandez began to video the officers after they arrived at the park. That video begins after the officers moved to a tree for cover and is attached as Caldwell Dec., Ex. 5. It does not show Delgado at the moment he was shot.

Page  5 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### iv.  Michael Naas

Mr. Naas was driving to work on SE 92nd when he had to stop near Lents Park for police vehicles entering the park. (Caldwell Dec., Ex. 6, pp.2, 4 (10:9–10; 12:14–23)). As he stopped, he saw a police officer interacting with an animated shirtless gentleman in the park. (*Id.*, p.3 (11:15–19)). The gentleman was yelling at the officer. (*Id.*, p.10 (30:5–8)). The shirtless gentleman approached a fence and started tearing into and throwing a tent around. (*Id.*, p.5 (p.13:17–24).

The officer interacting with Delgado told him to "not grab the gun or not reach for the weapon." (*Id.*, p.6 (14:12–14, 21–23)). Despite the admonishment, Naas saw Delgado reach down toward his tent and then "extending his arm really fast at the officer who he was originally talking to." (*Id.*, p.6–7 (14:23–15:1)). It looked like Delgado "was quick drawing or some, you know, kind of like a – on the officer. It almost looked like a – like he was trying to be in a wild west shootout or something." (*Id.*, p.8 (16:3–6)). Naas believed the gun was real and Delgado's actions made him believe Delgado was going to shoot the officer or a group of bicyclists behind the officer. (*Id.*, pp.8, 9, 11, 12 (16:15–17; 17:3–5; 31:1–13 (he was "pointing whatever he had in his hand toward the original officers, or at least the *** the bicyclist and stuff like – they were all standing in the same general area. The officer was between them and Mr. Delgado."); 32:23–25 ("was pointing it at their direction.")). Notably, Naas was a former marine and firearms instructor. (*Id.*, p.8 (16:18–24)).

Naas initially thought Delgado pointed a long gun at the officer because from that distance, it blended into a tattoo on Delgado's arm. (*Id.*, p.7 (15:5–15)). Naas was about 50 yards away and was not wearing his glasses. (*Id.*, pp.7, 13 (15:23; 41:17-19)).  But he could see well enough to drive and to see Delgado's actions and what he was doing. (*Id.*, p.14 (47:8–16)).

### v.  Jacqueline Lehrman

Ms. Lehrman provided testimony that conflicted with every other witness. For instance, she described Delgado as "running around and being happy and having fun" during the entire police interaction, up to and including the time he was shot. (Caldwell Dec., Ex. 7, pp.2, 3, 4, 8 (19:12–19; 23:18–19 (Q. "what was he doing before he was shot?" A. "To me, just being

Page  6 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

happy."); 24:8–12; 87:11–20 ("definitely happy - no chance it was anything other than happy")).

Lehrman also testified officers shot Delgado in the back when his arms were raised. (*Id.*, pp.5, 7 (26:12–23; 84:13–16)). She believed Delgado knew the officers were there. (*Id.*, pp.3–4 (23:23–24:2)). She also believed Delgado was the same individual showing their happiness by standing in the middle of the road, stopping, and hitting vehicles with a garbage can earlier that morning. (*Id.*, p.6 (71:9–19); *see* Wuthrich, *vii infra*, noting different individual placed on mental health hold and transported by ambulance earlier that morning).

### vi.     Zachary DeLong

Officer DeLong started with PPB in 2013. (Caldwell Dec., Ex. 8, p.2 (38:12–17)). His training with PPB required memorization of portions PPB's use of force directive. (*Id.*, p.3 (91:1–6)). De-escalation was also emphasized in all his trainings; initial and ongoing. (*Id.*, pp.4, 5 (109:11–18; 115:17-25)). He had Enhanced Crisis Intervention training. (DeLong Dec., ¶2)

On the morning of April 16, 2021, DeLong was driving a marked police car and wearing his police uniform with a badge and patches. (Caldwell Dec., Ex. 8, p.6 (159:15–23)). A call came over the radio about a man in Lents Park with a gun in his hand but not threatening anybody. (*Id.*, p.8 (171:1–4)). DeLong heard the call come in and was dispatched with Officer Samantha Wuthrich. (*Id.*, pp.7, 8 (170:16-18, 171:12-13)). Despite the fact the call noted the man was not threatening anybody, he was immediately concerned about danger to the community due to the popular and active nature of Lents Park. (*Id.*, pp.9 (172:12–24))

As he left for the call, he called the person, Hagen, who initially reported Delgado to acquire and confirm information about the report of the man with a gun. (*Id.*, p.19 (187:10–15)). DeLong's concern for people in the park and the surrounding community grew when Hagen told him the man was doing quick draws and acting like James Bond. (*Id.*, p.20 (188:16–20)).

DeLong first saw Delgado as he drove west on Holgate toward 92nd. (*Id.*, p.10 (174:21–23)). As he approached, DeLong wanted to stop and observe the situation before engaging with Delgado. (*Id.*, pp.12, 13 (177:7–10, 178:6–8); DeLong Dec., ¶¶9–10)). After seeing Delgado was

Page  7 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

empty handed and did not seem to be an immediate threat, DeLong decided it was a good time to approach and drove into the parking lot adjacent to where Delgado stood. (Caldwell Dec., Ex. 8, p.13 (178:6–12)). He did *not* have his lights and sirens on. Wuthrich followed him into the parking lot. (*Id*., p.14 (180:5–6)). He then radioed to all East precinct that his plan was to try to speak to Delgado from the parking lot. (*Id*., p.14 (180:11–14)). At the time DeLong decided to approach Delgado, he knew additional officers were almost on scene to assist with the call. (*Id*., pp.15–16 (182:11–183:7)). Again, at that time, he decided to approach Delgado because Delgado did not seem to be an active threat and it seemed safe to do so. (*Id*., p.16 (183:8–13); DeLong Dec., ¶11).

As he arrived, DeLong actively considered cover. (Caldwell Dec., Ex. 8, p.17 (184:1–7)). DeLong grabbed his AR15 as the appropriate tool to deal with a man, potentially with a gun, in a city park – to allow for distance–but initially kept it out of sight of Delgado, low on his side and behind his vehicle. (*Id*., p.17, 18, 33, 34 (p.184:9–14; 185:1-2, 8–12; 200:23–201:13); *id*., Ex. 9, p.2 (6:5-12); DeLong Dec., ¶15). DeLong then tried to engage in a calm, casual conversation with Delgado. (Caldwell Dec., Ex. 8, pp.18, 24 (185:12–22; 191:23-25); DeLong Dec., ¶16).

Again, when DeLong first attempted contact with Delgado he maintained distance. (Caldwell Dec., Ex. 8, p.24 (191:7–11)). And he initially wanted to attempt a casual conversation and spoke to him with a calm tone. (*Id*., pp.24, 30 (191:22–25; 197:3–5); DeLong Dec., ¶16). However, as soon as DeLong attempted to communicate with Delgado, Delgado "exploded" with anger and started yelling at him and Wuthrich, flipping them off. (Caldwell Dec., Ex.8, pp. 21–22 (188:25–189:5; *id*., Ex. 9, p.2 (6:5–19); DeLong Dec., ¶17). Based on Delgado's behavior, DeLong did not believe Delgado was experiencing a mental health crisis but instead, based on his years of experience, believed Delgado was under the influence of meth. (Caldwell Dec., Ex. 8, pp.22, 23, 38–39 (189:12–15, 21–190:7, 190:12-14; 208:18–209:3; DeLong Dec., ¶18). His belief was consistent with the ME post-mortem drug-analysis. (*See* Caldwell Dec., Ex. 10).

At that point, DeLong did not feel he could disengage with Delgado. (Caldwell Dec., Ex. 8, pp.24–25, 41–42 (191:19–192:10; 211:18–212:4). As Delgado exploded, a person in the parking

Page  8 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

lot next to DeLong told him Delgado had a gun. (*Id*., pp.25, 41 (192:6–10; 211:10–17); DeLong Dec., ¶19). That was now the second person to tell DeLong they saw Delgado with a gun. (DeLong Dec., ¶22; Caldwell Dec., Ex. 8, p.31 (198:19-24)). DeLong then became even more concerned about community safety. (*Id*., pp.25, 31 (192:14–16; 198:19-24). At that point, there were between 50 and 100 people in the park, with 10 to 20 directly behind him in the parking lot, as well as the person almost right next to him who told him Delgado had a gun. (*Id*., pp.25–26, 40-41 (192:19–193:11; 210:17–211:2)). DeLong radioed about Delgado's behavior, that another person said Delgado had a gun, and requested reinforcements to assist on the call as well as set containment around the park. (*Id*., pp.30, 39-40, 41 (97:209:23-210:11; 211:6-17); DeLong Dec., ¶20).

DeLong then moved from his car to behind a tree with Wuthrich joining him. (Caldwell Dec., Ex. 8, pp.26–27 (193:16–194:1); DeLong Dec., ¶21). He did not point his AR at Delgado but kept it at low ready and below Delgado as he gave Delgado commands to come to him. (*Id*., ¶29; Caldwell Dec., Ex. 8, pp.27–28, 31–32, 35, 36 (194:16–195:2; 198:19–199:6; 203:17–22; 205:3–11)).

Up to that point DeLong had used numerous de-escalation techniques in an attempt to figure out what was happening with Delgado as safely as possible. (*Id*., pp.28–30 (195:5–197:8 (e.g. took his time in assessing the situation, acquired more information from caller, observed Delong from a distance, approached calmly in conversational manner when situation looked safe, treated Delgado like a normal human and did not act like a cop, concealed his firearm, used distance and cover)). Once Delgado exploded and DeLong heard from a second person that Delgado had a gun, DeLong's tone changed but he continued to use de-escalatory strategies. (*Id*., pp.30–31, 39–40 (197:14–198:5 (e.g. recruited additional resources, coordinated containment, maintained distance, used harder cover); 209:23–210:11; *see also* Caldwell Dec., Ex. 9, pp.10–14 (49:4–53:6 (describing deescalation and ultimate necessity of force)).

Again, Delgado responded to DeLong's commands with anger, threats, and invitation to shoot him. (*Id*., p.7, (44:13–24)). DeLong, concerned about Delgado's reaction and the potential seriousness of an angry man with a gun threatening police, gave a force warning that if Delgado

Page  9 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

went for a gun, DeLong would "fucking" shoot him. (Caldwell Dec., Ex. 8, pp.31–32 (198:19–199:2); DeLong Dec., ¶22). Delgado had ample time to comply with DeLong's commands and warnings. (Caldwell Dec., Ex. 9, p.13 (52:21–25). Instead, Delgado bent over and when he rose back up, he was pointing a gun at DeLong and Wuthrich. (*Id*., Ex. 8., pp. 37, 44 (208:5–9; 223:10–13); DeLong Dec., ¶¶26–27). Delgado produced the gun so quickly that there was not enough time to give an additional warning before shooting him; DeLong did not think Delong would act in that manner so quickly. (*Id*., ¶22; Caldwell Dec., Ex. 9, pp.3, 9 (8:18–25; 48:6–7 (produced the gun "in a fraction of a second * * * and I'm looking down the barrel of that gun")). DeLong was not aware the gun was fake (*Id*., Ex. 8, p.43 (216:6–13); DeLong Dec., ¶28). DeLong's objective the entire time was to solve any problem that Delgado may have had but once Delgado pointed a gun at him, he had to shift his objective. (Caldwell Dec., Ex. 9, p.4 (32:2–12)). At that point, DeLong believed he was facing an immediate threat of death or serious bodily injury – "I thought I was going to be shot." (*Id*., pp.8-9 (47:3–12; 48:19–22); DeLong Dec., ¶¶30–31).

### vii.    *Samantha Wuthrich (now Cater)*

Earlier that morning Wuthrich responded to a different man, not Delgado, in the street at SE 92nd and Holgate. (Caldwell Dec., Ex. 11, pp.5–8 (69:5–8, 14–17, 25–70:7, 14–22, 71:1–3, 18–72:5)). She was cover for another officer who determined the individual needed to be placed on a "peace officer's hold" for a mental health evaluation. (*Id*.). That officer called an ambulance, and the individual was transported for evaluation. (*Id*.).

Later that morning, she was in a parking lot talking to DeLong when the Delgado call came in. (*Id*., p.9 (74:6–18)). The dispatch noted a man in Lents Park with a gun. (*Id*., p.12 (80:3–12)). There was no indication that there was a mental health component to the call. (*Id*., p.12 (p.80:13–16)). She had no knowledge of who Delgado was that day. (*Id*., p.10 (p.75:2–5)). She and DeLong both dispatched to the call and DeLong took the lead. (*Id*., p.11 (79:5–12)). She had been on more than 20 calls in the past where DeLong was the ECIT officer. (*Id*., p.11 (79:17–23)). As they left, DeLong told her that he called Mr. Hagen who told him about a man

Page  10 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

with a gun doing quick draws like James Bond. (*Id*., p.18 (97:18–98:4); Cater Dec., ¶7). DeLong sent that information over the radio. (*Id*., ¶8).

As Wuthrich approached Delgado's location, she noticed a group of bicyclists in the parking lot near him. (*Id*., Ex. 11, p.11 (84:4–8)). When she first saw Delgado, she did not think there were any mental health issues but thought he seemed angry. (*Id*., pp.13-14, 19 (83:24–84:3; 98:5–12)). She also believed he was exhibiting signs of methamphetamine intoxication. (*Id*., pp.20, 31 (99:1–15; p.111:15–19 ("thought it was drugs the whole time"))). He did not have anything in his hands at the time. (*Id*., p.15 (92:8–10)).

When she exited her vehicle, Hernandez (§*iii*, *supra*, the homeless man in the Suburban who filmed part of the interaction with Delgado) flagged her down. (*Id*., p.15 (92:17–18)). Hernandez warned her that Delgado had a gun. (*Id*., p.16 (93:1–18); Cater Dec., ¶11). She thought Hernandez warned her because he believed her to be in danger. (Caldwell Dec., Ex. 11, p.17 (94:13–22)). DeLong sent out the second report of the gun over a radio. (Cater Dec., ¶12).

As Wuthrich joined DeLong she had her sidearm out at low ready. (Caldwell Dec., Ex. 11, p.21 (101:23–25)). She could hear DeLong "engaging in a back and forth" with Delgado. (*Id*., p.22 (102:1–6)). At the time, Delgado was not complying with DeLong's commands. (*Id*., p.22 (102:21–24)). Based on the back and forth and the fact that she saw Delgado look "directly at" them multiple times, she knew Delgado was aware of their presence. (*Id*., pp.22, 23 (102:14–20, 103:2–3).

Her and DeLong's goal was to have Delgado raise his hands and determine whether he in fact had a firearm. (*Id*., pp.24–25 (104:25–105:3)). But he would not comply. (Cater Dec., ¶18).

At some point Delgado was yelling "fuck you" and similar. (Caldwell Dec., Ex. 11, p.26 (106:12–13)). She recalled that after his insults he yelled "fucking kill me." (*Id*., pp.26 (106:8–11)). She perceived Delgado as being antagonistic rather than suffering from any mental health crisis. (*Id*., p.27 (107:9–19)).

As Delong continued to pace back and forth toward them and away, she did not see a gun in his waistband so she holstered her sidearm and went to retrieve a less-lethal 40mm launcher

Page  11 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

from Officer DeLong's vehicle. (*Id.*, p.28 (108:13–17)). Based on his behavior, Wuthrich believed Delgado may try to fight them and she believed the less–lethal represented an appropriate tool to address that possibility. (*Id.*, p.28 (108:18–23)). Wuthrich told DeLong that if Delgado got too close, she would use the 40. (*Id.*, p.29-30 (109:21–110:2). She then gave Delong a few commands and he stopped pacing back and forth toward them and away and began to pace perpendicular to them. (*Id.*, p.30 (110:3–4)). As Delgado continued to pace, he continued to respond to commands with "fuck you" and similar. (*Id.*, p.31 (111:1–5)). Wuthrich continued to perceive his behavior as angry and wanting them to leave rather than suicidal or in a mental health crisis. (*Id.*, p.31 (111:6–19)).

At some point, Wuthrich and DeLong took cover behind a tree on the edge of the parking lot. (*Id.*, p.32 (112:4–11, 20–22)). They could not disengage at that time because they still had not confirmed whether Delgado had a gun or not. (*Id.*, p.33 (114:8–13)). There were still a number of people in the park, including the bike group, Hernandez, and other pedestrians walking in the park. (*Id.*, p.33 (114:17–22); Cater Dec., ¶17). She wanted to ensure the safety of all of those people. (Caldwell Dec., Ex. 11, p.33 (114:13–15)).

Delgado had yelled and sworn at them and thrown his belongings around. (*Id.*, p.34 (119:15-19). However, he had not attacked them. (*Id.*). So, Wuthrich to that point did not think it appropriate to try to use her 40mm; and he was out of effective range. (*Id.*).

Ultimately, Delgado began rummaging through his items on the ground like he was looking for something. (*Id.*, p.35 (122:12–14)). Then, he suddenly popped up with a gun pointed directly at her. (*Id.*, p.35 (122:14–18); Cater Dec., ¶19). He was approximately 40 yards away at the time. (Caldwell Dec., Ex. 11, p.36 (123:3–5). She thought Delgado was going to shoot her. (*Id.*, p.35 (122:6–7). She thought Delgado represented an immediate threat of death or serious bodily injury to herself, DeLong, the bicyclists behind her, Hernandez, and anybody else in the park. (Cater Dec., ¶¶21–23, 25). She and DeLong then fired their weapons at the same time. (Caldwell Dec., Ex. 11, p.35 (123:12–14). At the time, she believed Delgado pointed a real gun

Page  12 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

at them. (*Id.*, p.37 (124:7–13); Cater Dec., ¶20). Because Wuthrich believed Delgado was about to shoot her, she aimed the 40mm at Delgado's head intending to use lethal force to stop him. (Caldwell Dec., Ex. 11, p.39 (138:9–18); Cater Dec., ¶23). She never saw an orange tip on the gun. (Caldwell Dec., Ex. 11, p.38 (125:23–24)).

### viii.    Richard Bailey

Officer Bailey responded to the Delgado call in a support rather than primary role. (Caldwell Dec., Ex. 12, p.2 (28:16–24)). As he drove to Lents Park, he heard DeLong give updates that Delgado had been acting like James Bond in the park and that DeLong was onsite and Delgado was non-compliant. (Bailey Dec., ¶¶6, 7). He arrived and parked with two other officers, Consider Vosu and Ken Le, on SE 92nd at the north end of the park near Holgate. (*Id.*, ¶8; Caldwell Dec., Ex. 12, pp.3-4, 5 (30:22–31:2; 32:16–17)).

Bailey, Vosu, and Le wanted to move south, toward Wuthrich and DeLong. (*Id.*, p.6 (37:2–3). They recognized potential crossfire from Wuthrich and DeLong should those officers use lethal force. (Bailey Dec., ¶11). Le moved with Bailey once they decided to leave. (*Id.*, ¶13; Caldwell Dec., Ex. 12, p.7 (38:14–19)). Bailey's vehicle had ballistic panels offering protection from potential gunfire. (*Id.*, pp.8-8 (38:25–39:8); Bailey Dec., ¶12).

Bailey was unsure when he first spotted Delgado, but he recalled Delgado located just to the north of the parking lot. (Caldwell Dec., Ex. 12, pp.9, 10 (40:2–5; 41:5–13)). He saw Delgado as he generally moved south with his vehicle in the direction of Wuthrich and DeLong. (*Id.*, pp.9, 11–12 (40:2–5; 43:13–15, 22–44:5)).

As Bailey moved toward Delgado, he suddenly saw Delgado with what looked like a dark–colored handgun. (*Id.*, pp.14, 16 (58:19–22; 61:2–5); Bailey Dec., ¶17). Delgado pointed it in a southerly direction but Bailey could not determine exactly what Delgado was pointing at.

Page  13 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(*Id.*, ¶¶17, 18; (Caldwell Dec., Ex. 12, pp.14-15, 17 (58:23–59:8; 65:8–18 (pointing it "generally

how people shoot handguns or guns in general"))). He had seen DeLong in a generally southern

direction from Delgado, consistent with where Delgado pointed his weapon. (*Id.*, p.13 (46:8–21);



*see also* p.19 (Ex. 11 to Bailey Depo, excerpt left, marked by Bailey: Delgado general area of movement (D1); DeLong location, south, with a line to (ZD); Bailey position at time of shooting (RB2))).

Bailey believed Delgado was holding a real gun and that when Delgado pointed it south he posed an immediate threat of death or serious bodily injury to not only officers DeLong and Wurthrich, but also the community that was enjoying the park in general. (Bailey Dec., ¶¶19, 21).

### ix.    *Consider Vosu*

Officer Vosu heard a radio call about an individual in the park with a weapon doing quick draws and pointing a firearm. (Caldwell Dec., Ex. 13, p.2 (20:3–10)). When he arrived at the call, DeLong was already engaged with Delgado. (*Id.*, p.3 (21:4–9); Vosu Dec., ¶6). Delgado was noncompliant with DeLong's commands and making aggressive movements and yelling at DeLong. (*Id.*; Caldwell Dec., Ex. 13, p.3 (21:19–23)).

Vosu did not recall coordinating an approach with Ofc. Le and Ofc. Bailey, but he did recall connecting with them at the same location at the time of the shooting. (*Id.*, pp.4, 5 (34:3–10, 21–23, 35:4–9)).

When Vosu first arrived on scene, he did not see anything in Delgado's hands. (*Id.*, p.6 (41:8–19); Vosu Dec., ¶7). Shortly thereafter, Delgado went to the area of his tent, began to

Page  14 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

rummage around, came up, and walked toward Wuthrich and DeLong, then pointed a black Glock–style handgun directly at them. (*Id.*, ¶¶9, 10; (Caldwell Dec., Ex. 13, pp.7–8, 9, 10 (42:19–43:1, 43:12–19; 44:10–12, 24–25; 46:4–5)). Vosu believed Delgado pointed a real gun and could not see an orange tip from his position. (*Id.*, p.11 (48:1–9); Vosu Dec., ¶11). When Delgado pointed the gun at Wuthrich and DeLong he thought Delgado was going to shoot them. (*Id.*, ¶12). He therefore thought Delgado posed an immediate threat of death or serious bodily injury to those officers. (*Id.*, ¶13). He also believed Delgado posed an immediate threat of death or serious bodily injury to the people in the park behind Wuthrich and DeLong. (*Id.*, ¶14).

       **x.**    ***Ken Le***

Officer Le heard a call come in over the radio about a man waiving a firearm in Lents Park, attached to the call, and went to the park. (Caldwell Dec., Ex. 14, pp.2-3 (41:15–42:4); Le Dec.,¶¶4, 5). Ofc. DeLong was on scene when Le responded to the call. (*Id.*, ¶¶5, 8; (Caldwell Dec., Ex. 14, p.3 (42:15)).

When Le arrived, he parked on 92nd near Holgate at the north side of the park. Officer Vosu was parked in the same area when he arrived. (*Id.*, p.4 (45:11–19); Le Dec., ¶6). Officer Bailey showed up shortly thereafter. (*Id.*, ¶9; (Caldwell Dec., Ex. 14, p.5 (46:12–14)). When Bailey arrived, they began to formulate a plan to get closer to Delgado where they were not in the crossfire of Wuthrich and DeLong. (*Id.*, p.6 (47:1–2, 19–22); Le Dec., ¶9).

Le accompanied Bailey, using Bailey's vehicle as a barrier and began to move south along the edge of the park, parallel with 92nd. (*Id.*, ¶10; Caldwell Dec., Ex. 14, p. 7 (51:14–25)). Le had his AR15 out at the time pointed up and not at Delgado. (*Id.*, p.8 (52:9–13, 20–22)).

As they approached, Le could hear Delgado yelling but could not discern what he was yelling. (*Id.*, pp.9–10 (55:25–56:4); Le Dec., ¶7). Le continued to use the vehicle as a barrier and did not address Delgado because Delgado was engaged with Wuthrich and DeLong. (Caldwell Dec., Ex. 14, p.11 (61:17–21)).

/ / /

Page  15 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As they continued to triangulate Delgado "raised his hand up with what looked like a black firearm." (*Id*., p.12 (65:2–4, 19–25); Le Dec., ¶11). He pointed the weapon at Wuthrich and DeLong. (*Id*.; Caldwell Dec., Ex. 14, pp. 13-14 (67:6–7, 13–68:2)). It looked like a real gun in all aspects to Le. (Le Dec., ¶12). When he saw the gun, he told Bailey to stop and then a shot went off. (*Id*., ¶¶15, 16; Caldwell Dec., Ex. 14, p.14 (68:16–17)). Le told Bailey to stop the car because he thought he needed to use his AR to stop Delgado from shooting Wuthrich, DeLong, or other people in the park. (Le Dec., ¶¶14–17). Le believed Delgado represented an immediate threat of death or serious bodily to those people. (*Id*., ¶¶14, 17).

### B.      Delgado's History

There is no evidence that any officer on scene had ever interacted with Delgado before or had any information about him other than he was reported to have been doing quick draws with a gun in Lents Park. There is also no evidence in the record that Delgado had any mental health diagnosis. Plaintiffs admitted the same. (Caldwell Dec., Ex. 15, p.2 (148:19–25)). To the extent anything exists, it relates to his methamphetamine use. There is simply no evidence that on April 16, 2021, Mr. Delgado had any present medical diagnoses.

Ultimately, any diagnosis did not matter as, intoxicated, mentally ill, or completely healthy, when Mr. Delgado pointed a gun at officers, he posed an immediate threat of death or seriously bodily harm. It was then reasonable to use lethal force to protect the officers and community.

### C.      Subsequent Investigation and Discipline

As a starting point, Delgado's shooting was investigated by the Multnomah County District Attorney's Office and presented to a grand jury. After presentation of evidence, the grand jury returned a not true bill, finding DeLong's shooting lawful.[3] The shooting was also investigated through multiple different avenues within PPB. (*See*, *e.g.*, Caldwell Dec., Ex. 19, p.7 (71:3-11)).

---

[3] https://www.mcda.us/index.php/news/grand-jury-returns-not-true-bill-in-april-16-2021-fatal-shooting-by-an-officer-after-joint-presentation-from-the-doj-and-mcda (last visited August 3, 2026); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 80 F. Supp. 3d 1152, 1157 (D. Or. 2015) (court may take judicial notice of press release and contents of website when matters of public record); Fed. R. Evid. 201(b).

Page  16 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Portland Police Bureau Directive 1010.10 "Deadly Force and In–Custody Death Reporting and Investigation Procedures" was in effect at the time of this incident. (Declaration of Christopher Lindsey (Lindsey Dec.), ¶2). That policy provided that, "It is the policy of the Bureau that uses of deadly force . . . be investigated with the utmost thoroughness, professionalism and impartiality so as to determine whether member actions comport with applicable law and Bureau policies and training." (Lindsey Decl., ¶2; Ex. 16, p.2).

Directive 1010.10 sets forth procedures for on–scene responsibilities, follow–up responsibilities, reporting requirements, involved member responsibilities, supervisor responsibilities, detective division responsibilities, and professional standards division responsibilities. It also has specific requirements for the professional standards division review (commonly referred to as the internal affairs investigation) of every officer involved shooting. The policy requires communication restriction orders ("CROs") for all witness and involved officers immediately following the incident. (*Id.*, p.10 (8)). The CROs "prohibit direct or indirect communications among any and all involved and witness officers regarding the facts of the event." (*Id.* (8.2)). The CROs continue until conclusion of the grand jury proceedings.

PPB's Internal Affairs Unit conducts an internal investigation concurrent with the criminal investigation. (Lindsey Dec., ¶5; Ex. 16, p.9 (6.2)). This administrative review of the incident includes, "the events preceding the use of deadly force, the decision making surrounding the use of deadly force, the management/supervision of the incident, and the events following the use of deadly force to determine whether members actions were consistent with policy and if there are policy deficiencies." (Lindsey Dec., ¶3, Ex. 16, p.9 (6.3)). The internal affairs investigator provides the investigative materials to the appropriate Responsibility Unit ("RU") manager, who drafts "a findings memorandum to determine whether member actions were within policy." (Lindsey Dec., ¶5; Ex. 16, p. 9 (6.8.1)). The RU manager presents these findings to the Police Review Board. (*Id.*).

The results of the internal affairs investigation are presented to the Police Review Board by internal affairs investigators and criminal homicide detectives. (*Id.*). The RU manager

Page  17 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

presents findings to the Police Review Board, which includes a decision–point analysis of the event, as well as findings with respect to each officer's use of force. The Police Review Board, which for officer–involved shootings includes seven members, votes on each finding and makes recommendations to the Chief of Police. (Lindsey Dec., ¶5). The Chief of Police, at his or discretion, makes the final determination for each finding and any discipline. (Lindsey Dec., ¶6).

This has been the policy and procedure for more than 20 years, with multiple revisions since, the most recent in 2018. (Lindsey Dec., ¶7). In that time, the reviews have in fact resulted in out of policy findings related to use of deadly force, with related discipline of multiple officers, including but not limited to firing of multiple officers. (Lindsey Dec., ¶8).

### D.    Training

It is difficult to determine how training may be part of Plaintiffs' claims, but they use the word in conjunction with discipline in their Complaint. (ECF 1, ¶61). Regardless, PPB (and the State) gives extensive and ongoing training to every officer on de-escalation and encountering people exhibiting signs and symptoms of mental illness. (*See* Caldwell Dec., Ex. 17, p.3 (28:12–21); *id*., Ex. 18, pp. 2, 3, 5 (19:10–13; 20:2–8; 39:13–21); *see also*, *e.g.*, *id*., Ex. 19, pp.2, 3, 4, 5-6 (22:7-18; 34:2-19; 35:15-19; 37:24-38:7). In fact, the United States Department of Justice and court mandated monitor, Compliance Officer/Community Liaison ("COCL") had to review and approved all lesson plans for PPB trainings on encountering people in crisis since 2012.[4] (Caldwell Dec., Ex. 18, pp.4, 6–7, 9 (29:18–25; 51:24–52:2; 97:6–7 ("COCL didn't have any concerns with our training")).

Further, PPB has a robust review and screening process before allowing an officer to enter ECIT, a voluntary, uncompensated, higher level of crisis training, as well as to evaluate officers once they become ECIT. (Caldwell Dec., Ex. 17, pp.2, 4–5 (24:3–17; 30:5–31:6)).

### III.    LEGAL STANDARD

Fed. R. Civ. P.56(a) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to summary judgment as a matter of law. *See*

---

[4] *See* https://www.justice.gov/archives/opa/pr/justice-department-and-city-portland-ore-reach-preliminary-agreement-reforms-regarding (last visited August 3, 2026).

Page  18 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Addison v. City of Baker City*, 258 F. Supp.3d 1207, 1215 (D. Or. 2017) (citing Fed. R. Civ. P.56(a)). "The moving party has the burden of establishing the absence of a genuine dispute of material fact." *Addison*, 258 F. Supp.3d at 1215 (citing *Celotex Corp.v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party shows the absence of a genuine issue of material fact, the party opposing summary judgment "may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Sereno–Morales v. Cascade Food Inc.*, 819 F. Supp.2d 1148, 1150 (D. Or. 2011) (quoting *Celotex*, 477 U.S. at 322). A plaintiff opposing a properly supported motion for summary judgment "may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving" the elements of his or her claim. *Crawford–El v. Britton*, 523 U.S. 574, 600 (1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which she bears the burden of proof at trial, summary judgment must be granted." *Hicks v. City of Portland*, No. CV 04–825–AS, 2006 WL 3311552, at *4 (D. Or. Nov. 8, 2006) (citing *Celotex*, 477 U.S. at 322–23).

In a police excessive force case, the plaintiff bears the burden of proving the force used was unreasonable. *See Arpin v. Santa Clara Valley Transp.Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("Because [plaintiff] failed to meet her burden of proof of providing specific facts to show that the force used was unreasonable . . ., the district court did not err in granting summary judgment to the [defendants] on [plaintiff's] claim of unreasonable force."). The plaintiff

Page  19 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

similarly has the burden of proving the additional required elements of a *Monell* claim. *See Smith v. City of Los Angeles*, 686 F. App'x 509 (9th Cir. 2017) (explaining that for a *Monell* claim, Plaintiff must identify the policy, practice, or custom and has the burden of proof); *Martinez v. City of Los Angeles*, No. 2:23–cv–09491–SVW–SK, 2024 WL 4438889, at *19 (C.D. Cal. June 20, 2024) (explaining Plaintiff's burden of proof with respect to her *Monell* claim). A Fourteenth Amendment Claim requires a plaintiff prove more than required under the Fourth Amendment. *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022).

In a case like this one, where the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). It is not the task of the district court "to scour the record in search of a genuine issue of triable fact." *Jimmie's Limousine Service, Inc. v. City of Oakland*, No. C 04–03321 WHA, 2005 WL 2000947 (N.D. Cal. Aug. 18, 2005), *aff'd*, 252 *F. App'x* 847 (9th Cir. 2007) (quoting *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996)). Instead, the nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. (*Id.*).

## IV.    ARGUMENT

Mr. Delgado disobeyed multiple commands and force warnings on April 16, 2021. Instead, he went to his tent, grabbed a gun, and pointed it at officers. Delgado created the situation that required use of force. All officers and civilians that saw Mr. Delgado point the gun had the present objectively reasonable belief, and fear, that he represented an immediate threat of death or serious bodily injury. Therefore, when Officer DeLong fired, his use of force was reasonable, justified, and did not violate Delgado's Fourth Amendment Rights. Further, there is no precedent that would suggest Officer DeLong's use of force violated a clearly established right, so DeLong is entitled to qualified immunity. In addition, the City extensively trains its officers on encountering people with mental illness and de-escalation. It also comprehensively investigates all uses of force by officers, with particularly high scrutiny given to lethal force incidents, and disciplining officers when

Page  20 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

appropriate. Plaintiff cannot offer any evidence that any such prior investigation was lacking, much less any related legal finding of a violation of the Fourth Amendment through lethal force. Further, Officer DeLong made a snap judgment in an escalating situation pursuant to a law enforcement objective and therefore did not violate Skyler Delgado's Fourteenth Amendment Rights.

### A.    Officer DeLong's Use of Force Was Reasonable.

Officer DeLong's use of force against Delgado was objectively reasonable as a matter of law and therefore did not violate Mr. Delgado's Fourth Amendment right against unreasonable seizure. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

The Fourth Amendment allows police officers to use reasonable force in carrying out law enforcement duties. *See Graham*, 490 U.S. at 396. A claim for excessive force under the Fourth Amendment requires consideration of "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Id.* at 397; *see also Glenn v. Wash. Cty.,* 673 F.3d 864, 871 (9th Cir. 2011). Significantly, police officers are not "required to use the least intrusive degree of force possible" if the force used was reasonable. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). And "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.

Fundamentally, reasonableness involves balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1 (1985)). Such an inquiry requires the Court to answer "whether the totality of the circumstances justified" the use of force. *Garner*, 471 U.S. at 9. An excessive force claim is analyzed in three steps. *Glenn,* 673 F.3d at 871. First, the Court evaluates the gravity of the intrusion with reference to "the type and amount of force inflicted." *Id.* Second, the Court identifies the government's interests that were furthered by the use of force. *Id.* In the final step, the Court balances "the gravity of the intrusion on the individual against the government's need

Page  21 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

for that intrusion." *Id.* (quoting *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

There are three primary *Graham* factors courts consider when evaluating the government's interest: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to escape." *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (citing *Graham*, 490 U.S. at 396). The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). Whether a use of force was reasonable depends on the unique facts of each case and "must embody allowance for the fact that police officers are often forced to make split–second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Only information known to an officer at the time of the officer's conduct is relevant to the analysis. *City of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017); *Glenn v. Wash. City*, 673 F.3d 864, 873 n. 8 (9th Cir. 2011).1013 (quoting *Glenn*, 673 F.3d at 872).

"The threshold question at the summary judgment stage of whether an officer's actions were objectively reasonable under the Fourth Amendment is 'a pure question of law,' not a question of fact reserved for a jury." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 800 (9th Cir. 2014) (quoting *Scott v. Harris*, 550 U.S. 372, n.8 (2007)).

### i.      *Delgado Represented an Immediate Threat.*

DeLong did not use lethal force until Delgado pointed his gun at him. Then, DeLong utilized lethal force to protect himself, Wuthrich, and the people in the park behind him. The "case law is clear that when a suspect reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the Constitution." *Sabbe v. Washington Cnty. Bd. of Commissioners*, 84 F.4th 807, 828 (9th Cir. 2023). *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) ("Where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."). Thus, "[t]he key issue ... is whether a reasonable

Page  22 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

jury would necessarily find that [an officer] perceived an immediate threat of death or serious physical injury at the time" the officer used deadly force. *Gonzalez*, 747 F.3d at 794. "All determinations of unreasonable force 'must embody allowance for the fact that police officers are often forced to make split–second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Graham*, 490 U.S. at 396–97). "[O]fficers need not employ the least intrusive means available [] so long as they act within a range of reasonable conduct." *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (quoting *Hughes v. Kisela*, 841 F.3d 1081, 1085 (9th Cir. 2016), *overruled on other grounds by Kisela v. Hughes*, 584 U.S. 100 (2018)).

Under similar situations to those here, the Ninth Circuit has found it objectively reasonable to view an individual like Delgado as an immediate threat. *See Sabbe*, 84 F.T 828 (noting that, "[w]hen a suspect is armed–or *reasonably suspected of being armed*, even a furtive movement can create an immediate threat sufficient to justify the use of deadly force") (citing *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)) (emphasis added); *see also Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) (noting that, where a suspect is engaged in "dangerous and erratic behavior" and police reasonably believe he is carrying a gun "[i]t would be unquestionably reasonable for police to shoot a suspect in [the decedent]'s position if he reaches for a gun in his waistband, or even if he reaches there for some other reason"); *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 618 (9th Cir. 2023) (noting that "the Constitution even allows for officer's action that resulted from a reasonable 'mistake of fact'" and finding that the "officers' mistaken belief that [the suspect] possessed a dangerous weapon was reasonable and they were justified in the use of deadly force when he pointed it at them").

While in the context of a 12(b)(6) motion, the *Strickland* case is particularly informative about the immediate threat analysis here. That case was decided two years after the events at issue in this case. Strickland involved a mentally ill homeless man. Notably, he had multiple actual

Page  23 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

mental health diagnoses and law enforcement was aware of the diagnoses; they "had held him in custody [] several times before." *Strickland*, 69 F.4th at 618. A report came in of a man with a gun walking down the street. *Id.* Responding officers "recognized Strickland and knew he was homeless with mental health issues and had been released from custody days before." *Id.* Nonetheless, when those officers encountered him, they surrounded him with vehicles and "immediately began yelling at Strickland to 'drop the gun!' and 'drop the fucking gun!'" *Id.* Stickland told them it was a bb gun and tapped on it making a noise that sounded more plastic than metal. *Id.* He also showed them the orange tip on the gun, which the officers acknowledged seeing. *Id.*

The officers did not call a supervisor, request officers with more crisis training, bring in a negotiator, de-escalator, or mental health professional. *Id.* They closed in on him with weapons drawn. *Id.* Strickland then lowered the gun toward the officers and three officers fired on him. *Id.*

In evaluating the reasonableness of the force, the court noted that officers knew he was homeless and mentally ill and "it was obvious that he was suffering from a mental health crisis." *Id.* at 20. The court also noted that there was no report Strickland had brandished the gun. *Id.* It further found no de-escalation techniques were used and that officers may have exacerbated by immediately yelling at him. *Id.* With the use of lethal force the court found the bulk of the *Graham* factors benefited Strickland. *Id.*

The court further found the "officers met a 'tense, uncertain, and rapidly evolving' circumstance when they confronted Strickland." *Id.* at 621. They repeatedly told him to put down the gun and he did not. *Id.* He then pointed it at the officers. *Id.* The whole incident lasted three minutes. *Id.* The court held:

> The pivotal moment occurred when Strickland began pointing the replica gun in the officers' direction. At that point, they had probable cause to believe that Strickland posed a significant threat of death or serious physical injury to themselves and it became objectively reasonable for them to use lethal force. As we've said, when a suspect points a gun in the direction of officers, they would be justified to use deadly force.

/ / /

Page  24 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This analysis doesn't change because the weapon turned out to be a replica given the officers' reasonable belief that Strickland possessed a real firearm. They were called to the scene based on reports of a man walking down a residential street with what appeared to be a shotgun. When officers arrived, they saw Strickland armed with the black replica gun—as with all replicas, it was presumably intended to look like a real firearm.

* * *

In the light most favorable to Strickland, he was carrying a replica gun, disregarded multiple warnings to drop it, and pointed it at the officers. While the misidentification of the replica gun adds to the tragedy of this situation, it does not render the officers' use of force objectively unreasonable.

They were not required to "delay their fire" until they learned whether the gun was real.

*Id.* at 621– 623 (citations omitted). The court concluded the use of lethal force was objectively reasonable. *Id.* at 623.

The situation officers encountered with Delgado, while incredibly similar to *Strickland*, are also significantly distinguishable. The similarity lies in the fact that both scenes unfolded over approximately three minutes after making contact before a replica gun was pointed at officers. (*See* Caldwell Dec., Ex. 20). The similarities end there. First, Delgado had no diagnosed mental health condition. Second, even if he did, no officer on scene, and in particular DeLong and Wuthrich, had ever seen or interacted with Delgado before. Third, while initial reports noted Delgado was not threatening anybody, DeLong, and through him other officers, found out that he had been brandishing a gun in the park. Fourth, when DeLong first approached Delgado he did so in a calm and casual manner. While Hernandez's video only captures the last 44 seconds of the interaction, DeLong can still be seen attempting softer speech in addressing Delgado. (Caldwell Dec., Ex. 5). Fifth, DeLong in fact employed de-escalation techniques, maintained distance and cover, and did not move in. Sixth, consistent with de-escalation, DeLong actively attempted to bring in additional resources to support the situation. Seventh, DeLong and Wuthrich did not move in but continued to tell Delgado to drop his gun and surrender. Eighth, no officer had any reason to believe the gun was not real – nobody saw an orange tip. Officers Bailey, Vosu, and Le all believed Delgado posed an immediate threat to not only Wuthrich and DeLong's lives, but the lives of those

Page  25 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

behind them in the park. The former firearms instructor, Naas, believed Delgado was going to shoot DeLong or the bicyclists behind him. Officer Le prepared to use lethal force against Delgado due to his fear of Delgado causing death or serious bodily harm. At the same time, DeLong and Wuthrich made the same decision that lethal force was necessary.

Delgado represented an immediate threat of death or serious bodily injury so, like in *Strickland*, DeLong's use of lethal force was reasonable.

### ii.    *Delgado Attempted a Serious Crime*

The fact that Delgado wielded a fake gun does not negate that he engaged in a serious crime. *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 919 (9th Cir. 2024) ("that the weapon turned out to be plastic has no bearing on the severity of the crime because the officers on the scene reasonably believed it was real."). Killing a police officer while they perform their official duties constitutes murder in the first degree, a Class A felony. ORS 163.107(1)(g)(a). Manslaughter in the first degree, a Class A felony, is an available charge when a person, recklessly commits a homicide or, under the influence of extreme emotional disturbance, intentionally commits a homicide. ORS 163.118(1)(a), (b). A person commits the crime of assault in the first degree, a Class A felony, if the person intentionally causes serious physical injury to another by means of a deadly or dangerous weapon. ORS 163.185(1)(a). Attempted murder, manslaughter, or assault in the first degree are Class B felonies. ORS 161.405(2)(b) ("An attempt is a: (b) Class B felony if the offense attempted is a Class A felony."); *see*, *e.g.*, *State v. Smith*, 21 Or. App. 270, 276 (1975) ("An unsuccessful attempt to cause intended physical injury is an attempted assault."). All officers had grounds to believe that if Delgado was allowed to pull the trigger, he would have committed any of the above crimes.

### iii.    *Delgado Refused to Comply*

Under the case law, Delgado's understanding of officer instruction and refusal to comply with the same, fulfills the *Graham* factor of "actively resisting arrest or attempting to evade arrest by flight." *Napouk*, 123 F.4th at 920 (so stating).

Page  26 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### iv.    *More Warnings and Less Force Was Not Feasible.*

Delgado received force warnings, instruction to put down his gun, and surrender. Wuthrich had less lethal force as an option but was not at an effective range. The moment Mr. Delgado pointed his gun at the officers there was no time for any more tactics other than DeLong's use of force–his degree of resistance had increased to the level of an attack on officers. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015). Officers Le would have used lethal force at that point, but he was still moving.

### v.    *Any Mental Health or Intoxication Was not Material.*

Delgado had no current medical diagnoses, mental or otherwise. In any case, the Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals." *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010). When police use deadly force against a person who presents an immediate threat of serious injury or death to others, the presence of emotional disturbance does not reduce the governmental interest in using deadly force. *See Sheehan*, 135 S. Ct. at 1775; *Lal v. California*, 746 F.3d 1112, 1117-118 (9th Cir. 2014). Based on the foregoing, DeLong's use of force was objectively reasonable and required under the circumstances to stop the perceived immediate threat of Delgado shooting officers or community members. That force was constitutional and for that reason alone the Court should grant Summary Judgment as to all Claims.

### B.    Officer DeLong is Entitled to Qualified Immunity.

"In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Estate of Lopez*, 871 F.3d at 1005 (quoting *Lal*, 746 F.3d at 1116). Here, as discussed above, Officer DeLong did not violate Mr. Delgado's constitutional rights, and that ends the inquiry. However, even if there were a Fourth Amendment violation–there was not–there was no clearly established right, based in existing precedent, that would have apprised Officer DeLong that his actions were unreasonable.

Page  27 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Supreme Court emphasized that qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citations omitted). "To be clearly established, a legal principle must have a sufficiently clear foundation in then–existing precedent. The rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (citations omitted). "[I]t is not enough that the rule is suggested by then–existing precedent." *Id.* The Supreme Court has repeatedly warned lower courts against denying qualified immunity to officers responding to unique and challenging situations, explaining that "qualified immunity is important to 'society as a whole,' and because as 'an immunity from suit,' qualified immunity 'is effectively lost if a case is erroneously permitted to go to trial.'" *Pauly*, 137 S. Ct. at 551 ("In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases."); *see also Sheehan*, 135 S. Ct. at 1774, n.3 (collecting cases); *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019); *Kisela*, 138 U.S. at 104.

"Before a court can impose liability on [defendants], [it] must identify precedent as of . . . the night of the shooting–that put [defendants] on clear notice that using deadly force in these particular circumstances would be excessive." *S.B.*, 864 F.3d at 1015. "General excessive force principles" are not enough outside of the obvious cases. *Id.* "Instead, [the court] must 'identify a case where an officer acting under similar circumstances as [defendant] was held to have violated the Fourth Amendment.'" *Id.* at 1015–16 (quoting *Pauly*, 137 S. Ct. at 552). The Supreme Court again emphasized that "[e]xcessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 584 U.S. at 104; *Zorn v. Linton*, 607 U.S. ___, 146 S.Ct. 926, 93 (2026) (per curium).

Finally, "the clearly established right must be defined with specificity." *Emmons*, 139 S. Ct. at 503. "Such specificity is especially important in the Fourth Amendment context, where the

Page  28 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Just recently the Supreme Court reinforced the specificity requirement in *Zorn*, noting that general principals against use of force are not sufficient and emphasized that there must be a case within the Circuit that provides such a "high degree of specificity," that no officer would be unaware of the unlawfulness of such force. 607 U.S. ___, 146 S. Ct. at 930; *see also Smith v. Scott*, --S. Ct.--, 224 L. Ed. 2d 493 (Apr. 20, 2026) (vacating and remanding Ninth Circuit denial of QI for lack of sufficient specificity per *Zorn*).

The *Strickland* case discussed above, decided two years after the events at issue here, demonstrate that not only was DeLong's use of force reasonable, and thus not violative of any right, but also that Delgado had no clearly established right in being free from that force. *Napouk*, decided more than three years later, is also informative. 123 F.4th 906 (9th Cir. 2024).

In *Napouk,* police responded to a two 911 calls, the second reporting a man in the street with a machete. *Id*. at 912. Two officers approached Napouk separately without communicating with each other first. *Id*. at 913. When they encountered Napouk, they gave him commands to drop what he was holding and otherwise tried to convince him to comply. *Id*. They also called for reinforcements. *Id*. Napouk did not comply with their commands and told them to go away. *Id*. Both officers told Napouk that they would shoot him and he responded, "you have to" and "I know." *Id*. He continued to approach the officers and when he was about nine feet away, they both shot him multiple times. *Id*. at 914. What the officers believed was a machete was a plastic toy. *Id*.

The *Napouk* court cited to *Strickland* for the premise that "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of an immediate threat, and in those situations courts will not hold that they have violated the Constitution." *Id*. at 915. The court also noted that multiple other witnesses described Napouk holding a weapon. *Id*. The court ultimately held that the officers' mistake about the toy was not unreasonable. *Id*. at 916. The

Page  29 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

court stated, "[w]ith the mistake of fact addressed, this becomes a straightforward case" and found that Napouk posed an immediate threat at the time the officers used lethal force and therefore the force was reasonable. *Id*. at 919.

Like in *Strickland* and in *Napouk*, the mistake of fact as to the gun Delgado had was reasonable for an officer on the scene at the time. The use of force was therefore reasonable: DeLong did not violate Delgado's rights, and Delgado had no clearly established right to be free from such force. Because he neither violated Delgado's Fourth Amendment rights, nor were the violations Plaintiffs' allege clearly established, Officer DeLong is entitled to qualified immunity.

**C.    Plaintiffs Cannot State a *Monell* Claim.**

"To state a *Monell* claim, a plaintiff must establish: (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy, custom, or practice; (3) that the policy, custom, or practice amounted to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy, custom, or practice was the moving force behind the constitutional violation." *Sternberg v. Town of Danville*, 2015 WL 9024340, at *3 (N.D. Cal. Dec. 16, 2015) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (showing factors)).

As an initial and dispositive matter, Officer DeLong did not deprive Mr. Delgado of a constitutional right. On that basis alone, the Court should dismiss Plaintiffs' *Monell* claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

However, Plaintiffs similarly lack evidence to demonstrate that the City had a policy, custom, or practice amounting to deliberate indifference to Mr. Delgado's rights, which *caused* the alleged constitutional violation. In the context of *Monell*, municipal liability can arise from: "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

Page  30 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The gravamen of Plaintiffs *Monell* claim appears to be that the City's investigation and review of officer involved shootings is deficient. They cite a number of incidents in their Complaint as apparent support for their claims. (ECF 1, ¶¶41, 42). None of those in fact support their claims.

Beginning with Plaintiffs' reliance on the Campbell incident, it exemplifies how Plaintiffs cannot support their underlying *Monell* allegations. In Campbell, the officer was found out of policy and fired by PPB. PPB refused to reinstate the officer pursuant to arbitrator decision and took the challenge to the court of appeals. *Portland Police Ass'n v. City of Portland*, 275 Or. App. 700, 702 (2015) ("Portland Chief of Police Michael Reese terminated Frashour's employment with the city, concluding that Frashour had violated the Portland Police Bureau's policies on use of force, specifically City Policies 1010.10 (Deadly Physical Force)."). This result is in direct contradiction to their allegations–there was a meaningful review that led to the firing of a police officer.

As to Plaintiffs' other exemplars, they can provide nothing to show than any of the alleged uses of force were unconstitutional. Nor can they show a lack of discipline related to any shooting. As provided above in the Campbell case and §II(C), *supra*, the review process has resulted multiple times in discipline, including firings. (*See* Lindsey Dec., ¶8). Not only that, but each additional exemplar cited by Plaintiffs occurred between five to 15 years before the 2012 DOJ agreement, which led to a significant change in PPB polices, practices, and trainings. Once again, those trainings were all subject to U.S. DOJ and COCL review and approval. Even if there was a pattern or practice at the time of the exemplar shootings, the U.S. District Court and the DOJ required a change to PBB "policies, practices, trainings, and supervision."[5]

In fact, this Court found, during much of the same period as alleged here, that there was no such deficiency and denied similarly unsupported claims, holding:

> PPB has a detailed written policy for investigating every use of deadly force, and the unrefuted evidence in the record suggests that PPB carries out that policy by thoroughly investigating each use of deadly force by its officers.

---

[5] *See* https://www.justice.gov/sites/default/files/crt/legacy/2013/11/13/ppb_proposedsettle_12-17-12.pdf (copy of settlement agreement with U.S. DOJ in 3:12-cv-02265-SI); https://www.justice.gov/archives/opa/pr/justice-department-and-city-portland-ore-reach-preliminary-agreement-reforms-regarding (last visited August 3, 2026).

Page  31 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Elifritz v. Fender*, 460 F. Supp.3d 1088, 1119 (D. Or. 2020) (evaluating whether PPB fails to investigate deadly force incidents). None of Plaintiffs' historical references support their claims and it is well documented in this Court that the City has shifted its policies, training, and approach to dealing with people experiencing mental health issues. Plaintiffs' *Monell* claims must fail on these bases alone.

Defendant also brought a Fed. R. Evid. 702 motion to exclude the testimony of Jason Renaud. (ECF 54). Even if the Court denies that motion, neither Renaud's report nor testimony support a *Monell* claim. Leaving aside the fact that approximately half of his list of uses of force came before the U.S. DOJ began to review and approve all trainings and monitor uses of force, he does not distinguish between PPB uses of force and that by other law enforcement entities. (*See* Caldwell Dec., Ex. 21, pp.4– 14). Further, he provided no evidence, nor can he, that anything on his list of uses of force, by whoever, resulted in any tribunal or other legal institution finding a violation of any constitutional rights. Relatedly, he provides no evidence that any incident had improper review, investigation, or determination of fact. Plaintiffs' *Monell* claims must therefore fail.

**D.      DeLong did not Interfere with Plaintiff's Familial Relationship.**

Plaintiff Skyler Delgado's third claim alleges that officers deprived him of individual constitutional rights by depriving him of a familial relationship with his father. (ECF 1, ¶¶63–68). The Ninth Circuit recognizes certain family members have standing to pursue §1983 claims on behalf of relatives killed by law enforcement. *Moreland v. Las Vegas Metro Police Dep't.,* 159 F.3d 365, 370. To prevail on a familial association claim, a plaintiff must show the defendants engaged in behavior "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience." *Hanington v. Multnomah Cnty.*, 593 F. Supp. 3d 1022, 1043 (D. Or. 2022) (citation omitted). A Fourteenth Amendment substantive due process claim requires more than for a Fourth Amendment claim. *Ochoa*, 26 F.4th at 1056. Because of the "more demanding standard," it is possible to succeed on a Fourth Amendment excessive force claim and fail on a Fourteenth Amendment claim based on the same facts. *See Ochoa,* 26 F.4th at 1057.

Page  32 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

There are two tests used to decide whether an officer's conduct "shocks the conscience." Courts decide which test to apply by "ask[ing] 'whether the circumstances are such that actual deliberation by the officer is practical.'" *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir.2008)). The two tests are the "deliberate indifference" test and the "purpose-to-harm" test.

The "deliberate indifference" test is the less demanding of the two and applies if the situation at issue "evolve[d] in a time frame that permits the officer to deliberate before acting." *Porter*, 546 F.3d at 1137. Deliberation is not possible if the officers "encounter[ed] fast paced circumstances presenting competing public safety obligations." *Id.* at 1139. Deliberation in this context "should not be interpreted in the narrow, technical sense." *Wilkinson*, 610 F.3d at 554.

On the other hand, the "purpose-to-harm" test applies if the situation at issue "escalate[d] so quickly that the officer [had to] make a snap judgment." *Porter*, 546 F.3d at 1137. This test requires "a more demanding showing that [the officers] acted with a purpose to harm [the decedent] for reasons unrelated to legitimate law enforcement objectives." *Id.* Legitimate objectives can include "arrest, self-protection, and protection of the public." *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018). Illegitimate objectives include "when the officer 'had any ulterior motives for using force against' the suspect, such as 'to bully a suspect or 'get even,'" "or when an officer uses force against a clearly harmless or subdued suspect." *Id.* (citations omitted) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 798 (9th Cir. 2014)).

This case involves the "purpose to harm standard" based in part on the fact DeLong had to make a split-second decision when Delgado suddenly and unexpectedly produced the gun. *See Jones v. Las Vegas Metro Police Dept.,* 873 F.3d 1123, 1132-33 (9th Cir. 2017) (purpose to harm standard applies where "officers must react to rapidly changing situation"; *Wilkinson*, 610 F.3d at 554 (9th Cir. 2010) (noting five-minute interaction made actual deliberation not practical). In addition, DeLong noted that he wanted a peaceful resolution and only fired for his self-protection and the protection of people in the park. *Foster*, 908 F.3d at 1211. There is no evidence DeLong

Page  33 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

had any ulterior motives, wanted to bully, or otherwise harm Delong for a non-law enforcement purpose. This Claim should fail as well.

## **CONCLUSION**

Based on the foregoing, Defendants respectfully request the Court grant their Motion for Summary Judgment and dismiss all of Plaintiffs' claims with prejudice.

DATED: August 4, 2026.

Respectfully submitted,


*/s/ Carey Caldwell*
Carey Caldwell, OSB #093032
Deputy City Attorney
carey.caldwell@portlandoregon.gov
Of Attorneys for Defendants

Page  34 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT