Juan Chavez, OSB #136428
Hannah Bland, OSB #252404
Walter Fonseca, OSB #136349
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Tel: 503-944-2270
Fax: 971-328-3982

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| SKYLER DELGADO, in his capacity and as personal representative of the Estate of Robert Delgado; ROBERT DELGADO, deceased,<br><br>Plaintiff,<br>v.<br><br>CITY OF PORTLAND, ZACHARY DELONG, and JOHN DOES 1-5,<br><br>Defendants. | Case No. 3:23-cv-00529-AR<br><br>PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTINON FOR SUMMARY JUDGMENT |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... 4
I. INTRODUCTION .......... 6
II. SUMMARY OF FACTS .......... 6
a. Delgado Had a Long Medical and Anecdotal History of Mental Illness .......... 6
b. DeLong's Desire for Self-Sufficiency Was Detrimental to His Policing .......... 9
c. Witnesses to Delgado's Behavior Did Not Find Him Threatening .......... 11
d. ECIT Training Urges Use of Deescalation Techniques .......... 13
e. DeLong Escalated Without a Plan, Contrary to His ECIT Training .......... 14
f. Witnesses Provided Contradicting Statements .......... 19
i. Non-Officer Witnesses .......... 19
ii. Officer Witnesses .......... 23
g. "Not My Job": The City Has a Pattern of Institutional Review Failures .......... 26
i. Homicide Review .......... 26
a. Missing Bullet .......... 28
b. Omitting the Lehrmans .......... 29
c. Selective Interpretation of Delgado and DeLong's Actions .......... 31
d. Poor Investigation and Scene Management .......... 32
ii. Training Review33
a. No Training Review .......... 33
b. Suggestions Never Made .......... 36
c. Belittling City's Settlement Agreement with USA .......... 37
d. Report to Nowhere .......... 37
iii. The ECIT Program Lead .......... 38
a. No Lessons Learned .......... 40
b. The City's Response Is Always "It Depends" .......... 40
h. A History of Unaddressed Violence .......... 41
III. STANDARDS OF LAW .......... 48
a. Summary Judgment .......... 48
b. Excessive Force .......... 49
c. Qualified Immunity .......... 50
IV. ARGUMENT .......... 52
a. Defendants' Use of Deadly Force was Unreasonable. .......... 53
b. Viewing the facts in the light most favorable to plaintiff, the Graham factors weigh in plaintiff's favor. .......... 53
i. Mr. Delgado was not an Immediate Threat .......... 53
ii. Mr. Delgado did not commit any serious crimes .......... 55
iii. Mr. Delgado was not actively resisting arrest or attempting to flee .......... 56

iv. Less Intrusive Alternatives and Defendant DeLong's Escalation .................................. 58
v. It should have been apparent that Mr. Delgado was experiencing a mental health crisis 60
b. The Law Was Well Established ........................................................................... 62
c. A Jury Can Conclude the City Has Been Deliberately Indifferent ..................................... 62
d. Shocks the Conscience ..................................................................................... 67
V. CONCLUSION ............................................................................................... 69

# TABLE OF AUTHORITIES

## Cases

*A. K. H by & through Landeros v. City of Tustin*, 837 F3d 1005 (9th Cir 2016) ........................ 49
*Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) ........................................................... 63
*Brosseau v. Haugen*, 543 U.S. 194 (2004) ................................................................................ 52
*Bryan v. MacPherson*, 630 F3d 805 (9th Cir 2010) ............................................................ 50, 60
Caldwell v. City of San Francisco, 2020 WL 7643124 (N.D. Cal. Dec. 23, 2020)...................... 65
*Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)................................................... 63
*Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)..................................................... 62
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................. 48
*Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002) ......................................................................... 51
*Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010)............................................... 62
*Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014)............................................................. 50
*Deorle v. Rutherford*, 272 F3d 1272, 1281 (9th Cir 2001)............................................. 49, 50, 60
*Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) ................................................ 62
*Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614 (9th Cir. 2023) ................................................. 52
Forrest v. Parry, 930 F.3d 93 (3d Cir. 2019)................................................................................. 65
*Franklin v. Foxworth,* 31 F.3d 873 (9th Cir.1994) ....................................................................... 50
*Gibson v. Cnty. of Washoe*, 290 F.3d 1175 (9th Cir. 2002)........................................................... 63
*Glenn v. Washington Cnty.*, 673 F3d 864 (9th Cir 2011) ...................................................... 50, 57
*Graham v. Connor*, 490 U.S. 386 (1989) ........................................................................ 48, 49, 50
*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................................ 50, 51
*Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir 2024)........................................................... 49
*Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997) ............................................................ 64
Hogan v. Franco, 896 F. Supp. 1313 (N.D.N.Y. 1995) .................................................................. 65
*Hope v. Pelzer*, 536 U.S. 730, n. 1, 122 S.Ct. 2508 (2002) .......................................................... 50
*Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019) ................. 62
*Hughes v Rodriquez*, 31 F.4th 1211 (9th Cir. 2022)...................................................................... 48
*Hung Lam v. City of San Jose*, 869 F.3d 1077 (9th Cir. 2017)...................................................... 58
Hunter v. Cnty of Sacramento, 652 F.3d 1225 (9th Cir. 2011) ...................................................... 65
*Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014) .......................................................................... 62
*L.F. by & through Brown v. City of Stockton*, 2020 WL 4043017, (E.D. Cal. July 17, 2020).... 63
*Lockett v. County of Los Angeles*, 977 F.3d 737 (9th Cir. 2020)................................................... 62
*Mattos v. Aragano*, 661 F.3d 433 (9th Cir. 2012)........................................................................... 51
*Napouk v. Las Vegas Metro. Police Dept.*, 123 F4th 906 (9th Cir 2024)............................. 56, 67
*Pearson v. Callahan*, 555 U.S. 223 (2009)..................................................................................... 50
*Rodriguez v. Cty. of L.A.*, 891 F.3d 776 (9th Cir. 2018)................................................................ 63
*Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001) ........................................................ 50
*Taylor v. Riojas*, 592 U.S. 7 (2020) ................................................................................................ 51
*Tennessee v. Garner*, 471 U.S. 1 (1985)......................................................................................... 49
*Tolan v. Cotton*, 572 U.S. 650 (2014)..................................................................................... 50, 51
*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) .......................................................... 63
*United States v. City of Portland*, No. 3:12-cv-02265-SI (D. Or. Dec. 17, 2012)...................... 8, 9
*Velazquez v. City of Long Beach*, 793 F.3d 1010 (9th Cir. 2015) ................................................ 63

*Vos v. City of Newport Beach*, 892 F3d 1024 (9th Cir 2018) ........................................................ 58
*Waid v. County of Lyon*, 87 F.4th 383 (2023)........................................................................ 67
*White v. Pauly*, 137 S.Ct. 548, 551 (2017) ........................................................................ 51

**Other Authorities**

Joanna C. Schwartz, Monell's Untapped Potential, 125 Colum. L. Rev. 925, 948 (2025)........... 65
U.S. Dep't of Justice, Office of Community Oriented Policing Services, Standards and Guidelines for Internal Affairs at 45 (2009) ................................................................ 65

## I. INTRODUCTION

The City of Portland shot and killed a man in a clear mental health crisis against the training and policy of their police bureau. Instead of investigating or even acknowledging the clear deviations from training and policy, the City ratified their officer's actions. This follows a clear pattern from the City. In its defense, the City justifies killing this man by claiming that Mr. Delgado did not have a mental illness, that he was on meth, and that he pointed a replica gun at the officers. This construction omits key facts, including the forensic evidence and witness testimony that contradicted the officer's story and the narrative spun for this Court. On the basis of material facts being in contention alone, a judgment in their favor under Fed. R. Civ. P. 56 is impossible. But the very actions of Officer DeLong, and every officer, supervisor, and city official who covered up for his mistakes, would not warrant a judgment in the City's favor under Fed. R. Civ. P. 56. The Plaintiff humbly asks that this Court denies the Defendants' motion and allow a jury to judge the unreasonableness of Officer DeLong's actions that day.

## II. SUMMARY OF FACTS

### a. Delgado Had a Long Medical and Anecdotal History of Mental Illness

Mr. Delgado's mental health issues were apparent to his family members in the years leading up to his death. His behaviors on the date of his death were consistent with his condition.

In the months preceding April 16, 2021, Robert Delgado's family and medical providers separately documented a marked deterioration in his mental health. His sister, Tina Delgado, observed him standing in a park near her apartment talking to himself and looking up at the sky, appearing "delusional, kind of . . . seeing things or believing he was talking to somebody." T. Delgado Dep. 88:7–13. Within about five months of his death, he told her he was seeing things, and within roughly two months he told her he believed he was being followed. T. Delgado Dep.

88:21–89:6. She urged him to see a doctor and offered to take him herself. He refused, insisting that he was not “crazy” and no one believed him. T. Delgado Dep. 89:17–90:6. His son, Skyler Delgado, described a separate in-person conversation where his father told him he was experiencing hallucinations, appearing visibly distressed before attempting to reassure his son that everything was fine. S. Delgado Dep. 69:6–14; 149:11–18. Skyler testified that to his perception his father was not intoxicated during that conversation. S. Delgado Dep. 149:4–8; 149:19–150:1.

Contemporaneous emergency department records corroborate the family's observations: in August 2020 providers recorded paranoid symptoms, and on December 26, 2020, Mr. Delgado was brought to Providence Milwaukie after being found wandering barefoot in inclement December weather, presenting as paranoid, anxious, and disheveled. S. Delgado Dep. 140:19–141:8; 147:16–21; T. Delgado Dep. 79:10–17. Despite this history, no provider ever diagnosed him with a psychiatric condition, and he was never committed, voluntarily or involuntarily. T. Delgado Dep. 90:17–91:11.

The record establishes that Mr. Delgado’s crisis was fully apparent to trained observers weeks before the shooting, and that those observers found him to present no danger to anyone else. On March 12, 2021, approximately five weeks before his death, Mr. Delgado was evaluated in custody by Patricia Bear, a qualified mental health professional (QMHP). Her subjective note records his chief complaint as the belief that he was “not really in this place,” that his surroundings were “not my reality,” and that he was stuck in another reality that was disrupting his personal timeline. S. Delgado Dep. 156:12–19. Her assessment recorded that he made delusional-based remarks and described in detail a belief system that was not reality-based, and

she deferred diagnosis. S. Delgado Dep. 157:25–158:9. In the same assessment, she concluded that Mr. Delgado "presented [. . .] little to no risk to others," that his delusional thought processes did not increase that risk, and that he "demonstrate[d] no desire and expresse[d] no need to harm others," being instead focused on a fear that some negative event would occur in his own timeline. S. Delgado Dep. 158:10–17.

That is the man officers encountered on the morning of April 16, 2021. Mr. Delgado had been living without stable housing for an extended period—sleeping in parks, in his sister's unlocked car, and, at the time of his death, in a tent. T. Delgado Dep. 88:14–20. His family knew of no firearm he had ever owned, and no replica firearm he had ever purchased. S. Delgado Dep. 169:18–23; T. Delgado Dep. 96:6–19. He had never spoken to his family about suicide, and no one had ever reported to them that he had discussed provoking police into killing him. S. Delgado Dep. 169:24–170:10. Reviewing the record of the encounter, Skyler Delgado testified that his father appeared to be experiencing a mental crisis or breakdown, that he appeared to feel threatened and to want the officers to leave him alone, and that he presented no immediate threat. S. Delgado Dep. 168:11–169:13. Defendants' response to a man in documented psychiatric crisis, occupying a public park alone, was to deploy an officer with an AR-15 who fired two rounds within four minutes of contact. *See* Ex. 1 at 3-4.[1]

As discussed below, City policies regarding approaching subjects in apparent crisis make no distinction between someone under the influence of drugs or in the throes of a mental health crisis. *See* Ex. 2; Vosu Dep. 14:21-25; Le Dep. 24:5-9l; Wuthrich Dep. 111:20–25; Gerritsen Dep. 86:7-87:2; Bryson Dep. 75:12-16; 75:24-76:3. The City's insistence on making a

[1] Unless otherwise noted, all exhibits referenced by number in this brief are attached to the Declaration of Juan C. Chavez. For exhibits filed under seal, those are attached to the Supplemental Declaration of Juan C. Chavez.

distinction here is inappropriate and undermines any potential progress made in the United States consent decree. *See Compl.*, *United States v. City of Portland*, No. 3:12-cv-02265-SI (D. Or. Dec. 17, 2012), Dkt. 1.

**b. DeLong's Desire for Self-Sufficiency Was Detrimental to His Policing**

In the months preceding his deadly encounter with Mr. Delgado, Defendant DeLong had encounters that should have warned the City that Defendant DeLong does not follow his training and creates dangerous circumstances for himself.

DeLong joined the Portland Police Bureau on January 10, 2013. DeLong Dep. Vol. I 38:11–17, 41:6–8; Ex. 3 at 1. He became an AR-15 operator in February 2016 and joined the Enhanced Crisis Intervention Team ("ECIT") in February 2017. DeLong Dep. Vol. I 77:1–4, 97:23–98:12. He sought the AR-15 certification because:

> I also like self-sufficiency as a police officer. I like to have all the tools — as much — as many of the tools and as much of the training as I can so that I can handle my investigations or my calls for service without the help of others.

DeLong Dep. Vol. I 80:25–81:5. He gave the identical answer for ECIT: he joined because of "being self-sufficient," wanting to "handle calls for service with as few resources as possible." DeLong Dep. Vol. I 98:13–19. He added, "I like to show up to all calls." DeLong Dep. Vol. II 16:15. ECIT training is built on the opposite premise. As described below, the crisis-response practices DeLong was taught are cooperative by design: using a cover officer trained in crisis negotiation as the primary communicator, attempting multiple verbal contacts over time, waiting for a Behavioral Health Unit or ECIT supervisor, and employing a coordinated team approach with non-lethal cover before any force is applied. Ex. 4 at 9. An officer whose stated aim is to resolve calls "with as few resources as possible" is oriented against every one of them.

[redacted] the Bureau's Employment Information System ("EIS"), a system that grew out of the City's longstanding settlement agreement with the Federal government meant to end PPB's pattern and practice of excessive force against people in mental health crises. *See Settlement Agreement*, *United States v. City of Portland*, No. 3:12-cv-02265-SI (D. Or. Dec. 17, 2012), Dkt. 4-1, ¶¶ 27, 75(j).

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] He was then asked whether he had *ever* had such a conversation with a supervisor. He answered: "No." DeLong Dep. Vol. II 23:5–18.

**c. Witnesses to Delgado's Behavior Did Not Find Him Threatening**

On the morning of April 16, 2021, Kaela Ingle and her husband, Chase Hagen, were walking their dog near Lents Park. Ingle Dep. 13:20-22; Hagen Dep. 14:2-25. Ms. Ingle noticed something was off because she saw a man pacing near the fenceline with a pile of things on the ground next to him. Ingle Dep. 15:9-17. She knew that homeless people lived at the park, but typically they lived in their cars, not in tents on the grass, which is what made this man noticeable to her. Ingle Dep. 15:9-17. The two continued their walk, crossed the street, and Ms. Ingle looked up to see what the man was doing. Ingle Dep. 18:1-10. She saw him grab something from his pocket and hold "it in the way that you would hold a gun." Ingle Dep. 18:10-15. She saw him drawing the replica gun and pointing it along the fence line of the baseball field. Ingle Dep. 19:15-19. Mr. Hagen describes it more as "quick draws" like a cowboy or like James Bond. Hagen Dep. 15:11-19; 19:12-19. As far as they could see, there was no one in the park towards which he could be pointing the object. Ingle Dep. 19:22-20:3; Hagen Dep. 20:6-10.

Ms. Ingle and Mr. Hagen discussed with each other what they should do, but neither were sure if what the man was holding was a gun. Mr. Hagen said to his wife, "Let's just call the nonemergency, not 911. Let's call nonemergency because I'm not sure [if it is a gun]." Hagen Dep. 18:7-23. Ms. Ingle elaborates that she specifically wanted to call nonemergency not just because they weren't sure if it was a gun but also because the man in the park seemed agitated and she was hoping that Portland Street Response would come handle the situation. Ingle Dep. 34:15-35:5. Portland Street Response is an alternative mobile response service tasked with responding to calls involving people in non-emergency mental and behavioral health crises. Renaud Dec. ¶ 5. The program began in February 2021 but did not expand City-wide until 2022. *Id.* When Mr. Delgado was shot and killed, PSR was operating in the Lents neighborhood, but would not have been dispatched to this call by 911 because the call for service initially cited the presence of a firearm. *Id.* at 6.

Mr. Hagen ultimately calls the nonemergency line and explains that the man in the park was doing quick draws but not pointing it at anyone. Hagen Dep. 19:1-20:13. After he got off the phone with the nonemergency line, Mr. Hagen received a phone call from Defendant DeLong. Hagen Dep. 23:20-23; DeLong Dep. Vol. I 187:7-15. This call lasted about a minute to a minute and a half. Hagen Dep. 23:24-24:5. During this call, Defendant DeLong asked "just general identification questions" and Mr. Hagen relayed the same information he told the nonemergency operator: that the man was wearing a red shirt and black pants, and that he was doing cowboy-style quick draws toward the field but not pointing it at anyone. Hagen Dep. 24:6-18.

DeLong admitted during his deposition that he remembers the dispatch report describing a white male wearing black pants and a red shirt in the park holding a gun in his hand but was *not threatening anybody with it*. DeLong Dep. Vol. I 171:1-4; 174:14-17.

**d. ECIT Training Urges Use of Deescalation Techniques**

Officer DeLong was a certified member of the Portland Police Bureau's Enhanced Crisis Intervention Team, the Bureau's specialized cadre for mental-health calls, and had accumulated roughly 154 hours of related training. PPB Directive 1010.00 defines de-escalation as a "deliberate attempt to prevent or reduce the amount of force necessary to resolve the confrontation," commands that members *shall* use de-escalation techniques when time and circumstances reasonably permit and directs that members "attempt to avoid or minimize the use of force" against people in perceived mental-health crisis. Ex. 2 at 2, 6 (emphasis added). The enumerated techniques expressly include buying time, communicating from a safe position, using distance, cover, and concealment, summoning specialized units such as behavioral health and negotiation, and maintaining one-on-one communication rather than shouting simultaneous commands. *Id.* at 6.

Some examples of statements the Bureau has instructed members to not consider de-escalatory include:

[redacted]

[redacted]

[redacted]

[redacted]

ECIT certification requires a forty-hour course for which officers volunteer. Bryson Dep. 17:6-15; 20:14-24. In theory, the Bureau's accountability processes can prompt "a discussion about decertification." Bryson Dep. 29:14-31:6. Chase Bryson, who was the officer in charge of ECIT training for 13 years and testified on behalf of the City regarding ECIT, was asked whether he had been involved with, or was aware of, anyone losing ECIT certification because of a disciplinary problem or a use-of-force incident involving a person in mental health crisis, Bryson testified, "I've not been a part of removing a certification for those — those reasons, not in my time." Bryson Dep. 32:15-17.

**e. DeLong Escalated Without a Plan, Contrary to His ECIT Training**

In total disregard of his ECIT training, Defendant DeLong once again decided to go it alone as he handled the call for service regarding Mr. Delgado. Mr. Delgado was completely calm until Defendant DeLong rushed up on him with an AR-15 yelling at Mr. Delgado that he was going to "fucking shoot" him.

Defendant DeLong first saw Mr. Delgado when he was "casually" driving to the scene westbound on SE Holgate approaching the intersection with SE 92nd Ave. DeLong Dep. Vol. I

174:19-23; 195:15. While sitting in the turn lane to make a left onto 92nd, Defendant DeLong observed Mr. Delgado just standing in the park, not moving or interacting with anyone, and that his hands were empty. DeLong Dep. Vol. I 177:5-10; 174:24-175:3; 177:16-19; 178:4-12. After about 30 seconds of sitting in the turn lane, he completed the turn onto 92nd. DeLong Dep. Vol. I 177:5-10. Defendant DeLong describes looking at Mr. Delgado while he was sitting in the turn lane as being de-escalation. DeLong Dep. Vol. I 195:15-20. In essence, he "de-escalated" by being observant while driving to the scene.

At this point, the information Defendant DeLong had was: (1) a report that a man in the park wearing a red shirt and black pants doing quick draws, but not threatening anyone, DeLong Dep. Vol. I 187:10-15; 171:1-4; 174:14-17; (2) that additional officers were on the way and those officers would have additional—less lethal—tools, DeLong Dep. Vol. I 196:4-5; Vol. II 51:25-52:11; and (3) that once he saw Mr. Delgado, he observed that the circumstances had changed—Mr. Delgado was no longer wearing a shirt, he was not holding a weapon, and he was "nearly catatonic," DeLong Dep. Vol. I 189:2-3.

The ECIT curriculum described above is based on the idea of using "time as a tactic." But here, that was not a resource Defendant DeLong wanted to use. Defendant DeLong was dispatched to this call at 09:30:32 and he arrived on scene at 09:36:22. Ex. 1 at 3. That roughly six minutes covers the time it took for Defendant DeLong to receive the call, talk to Mr. Hagen on the phone, drive casually to the scene, and observe Mr. Delgado. *See* DeLong Dep. Vol. II 49:19-50:14. The events that follow last just under four minutes as Defendant DeLong ultimately shoots Mr. Delgado at 09:40:15. *Id.* at 4. In total, Defendant DeLong spends approximately ten minutes on this call for service—far from using time as a tactic.

Defendant DeLong's ECIT training also emphasizes that communication is built around a team. [redacted]. Ex. 7 at 4; Ex. 8 at 3. But he didn't want to use that resource either. Even though Defendant DeLong knew other officers were on the way, he did not wait to coordinate with those officers and set up this team. Again, when Defendant DeLong arrived at Lents Park, he knew Mr. Delgado was not threatening anyone, and he described Mr. Delgado's behavior as "nearly catatonic." Time and circumstance clearly allowed for Defendant DeLong to use his ECIT training, which PPB directives require him to do.

Not only did he refuse to wait for the officers that were on the way, he did not even coordinate with the officer he had with him: Officer Wuthrich. Upon arriving at the scene, Officer Wuthrich first engaged with a witness, Mr. Hernandez, to gather information about the situation. Wuthrich Dep. 92:14-18. But Defendant DeLong was already fixated on the "nearly catatonic" Mr. Delgado. Wuthrich Dep. 95:5-9; *See* DeLong Dep. Vol. I 189:2-3. In DeLong's words, "[a]fter watching him for about 30 seconds [while DeLong was sitting in the intersection] and him not moving and I saw that his hands appeared to be empty, I made the decision that that was a good time to try to speak with Mr. Delgado [. . .]. I got out of my car. I retrieved my AR15, kept it out of sight." DeLong Dep. Vol. I 178:4-12. Before Officer Wuthrich could catch up to him, Defendant DeLong was already engaged with Mr. Delgado. Wuthrich Dep. 97:2-4. As described above, Defendant DeLong prides himself on being self-sufficient, handling "calls for service without the help of others" and "with as few resources as possible" DeLong Dep. Vol. I 81:3-5; 98:16-18. All of which is in direct contradiction to the team effort that ECIT requires.

Also in contradiction of his ECIT training, Defendant DeLong's only preparation for this interaction was an AR-15. ECIT requires an officer to "attempt to avoid or minimize use of

force," but without coordinated backup, cover, nor containment, Defendant DeLong's only tool was an AR-15. His plan was to have "a casual conversation" while holding his rifle on Mr. Delgado. DeLong Dep. Vol. I 191:19-192:10.[2] But upon engaging with him, Mr. Delgado, who had been "nearly catatonic," became enraged. DeLong Dep. Vol. I 188:25-189:5. Defendant DeLong even explains that now that he has engaged with Mr. Delgado, he is not capable of dividing his attention to try to get other people to leave the park. DeLong Dep. Vol. I 192:17-25. But by disregarding his ECIT training, Defendant DeLong created a dire situation where he could not, in fact, handle it without the help of others like he wanted.

Officer Wuthrich joined Defendant DeLong at the tree with her handgun out because she still believed that Mr. Delgado was armed. Wuthrich Dep. 100:2-3; 101:21-25. DeLong was actively engaging back and forth with Mr. Delgado. Wuthrich Dep. 102:1-6. Mr. Delgado was pacing, waving his hands in the air, mumbling to himself, "[n]ot really having a conversation with" the police officers. Hernandez Dep. 33:7-8; Wuthrich Dep. 111:1-5. During this overwhelming moment—again in contradiction of ECIT training that expressly discourages shouting simultaneous commands—both Defendant DeLong and Officer Wuthrich were yelling at Mr. Delgado. Ex. 10 at 0:00-0:41; Ex. 8 at 6; Ex. 2 at 6. The shouting included Defendant DeLong yelling "if you reach for a gun I'm going to fucking shoot you." DeLong Dep. Vol. I 199:1-2; 199:7-13.

During his deposition, Defendant DeLong was asked if at any point he considered switching to a different kind of weapon. He responded, "[t]hat thought did not enter my mind."

---

[2] Although at certain points during the interaction, Defendant DeLong held his rifle behind his vehicle or behind the tree, he has "no way of knowing" whether Mr. Delgado saw his weapon but notes that Mr. Delgado's behavior did not change between when the weapon was visible compared to when Defendant DeLong held it behind another object. DeLong Dep. 194:6-14. Regardless of whether Defendant DeLong thinks he effectively hid his rifle out of Mr. Delgado's view, "[v]ery early on" in the interaction, Defendant DeLong shouted that he was "going to fucking shoot" Mr. Delgado. DeLong Dep. Vol. II 7:8-11. Whether the AR-15 was hidden is immaterial given that telling Mr. Delgado he was "going to fucking shoot" implies that Defendant DeLong had a weapon.

DeLong Dep. Vol. I 200:23-201:4. But the thought certainly entered Officer Wuthrich's mind. After Mr. Delgado had started pacing, Officer Wuthrich could tell that he did not have a handgun in his waistband, so she ran back to Defendant DeLong's car and grabbed his 40-millimeter launcher. Wuthrich Dep. 108:11-17. A 40-millimeter launcher is considered a "less lethal" tool. Wuthrich Dep. 19:10-15. Officer Wuthrich believed that because Mr. Delgado was pacing, he might try to run up on them and try to fight them, and in that situation, a 40-millimeter launcher would be the correct tool to use. Wuthrich Dep. 108:18-23. She communicated to Defendant DeLong that she was going to get the—more appropriate—40-millimeter launcher and she believes that he acknowledged he heard her. Wuthrich Dep. 108:24-109:3. But Defendant DeLong was so fixated that he was not aware that she retrieved the 40-millimater until after the shooting. DeLong Dep. Vol. I 201:22-24. When she returned to the tree, she continued to try to coordinate with Defendant DeLong and told him that if Mr. Delgado comes too close, she would "40 him." Wuthrich Dep. 109:21-110:4.

Even though Officer Wuthrich had recognized that the circumstances had changed enough for her to holster her handgun and retrieve a less lethal weapon and she had tried to coordinate with Defendant DeLong, he was still locked in on Mr. Delgado with his AR-15. Despite Officer Wuthrich's efforts to try to coordinate with Defendant DeLong, he did not coordinate with her. *See generally* DeLong Dep. Vol. I 209:23-211:17. There was no discussion about trying to disengage with Mr. Delgado nor a discussion about bringing in a member of the crisis negotiation team. Wuthrich Dep. 113:17-22.

While Mr. Delgado is pacing, he is mumbling to himself, not really having a conversation with the officers. Wuthrich Dep. 111:1-5. Regardless of whether Defendant DeLong and Officer Wuthrich thought Mr. Delgado was on drugs or having a mental health crisis, the two situations

present similar behaviors and de-escalation would be the same in both situations. Wuthrich Dep. 111:15-25; Ex. 2 at 6-7.

From here, the story varies significantly between the witnesses and will be discussed in turn.

**f. Witnesses Provided Contradicting Statements**

Nine people witnessed the shooting and the moments leading up to it, each recounting a different series of events. These witnesses can be divided into two categories: non-officer witnesses and officer witnesses.

**i. Non-Officer Witnesses**

There were four percipient witnesses in and around the park who witnessed the shooting. Starting with the individuals who were closest to the shooting; David Hernandez was in the parking lot of Lents Park recording the interaction between Mr. Delgado and Defendant DeLong on his cell phone. Hernandez Dep. 21:11-13; 68:11-12; *See generally* Ex. 10. Earlier in the day, Mr. Hernandez had seen what he thought was a gun sticking out of the lapel of Mr. Delgado's jacket. Hernandez Dep. 22:20-23. During this earlier interaction, Mr. Hernandez described Mr. Delgado as being "dressed up nice." *Id.* Mr. Delgado had a tent that was broken down and his stuff was "strewed around" by the fence. Hernandez Dep. 62:2-6. Mr. Hernandez was still in the parking lot when the police arrived, and he described the interaction as follows:

> When the police pulled up, I'm going into what I saw, not what you guys saw from the videos, the police took no time at all, whatsoever, to get to know the situation, to talk him down on anything. All they did was come out of the cars with their guns drawn, his rifle and her beanbag gun, and just barking and screaming demands.
>
> At that time, plain as day, because he had taken off his jacket, his shirt, his pants were low-riding, meaning waist-wise, and you can clearly see he did not have a weapon on him at all because his pants was getting tied. No weapon at all. It was very clear.
>
> [T]hey started barking more commands at him which caused him to flip out.

Hernandez Dep. 32:4-17. Right before Defendant DeLong shot Mr. Delgado, Mr. Delgado was bent over, digging around his belongings on the ground. Hernandez Dep. 56:18-19, 88:8-12. Mr. Delgado was in the process of standing up when Defendant DeLong shot him. Hernandez Dep. 88:8-16. Despite Mr. Hernandez's belief that the replica gun was real, he is adamant that "it was never in his hands pointed at the police." Hernandez Dep. 101:15-16. "Right now, clearly, I can remember he had nothing in his hands." Hernandez Dep. 56:24-25.

In another car in the parking lot of Lents Park, Mrs. Jacquline Lehrman and Mr. William Lehrman witnessed the shooting and the events leading up to it. Mr. Lehrman was sitting in the driver's seat and Mrs. Lehrman was sitting in the passenger seat. J. Lehrman Dep. 9:21-24. Their car was about four parking spaces from the northernmost side of the parking lot and they were parked angled within the parking space facing northeast. Ex. 11 at 8:59-9:20; J. Lehrman Dep. 16:16-19. Mr. Lehrman explained that the two of them had a clear view of the police and the man who was shot. Dec. of Jason Renaud Ex. 1 at 5:16-5:23.[3] [redacted] Ex. 11 at 10:47-10:50. [redacted] *Id.* at 10:58-11:04. Throughout the two

[3] Mr. Lehrman suffers from dementia and no longer remembers the shooting at Lents Park. J. Lehrman Dep. 9:2-10. Following the shooting that same day, Mr. Lehrman was interviewed by a police detective and by a community member; the police interview was audio recorded and the community member interview was video and audio recorded. J. Lehrman Dep. 9:25-10:7; Ex. 11; Dec. of Jason Renaud Ex. 1. In the years since the day of the shooting, Mr. and Mrs. Lehrman never discussed the shooting again. J. Lehrman Dep. 11:7-13. In response to being asked if the community member's video recording of the interview could be shown to law enforcement, the courts, and posted to YouTube, Mr. Lehrman said, "Yeah, you betcha. You show that. I didn't say nothing that wasn't the whole truth, nothing but the truth. I did not see no gun." Dec. of Jason Renaud Ex. 1 at 10:49-10:56. Although Mr. Lehrman will be unable to testify at trial given his mental condition, his statements in the recordings are nonetheless admissible under Fed. R. Evid. 803(5). The recorded statements he made the day of the shooting were fresh in his memory, but he now no longer can recall sufficiently to testify due to his mental condition. While Mr. Lehrman's statements were not under oath, he made clear that what he said accurately reflected his knowledge by echoing the language of the oath. *See* Dec. of Jason Renaud Ex. 1 at 10:49-10:56 ("the whole truth" and "nothing but the truth").

interviews, Mr. Lehrman made it clear repeatedly that when Mr. Delgado had his hands up, he did not have a weapon.[4]

Mrs. Lehrman, who was sitting in the car next to her husband when the shooting occurred, was able to provide deposition testimony. J. Lehrman Dep. 19:3-8. Her testimony also reflects what Mr. Lehrman and Mr. Hernandez saw: "I never seen him with a gun." J. Lehrman Dep. 20:7-13. When asked if she remembers the police officers saying anything to Mr. Delgado, she said, "The only thing I remember them saying is put your hands up. He put his hands up, and then before I know it, they shot him. And [. . .] I still did not see no gun. [. . .] No knives, no guns, no nothing." J. Lehrman Dep. 23:4-16. She continued, "He did what they asked. They said put your hands up. He put his hands up. I just don't understand why they shot him." J. Lehrman Dep. 24:4-6.

Through the emotions of reliving the trauma of watching the police kill Mr. Delgado, she testified:

> I'm sorry. It made me mad because I figured that they should have worked with him instead of shot him. To me, they're . . . trigger-happy. . . . [A]nything goes wrong, the first thing they do is hide behind a tree and then take a gun and shoot it. They don't find out what the person's problem is. I mean, if they got a drug problem, they can always take them somewhere to get them help. Or if he's got a medical problem, they could have taken him to the hospital and get medicine that he needed. But no, they're just too busy taking their guns out and shooting. You know, I'm not a doctor and I'm not a nurse and I'm not a nothing, but anybody in their right mind that has seen enough of it could figure that – that they should, you know, at least work with the person instead of shooting them.

J. Lehrman Dep. 35:19-36:13. In sum, all three of the witnesses that were in the parking lot of Lents Park when Defendant DeLong killed Mr. Delgado attested that Mr. Delgado did not have

[4] Ex. 11 at 11:36-11:54 [redacted]); *Id.* at 18:07-18:09 [redacted]) Dec. of Jason Renaud Ex. 1 at 0:51-0:52 ("The guy [referring to Mr. Delgado] didn't have a gun."); *Id.* at 2:13-2:14 ("I said there was no gun there [referring to what Mr. Lehrman told the police detective].") *Id.* at 4:41-4:44 ("He [referring to Mr. Delgado] ain't got nothing in his hands. Not a damn thing."); *Id.* at 4:48-4:52 ("[S]hot him for no reason. He didn't have no weapon on him.").

anything in his hands at the time he was shot. A fourth witness, Michael Naas, was outside the park—about 50 to 100 yards away from Mr. Delgado—witnessed [redacted] the interaction between Mr. Delgado and Defendant DeLong. Ex. 12 at 298-99. He only saw the [redacted] interaction between the two. *Id.* at 299. For context, Mr. Hernandez's video covers approximately the last 41 seconds of the interaction between Mr. Delgado and the police before Defendant DeLong shot him; Mr. Naas witnessing [redacted] the interaction from 50-100 yards away provides little insight into the events that occurred.

Mr. Naas was driving northbound on SE 92nd on his way to work. Naas Dep. 10:24-11:1; 10:6-10. He noticed something was going on in the park when he saw that the police were engaged with a shirtless man who was flailing. Naas Dep. 11:15-19. He had to stop in the middle of the street because police cars were arriving at the scene. Naas Dep. 23:5-8. Once his vehicle was stopped, he was about 50-100 yards to the east of the interaction and about 30 yards north of Mr. Delgado, so in order to see the engagement between Mr. Delgado and Defendant DeLong, he had to turn his head back towards the left and look over his shoulder. Naas Dep. 23:9-16.

Mr. Naas has a restriction on his driver's license requiring him to wear glasses because he has difficulty seeing things that are far away. Naas Dep. 45:3-6; 21:22-25. On the day of the shooting, he was not wearing his glasses. Naas Dep. 41:17-19. Given his vision limitations and restrictions on his driver's license, he should not have been driving a vehicle that day, let alone opining on whether Mr. Delgado was holding a weapon.

Nonetheless, Mr. Naas wanted to make sure the police took his statement. Following the shooting, Mr. Naas turned his vehicle around and drove to the parking lot of Lents Park. Naas Dep. 17:16-25. He waited for 20-30 minutes, but he had to get to work, so he left his card with an officer so the police could reach out to him later for his statement. Naas Dep. 19:6-15. The

reason he left his card was "because the political climate in Portland is really bad and it really tears down police officers. I just wanted to be sure the cop got a fair shake, because the city at the time [. . .] I didn't think was standing up for their officers." Naas Dep. 36:23-37:5. A police detective called Mr. Naas around 3:00 PM that afternoon. Naas Dep. 24:10-15. Given that four years had passed since the day of the shooting and his deposition, Mr. Naas defers to what he told the detective at the time. Naas Dep. 25:7-13; 40:12-13.

[redacted] Ex. 12 at 298. He says that Mr. Delgado was holding the rifle in his right hand high over his shoulder and started moving toward the cop. *Id.* at 303-04. Naas Dep. 31:20-21. [redacted]. Ex. 12 at 303-04.

A rifle would have been much bigger than the replica handgun that was later recovered. Ex. 13. In his deposition, Mr. Naas explains that what he thought was a rifle could have just been the tattoo on Mr. Delgado's arm:

> What I perceived at the time was that it was a much bigger gun because – and I said that's just from my angle, because when he extended his arm it looked like he was holding something bigger. And then, like I said, when I saw the picture in the paper later on, I realized he had a big, like, cross tattoo on his forearm. And that's – might have been what I was seeing.

Naas Dep. 30:19-25. Mr. Naas' visibility issues and his bias in making sure the detective took his statement so that the city would "stand[] up for their officers" both raise credibility issues that require resolution by a jury.

**ii. Officer Witnesses**

Despite the non-officer witnesses definitively not seeing Mr. Delgado holding a weapon—and in Mr. Naas' case, confusing a tattoo for a rifle—the officers' stories paint a

different picture. Each of the officers' stories conflicts not only with the non-officer witnesses, but also with each other.

Starting with Defendant DeLong, he testified that when he shot Mr. Delgado, he allegedly saw Mr. Delgado, "standing facing me with his arms outstretched pointing that gun at me, and I'm looking directly down the barrel of that gun." DeLong Dep. Vol. II 48:15-18. He testifies that at that moment, Mr. Delgado was standing upright and facing him directly. DeLong Dep. Vol. I 212:21-213:1. The physical evidence, however, contradicts Defendant DeLong's story. The medical examiner performed an autopsy and noted that the bullet from the AR-15 entered Mr. Delgado's left lateral chest, six inches from the anterior midline. Ex. 14 at 2. Plaintiffs' Biomechanical expert opined that given the bullet trajectory, Mr. Delgado could not have been facing Defendant DeLong when he was shot. Ex. 15 at 7.

The other officers tell varying stories about the replica gun. Although Defendant DeLong said the gun was pointed directly at him—such that he was looking down the barrel of the gun—Officer Wuthrich, who was standing feet away on the other side of the tree, said that the gun was actually pointed directly at her. Wuthrich Dep. 122:12-24; 137:11-14. More specifically, she said she saw Mr. Delgado in "shooter's stance" with both arms stretched out, feet shoulder width apart, and a handgun pointed directly at her. Wuthrich Dep. 122:12-24, 137:11-14.

Ken Le was one of the officers that arrived at Lents Park during the interaction between Mr. Delgado and Defendant DeLong. Le Dep. 44:24-45:2; 45:14-19; 47:23-48:10. Officer Le, along with Officer Bailey, were doing a slow approach hiding behind Officer Bailey's vehicle at the moment Mr. Delgado was shot. Le Dep. 64:10-24; Bailey Dep. 38:14-39:3. Unlike Defendant DeLong's story that Mr. Delgado was bent over and picked a gun up from the ground, DeLong Dep. Vol. I 223:10-13, Officer Le does not remember Mr. Delgado ever being crouched down

and instead he explains that Mr. Delgado retrieved a weapon from somewhere on his person. Le Dep. 67:3-5; 66:13-18. Officer Le's story also differs from Defendant DeLong and Officer Wuthrich's stories in that he says Mr. Delgado raised the gun in one hand and pointed it at the officers. Le Dep. 67:8-12. Compare that to Defendant DeLong and Officer Wuthrich who describe a more aggressive set of facts where Mr. Delgado is allegedly holding the gun in "shooter's stance." DeLong Dep. Vol. II 48:15-18; DeLong Dep. Vol. I 212:21-213:1; Wuthrich Dep. 122:12-24, 137:11-14. Officer Bailey, on the other hand, could not commit to whether Mr. Delgado was pointing a gun at officers, just that Mr. Delgado's "arm was generally extended and he was generally pointing it in a southerly direction." Bailey Dep. 65:8-12.

After Officer Vosu arrived, he parked his vehicle on the lawn on the eastern edge of Lents Park, about 20-30 feet from Defendant DeLong. Vosu Dep. 24:14-24. At this point Defendant DeLong already had his AR-15 pointed at Mr. Delgado, and Officer Vosu did not see anything in Mr. Delgado's hands. Vosu Dep. 21:5-7; 41:1-10. Once parked, Officer Vosu stood behind his ajar driver's side door and pointed his gun at Mr. Delgado. Vosu Dep. 26:20-25. His telling of the story differs substantially from the rest. In his version of events, Mr. Delgado's tent had been fully assembled, and Mr. Delgado began searching into the porthole of the tent and started to uproot the stakes. Vosu Dep. 42:11-43:1. Then Mr. Delgado emerged from the tent and began walking swiftly toward Officer Wuthrich and Defendant DeLong covering about 10-12 feet in the process. Vosu Dep. 43:16-44:7. Finally, as he tells it, Mr. Delgado punches one arm out with a handgun in it. Vosu Dep. 44:8-12.

Each of the witnesses in this case testify to markedly different versions of the events leading up to Defendant DeLong killing Mr. Delgado. The witnesses have material factual disputes as to whether Mr. Delgado ever had a weapon in his hands, the witnesses do not agree

on what Mr. Delgado was doing right before the shooting, and for the witnesses who purportedly saw a weapon, they do not agree on the type of weapon, the manner in which Mr. Delgado was holding it, nor the direction in which Mr. Delgado was supposedly pointing it.

**g. "Not My Job": The City Has a Pattern of Institutional Review Failures**

Two institutional reviews followed Mr. Delgado's death. The Detective Division conducted the criminal investigation, with Detective Anthony Merrill as the primary homicide detective. The Training Division conducted the deadly-force training review, authored by Lieutenant Jennifer Baxter. As detailed below, these reviews are designed to absolve officer misconduct when it results in a death.

The depositions of Merrill and Baxter establish that neither review will test the officers' account, create detailed forensic evidence, nor provide substantive critique of the officers' actions. Merrill testified that his function was limited to being "the purveyor of fact." Merrill Dep. 64:11-14. But he did not seek obvious, reasonably available facts, and omitted facts or characterizations when they were inconvenient for the officers' narratives. Baxter was to assess whether the officers' actions were consistent with their training. But she did not. She relied on *her own* training and did not review DeLong's ECIT training. She also referred to reconciling inconsistencies in the record as "not … my role." Baxter Dep. 45:8-14. She relies on the information gathered by the homicide detective. Baxter Dep. 16:22-17:3. Between the two of them, no one in the Portland Police Bureau was assigned to verify the officers' stories nor ensure that their actions were consistent with training.

**i. Homicide Review**

Merrill was the primary homicide detective assigned to the shooting. Merrill Dep. 6:12-15. Asked whether it would have helped the investigation to determine where Mr. Delgado's

body fell after being shot—and thereby whether the officers' accounts of his body position were accurate—Merrill answered that it was "not my obligation" and "not my responsibility to determine that." Merrill Dep. 80:16-18. When Plaintiffs' Counsel asked whether that was true of every homicide case he investigated, Merrill drew the distinction expressly:

> Q. And that's true for every homicide case you investigate?
> A. This is an officer-involved shooting. It's not separate — like, it's not a — so a homicide or an officer-involved shooting are two different kinds of case.
> Q. They are two different kinds of cases?
> A. (Witness nods head.)
> Q. You treat them differently?
> A. No. I say — I would say the procedures there involved create some differences.

Merrill Dep. 80:19-81:4. Merrill confirmed that a use-of-force policy governs how the Bureau investigates its own officers. Merrill Dep. 23:1-9. He did not work with Internal Affairs, which "conduct[s] a separate investigation from us." Merrill Dep. 23:11-18. He did not consult the Training Division on the correct description of use-of-force policy while investigating this use-of-force case. Merrill Dep. 25:23-26:7. He did not consult the deputy district attorneys on scene as to an accurate description of Oregon use-of-force law. Merrill Dep. 27:10-15. Thus, the investigation proceeded without any component to measure the officers' conduct against the standards that governed it.

Merrill consulted no ballistics expert. Merrill Dep. 46:19-24. He consulted no biomechanical expert. Merrill Dep. 47:1-2. Asked whether a biomechanical expert would have been helpful in determining Mr. Delgado's position when he was shot, Merrill initially answered "It depends," then affirmatively corrected himself to "No," explaining:

> My job as the primary homicide detective in this case is be the presenter of fact: what we see at the scene, what we collect, the interviews, the video we have. So, I think that's our primary

> function, as the detective overseeing the investigation and documenting the scene.

Merrill Dep. 40:8-18.

He repeated the formulation later: “It’s not my job. I’m the purveyor of fact. I’m putting together all the data that I can collect, through interviews, documentation, video.” Merrill Dep. 64:11-14.

Merrill was asked what he would do if an officer testified that Mr. Delgado was standing in a shooter’s stance facing him, but the wound entered the left side of the chest. Merrill answered: “It depends.” Merrill Dep. 43:2-11. He conceded he did not recall the trajectory angle. Merrill Dep. 39:9-11. He was present at the autopsy and observed the entry wound. Merrill Dep. 44:3-7. He never concluded where Mr. Delgado’s body fell. Merrill Dep. 77:15-19. Asked whose job it is to develop additional evidence when the facts “come up short,” he answered: "I’m not sure. It depends." Merrill Dep. 44:19-25.

Merrill did acknowledge that weighing and reassessing gathered evidence is part of the job: “I would say, yes. When we can.” Merrill Dep. 42:12-13. He identified video as the circumstance that might excuse the exercise but then conceded the video in this case “doesn’t show exactly what happened” and does not show Mr. Delgado being struck by a bullet. Merrill Dep. 42:18-43:1.

**a. Missing Bullet**

Defendant DeLong fired two bullets from his AR-15. Ex. 1 at 4. Mr. Delgado sustained one entry wound. Merrill Dep. 45:1-7. Merrill’s recollection was that someone worked on locating the second round, “but not by me, at least not that day,” and he could not identify who. Merrill Dep. 45:8-13. He acknowledged that locating the second fired round would be

informative to the investigation, immediately adding: "It depends. We didn't find it." Merrill Dep. 72:6-18.

Merrill did not inquire of anyone at the Bureau about the travel distance of a bullet fired from an AR-15 or a 40mm round during the investigation. Merrill Dep. 71:14-21. He is not trained on the 40mm launcher and qualified with an AR-15 once, years earlier. Merrill Dep. 70:25-71:7.

The Bureau's own Training Division reached the same conclusion Plaintiff urges here. Recommendation 5 of the Training Division Analysis states that the Detective and Forensic Evidence Divisions "should make every effort to find the impact point of all rounds which do not hit their intended target," and continues: "nowhere in the case file was there any analysis on where Officer DELONG's second round landed. This is obviously concerning, especially since this was a rifle round bound to travel much further than a pistol round." Ex. 1 at 17.

Because the second bullet was never located, the record does not establish which bullet struck Mr. Delgado, from what angle, or at what point in the sequence. Merrill conceded he could not determine "which bullet fatally killed him." Merrill Dep. 73:4-8. The Fourth Amendment requires every bullet fired to be backed with lethal force justification. *See Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992) (analyzing the justification of force when multiple shots are fired). Failing to account for every bullet hinders the investigation, and the chances of accountability.

**b. Omitting the Lehrmans**

William Lehrman and Jacqueline Lehrman watched the shooting from a pickup truck backed into a parking space roughly fifty yards from the tree where DeLong and Wuthrich had

taken position. In his recorded interview with Detective Sharp on the day of the shooting, William Lehrman stated that when Mr. Delgado came out from behind the tree, [redacted] describing the shots that followed. Ex. 11 at 10:58-11:04. Jacqueline Lehrman told Detective Sims she [redacted] Ex. 16 at 1-2. Neither account appears in Merrill's narrative.

Merrill also could not recall whether he had spoken to the Lehrmans. Merrill Dep. 47:18-20. Asked whether he recalled any non-officer witness stating that Mr. Delgado pointed the replica gun at DeLong or Wuthrich, he answered: "I don't recall that." Merrill Dep. 47:21-48:9.

Reviewing his own report on the record, Merrill confirmed: "I'm not seeing it in this narrative. No." Merrill Dep. 48:24-49:3. Shown the interview report, he acknowledged that Lehrman did not describe Mr. Delgado pointing a gun at the officers, and that he had not included the observation in his initial narrative. Merrill Dep. 52:1-17. Asked why, he answered: "I don't know." Merrill Dep. 52:18-21. After an off-record discussion, he added that he believed his partner, Detective Corona, had followed up on the issue. Merrill Dep. 52:23-53:2. Later in the deposition, having reviewed the follow-up materials, Merrill confirmed that neither Mr. Lehrman nor Mrs. Lehrman's statement made it into his additional scene investigation report either. Merrill Dep. 66:15-18.

Jacqueline Lehrman's interview was never recorded. [redacted] Ex. 12 at 43-44. The only record of her account is the detective's own summary. This was the precise scenario Merrill identified in the abstract as warranting further investigative work, a witness whose

account does not match other evidence: "Sometimes we interview people. Sometimes things don't always match everything: witness statements." Merrill Dep. 41:2-17. And yet this discrepancy did not find its way into the PPB records, or the DA's review of the incident.

**c. Selective Interpretation of Delgado and DeLong's Actions**

Merrill's report describes Mr. Delgado as "violently throwing his personal items down," "appear[ing] very aggressive," and "yelling defiantly." Asked what it means to violently throw a personal object down, Merrill answered: "Throw things very hard, fast." Merrill Dep. 63:4-9. Asked why he chose "aggressive" rather than "upset," he said Mr. Delgado "didn't appear to be complying with the directions the officers were giving him." Merrill Dep. 57:16-25. Asked why "defiantly," he gave the same answer: "He wasn't complying with police officers that were giving him instructions." Merrill Dep. 58:7-9.

When asked whether he knew Defendant DeLong shouted threats to effect of "I'm going to fucking shoot you," Merrill's power of description failed him.

> Q. (By Mr. Chavez) Do you consider that as a violent threat?
> A. It's not my job to interpret that.
> Q. But you interpreted throwing personal items down as violent.
> A. Yeah.
> Q. What's -- why can't you opine on --
> A. It's not my job. I'm the purveyor of fact. I'm putting together all the data that I can collect, through interviews, documentation, video.

Merrill Dep. 64:4-13. Merrill also testified he could not determine from the video whether Mr. Delgado had "all of his faculties together" because he would "be speculating," Merrill Dep. 58:18-24, though he had just characterized the same footage as showing aggression and defiance. Merrill Dep. 58:25-59:7. In his report, he never opined whether Mr. Delgado exhibited signs and symptoms of a mental health crisis. Merrill Dep. 59:18-25.

**d. Poor Investigation and Scene Management**

Merrill testified that in his experience, Portland Police Association ("PPA") representatives arrive at the scene whenever an officer shoots and kills someone. Merrill Dep. 33:18-21. He did not know what access those representatives had to the crime scene and identified no policy restricting their entry beyond noting that a representative might need to retrieve an officer's personal items from a vehicle. Merrill Dep. 33:22-34:8. He knew the PPA's attorney, Anil Karia, from officer-involved shooting scenes. Merrill Dep. 34:9-18. Involved officers received a written communication restriction order delivered by a lieutenant; Merrill did not know whether that order restricted the officers' lawyers or their PPA representatives from speaking with one another. Merrill Dep. 53:3-54:8.

Reviewing the Forensic Evidence Division scene video, Merrill could not identify what evidence markers one, two, and five designated. Merrill Dep. 74:22-76:8. He observed that the orange-tipped replica gun had no evidence marker beside it and did not know whether one had ever been placed. Merrill Dep. 78:18-24. Only one of the two 40mm sponge rounds was recovered on the day of the shooting. The second was located the following day, after the crowd dispersed, at a location Merrill could place only approximately. Merrill Dep. 69:2-70:19.

Merrill's contemporaneous handwritten notes may no longer exist. He testified that detectives "are not required to save our notes, if we have the police reports documenting the event," and that his notes "could have been shredded." Merrill Dep. 86:7-12.

Finally, Merrill acknowledged that in a prior homicide prosecution, Multnomah County Judge Gregory Silver characterized his investigative summary as either intentionally misleading or incompetent for omitting details from his notes. Merrill Dep. 84:2-85:9. No Internal Affairs investigation followed. Merrill Dep. 85:1-4.

**ii. Training Review**

Lieutenant Jennifer Baxter authored the Training Division Analysis. Baxter Dep. 9:5-7. Baxter is not certified to operate an AR-15. Baxter Dep. 22:5-6. She confirmed that AR-15 certification is not required to review a shooting involving an AR-15. Baxter Dep. 23:6-9. She did not recall speaking to any AR-15 trainer in this case, Baxter Dep. 23:10-12, 64:1-5, and had no personal knowledge whether the Bureau trains officers to appreciate the particular lethality of an AR-15 relative to other weapons in their arsenal. Baxter Dep. 64:6-14.

Baxter described her process: she received the case files from Internal Affairs, the Detective Division, and the grand jury transcripts. Baxter Dep. 16:22-17:3. She spoke to none of the people involved. Baxter Dep. 17:4-6.

Asked how she would account for facts that were misrepresented to her, Baxter answered: “I don’t know how I would know that.” Baxter Dep. 44:10-21. Asked how she resolved inconsistencies she sensed in the testimony, she answered: “I don’t think that was — that’s my role.” Baxter Dep. 45:8-14.

Baxter also did not recall reviewing the medical examiner’s reports, Baxter Dep. 41:1-8, did not recall reviewing any toxicology report notwithstanding that her analysis recorded DeLong’s description of Mr. Delgado’s behavior as consistent with methamphetamine intoxication, Baxter Dep. 41:10-20, and did not recall reviewing any ballistic information regarding the entry wound, Baxter Dep. 45:17-25.

**a. No Training Review**

The Training Division Analysis states on its face that “[t]his review is focused on the training Bureau members have received throughout their career.” Ex. 1 at 2. Asked whether that required her to review the training DeLong had actually received, Baxter answered: “I make the

review based on the training I've had and what my recollection is of the training that we have all received." Baxter Dep. 63:7-20. She testified there was no specific requirement to review what training each involved officer had received. Baxter Dep. 63:1-6. Her methodology generally was "a lot of it would just be my own training and experience." Baxter Dep. 11:23-25. When Plaintiffs' Counsel asked Captain Kevin Jackson, the current head of the training division, about this, he responded:

> Q. "This review is focused on the training Bureau members have received throughout their career." Do you see that there?
> A. Yes.
> Q. Would training received by bureau members throughout their career include ECIT training if they had received it?
> [objections]
> THE WITNESS: Yes, it would.
> …
> Q. Sure. So Ms. Baxter testified to us that — I'll be more specific. She relied on the training she received in ECIT when reviewing Officer DeLong's use of force in this case rather than reviewing what Officer DeLong had received in training. Is that consistent with your understanding of bureau policy?
> [objections]
> THE WITNESS: And through my own experience they should be reviewing the officer's training.

Jackson Dep. 74:2-15; 76:14-23.

Baxter did not review the officer's other use-of-force incidents. Baxter Dep. 20:20-23. She confirmed that if a particular officer had a pattern of using excessive force, that information would not be before her when she wrote the report. Baxter Dep. 20:24-21:6. Across roughly five deadly-force reviews, Baxter did not remember ever finding an officer in violation of their training. Baxter Dep. 30:20-22; 21:17-19.

Baxter did not review ECIT training materials in preparing the report. Baxter Dep. 12:2-7. Obtaining a specialized unit's input was available only on request. Baxter Dep. 12:8-13:3. She

did not recall consulting Dr. Gerritsen, who led ECIT training development at the time. Baxter Dep. 21:11-15; 23:14-16; 24:14-23. She did not know whether the report was ever shared with Dr. Gerritsen. Baxter Dep. 62:7-24.

Her own report identified the governing principle: "If time and circumstances allow, the ECIT officer should have only one job — as communicator." Ex. 1 at 9; Baxter Dep. 24:5-13. The report then catalogued the four roles DeLong occupied simultaneously (primary officer, de facto incident commander, lethal cover, and crisis communicator) while describing him as "multi-tasking under extremely stressful circumstances." Ex. 1 at 8.; Baxter Dep. 50:13-23. He was also pointing a high-powered lethal rifle. Baxter Dep. 52:16-18.

The report likewise recorded that Wuthrich told DeLong her 40mm launcher might not be effective at that distance, and that DeLong "either did not hear her or forgot due to the intensity of the incident." Ex. 1 at 8; Baxter Dep. 48:11-49:1. Baxter made no recommendation regarding officer communication. Baxter Dep. 49:12-16. She made no ECIT recommendation at all. Baxter Dep. 61:21-62:5 ("It appears that I did not make that recommendation in my report"); *see also* Baxter Dep. 61:3-9 ("I don't see anything about ECIT in my report"). The Analysis's five recommendations concern BOEC paging protocols, crowd management, Portland Street Response, ballistic shields, and the unlocated round. Ex. 1 at 17. None addresses crisis communication, role allocation, de-escalation, or the use of a rifle against a person in crisis.

Baxter had no training on suicide by cop and did not know whether she assessed DeLong's compliance with any such training. Baxter Dep. 46:10-47:5. Shown the Bureau's own ECIT Patrol Procedures document titled "Suicide By Cop," Ex. 9, she testified she did not remember ever receiving that training. Baxter Dep. 47:19-24. She did not know whether Mr.

Delgado was suicidal, or whether she had reached any conclusion on the point. Baxter Dep. 48:1-6. Her report quotes Mr. Delgado saying "Fucking shoot me then, fucking shoot me then." Ex. 1 at 7; Baxter Dep. 46:5-9.

Asked whether the approach to a person on methamphetamine and a person in mental health crisis would be the same from a crisis-intervention standpoint, Baxter answered that it was "very situational," and could not identify any training directing a different response to the two. Baxter Dep. 41:21-42:15. She did not know that Directive 1010.00 § 1.2 treats suspected intoxication and perceived mental health crisis as parallel triggers for the same analytic obligation. Ex. 2 at 6-7.

**b. Suggestions Never Made**

Baxter stands by the report and would change nothing in it. Baxter Dep. 40:11-16. The following assessments are accordingly absent from the Bureau's review:

- Whether taking time to surveil Mr. Delgado from a distance would have assisted the response: "I did not make that assessment at this time." Baxter Dep. 57:13-20.
- Whether DeLong's escalatory language was appropriate: Baxter would have to review her report for any such language, and did not recall DeLong's reported warning that he would "fucking shoot" Mr. Delgado if he reached for the gun. Baxter Dep. 57:22-58:20.
- Whether the officers' conduct escalated the encounter and produced the agitation that preceded the shooting: "I made an assessment based on the information that I reviewed"; she did not recall her conclusion on the point. Baxter Dep. 59:20-60:23.
- Whether DeLong took on too much in responding to the call: "I think the circumstances of every incident are unique so it's hard to make a determination like that." Baxter Dep. 53:16-23.
- Whether the AR-15's use was inside or outside training practice: "I don't specifically recall." Baxter Dep. 63:23-64:5.
- Whether long-distance surveillance training exists for calls involving a purported gun, or whether officers are issued binoculars: "I don't know." Baxter Dep. 56:16-20.

The Analysis nonetheless concluded that the officers' actions at each stage "were within a range of reasonable options and tactics," including the decision to shoot the rifle. Ex. 1 at 8–9, 11, 13.

**c. Belittling City's Settlement Agreement with USA**

Baxter testified that the United States Department of Justice reviewed the Bureau and "determined … that we had a pattern and practice of excessive force on people suffering mental health crisis," using air quotes as she said it. Baxter Dep. 15:10-13. Asked why she used air quotes, she explained:

> They specifically polled a very small number in the grand scheme of how many citizen contacts we had, hundreds of thousands of citizen contacts, and they picked out a handful of ones that had bad outcomes, so in my opinion that's not a pattern.

Baxter Dep. 15:17-21.

For more than a decade, the Bureau has represented to a federal court that they took their responsibilities under the settlement agreement with the federal government to end their pattern and practice of excessive use of force against people in crisis seriously. Yet, one of their own Training Review Lieutenants disagreed there was even a problem to address.

**d. Report to Nowhere**

Baxter believed her report was reviewed by the Training Division captain, then by the chief's office and perhaps the inspector, but when pressed conceded she had no personal knowledge that this occurs. Baxter Dep. 17:16-18:13. She did not specifically recall presenting this report to a Police Review Board. Baxter Dep. 19:2-4. She did not know whether any training improvements on officer communication followed her report. Baxter Dep. 49:3-10. She did not

know whether the report reached the ECIT program lead, Dr. Liesbeth Gerritsen. Baxter Dep. 62:7-24.

**iii. The ECIT Program Lead**

Blame here also rests on the training curriculum management itself. Dr. Liesbeth Gerritsen has worked in the Training Division for 18 years. Gerritsen Dep. 9:11-15. She is part of the curriculum design team and oversees the Bureau's curriculum on responding to a mental health crisis. Gerritsen Dep. 9:16-21. She developed the ECIT program in 2013 pursuant to the DOJ settlement agreement, with the DOJ and COCL reviewing and approving every ECIT lesson plan. Gerritsen Dep. 28:14-17; 29:21-25; 39:1-8. In 2021, she co-developed the ECIT curriculum with Chase Bryson. Gerritsen Dep. 26:18-27:12. Defendant DeLong sat in one of her classes. Gerritsen Dep. 48:1-5. No one asked Dr. Gerritsen about what happened in Lents Park that day.

Her involvement in the training review that follows an officer-involved shooting is "None." Gerritsen Dep. 30:2-6. The Bureau does not tell her when its officers shoot people:

> Q. The bureau doesn't come to one of their trainers on ECIT when there's a person shot who is exhibiting a mental health crisis?
> [objection]
> THE WITNESS: Not as a rule.
> [. . .]
> Q. I'll be more specific. Are you ever made aware of when an ECIT officer shoots and kills a person?
> A. No.

Gerritsen Dep. 30:12-17; 31:6-9. She could not recall a single instance in which the Bureau informally sought her input after a shooting. Gerritsen Dep. 30:18-25. The Training Division has never spoken to her about a problem with an ECIT officer arising from a shooting review. Gerritsen Dep. 33:8-15. The Behavioral Health Unit Advisory Committee does not call her in after a shooting. Gerritsen Dep. 46:2-4. She has no role in discipline. Gerritsen Dep. 50:21-23.

The Training Division Review says that it "is focused on the training Bureau members have received throughout their career" Ex. 1 at 2, but Baxter never consulted Dr. Gerritsen about what training DeLong received. Gerritsen Dep. 101:8-22. Baxter never spoke to her about the shooting at all. Gerritsen Dep. 36:4-7. Dr. Gerritsen had never read the Analysis at any time before her deposition, Gerritsen Dep. 35:7-12, and was never consulted on either of its ECIT-specific findings. Gerritsen Dep. 37:2-6; 38:10-13.

Dr. Gerritsen learned of the shooting from "[m]aybe a news report or someone mentioned a shooting." Gerritsen Dep. 48:6-9. She never reviewed the facts of the case. Gerritsen Dep. 47:18-21. Her knowledge was that "it was in a park, and I know Zach DeLong was involved. I know there was a shooting. And I don't know any of the other details." Gerritsen Dep. 70:13-15. She did not know that Mr. Delgado paced when confronted; that he yelled "shoot me;" that DeLong retrieved his AR-15 on contact and kept it visible while communicating; that DeLong yelled back "I'm going to fucking shoot you;" that DeLong was simultaneously coordinating containment; that Wuthrich asked to close the distance so her 40mm launcher would be effective; or that every officer stood roughly 90 yards away. Gerritsen Dep. 71:7-72:15. Plaintiff's Counsel asked, "Nobody from the bureau told you any of that?" and Gerritsen answered "No." Gerritsen Dep. 72:16-18.

Nor did Dr. Gerritsen seek the information out. She does not proactively investigate shootings involving ECIT officers, Gerritsen Dep. 47:9-17, and did not do so here. Gerritsen Dep. 48:10-20. Asked whether it would interest her to have input where an ECIT officer "perhaps violated" his training in a shooting, she answered "No," because "It's not my role." Gerritsen Dep. 46:12-22. Asked whether anything she had learned about the Delgado case gave her pause: "No." Gerritsen Dep. 78:20-25.

**a. No Lessons Learned**

If an ECIT-trained Bureau member kills someone, there is no reevaluation of the training. ECIT in-service training occurs “as needed,” but “[a]s needed is not based on an individual officer, it's based on our training division's evaluation needs assessment.” Gerritsen Dep. 33:2-7. That needs assessment is built from “student surveys.” Gerritsen Dep. 95:14-21. In-service ECIT sessions are triggered when “new resources come online in the city of Portland,” not when an officer fails to use the training. Gerritsen Dep. 96:7-11. The only recurring crisis-intervention requirement is the state-mandated one hour per year, which “could be many things.” Gerritsen Dep. 31:21-32:2; 96:1-6. There are no trainings built on lessons from the Bureau's own shootings, like after the killing of Aaron Campbell. Gerritsen Dep. 50:4-19. Lessons reach the Training Division only if “trends” are “noticed by the force inspector or others in the bureau” and “trickle[] down,” and none has ever trickled down to her. Gerritsen Dep. 49:18-50:3.

As of April 2021, there was no means by which CIT trainers evaluated an officer’s performance during training. Gerritsen Dep. 24:1-8. Asked what happens to an officer who cannot remediate a failing CIT grade, the curriculum designer answered: “I don't know.” Gerritsen Dep. 26:12-17. Asked whether anyone has ever failed ECIT training: “I don't recall.” Gerritsen Dep. 76:13-15. Asked whether there is any evaluation of whether officers follow their ECIT training in the field: “That — I don't know.” Gerritsen Dep. 98:19-23.

**b. The City’s Response Is Always “It Depends”**

Confronted with the core facts of this shooting, Dr. Gerritsen, who wrote the Bureau's de-escalation curriculum, would not say that any of them departed from it:

> Q. “I'm going to fucking shoot you” is de-escalatory?
> [objection]
> THE WITNESS: It depends. There are -- it depends.
> Q. Pointing a gun, is that de-escalatory?

> A. It depends.
> Q. For a person in crisis, does pointing a gun at them tend to build rapport with the individual?
> [objection]
> THE WITNESS: It depends.
> Q. So if everything depends, how are we to ever assess whether an officer in fact followed their training?
> [objection]
> THE WITNESS: I don't assess whether an officer follows their training.

Gerritsen Dep. 83:6-84:3. She said it again when asked whether such an assessment would help her improve training: "Again, I don't assess whether an officer followed their training." Gerritsen Dep. 84:12-15. She even disagreed with the principle Baxter's own report identified, that "[i]f time and circumstances allow, the ECIT officer shall only have one job - as communicator," because "[i]t depends." Gerritsen Dep. 77:14-21. Whether one officer handling containment, communication, and lethal cover for a single subject is problematic: "That's not -- that's not my world." Gerritsen Dep. 78:3-4. Whether it concerns her that ECIT officers contact people in crisis with AR-15s: "I don't weigh in on tactics. I don't have an opinion on that." Gerritsen Dep. 98:7-14.

Asked whether she agreed with the DOJ's conclusion that the Bureau had a pattern or practice of excessive force against people in mental health crisis, she answered: "I don't know how to answer that. I don't know what their methodology was or how they came to those conclusions." Gerritsen Dep. 29:8-17. Asked whether curing that pattern remains a Bureau responsibility, she "honestly, [didn't] understand [the] question." Gerritsen Dep. 85:14-22.

**h. A History of Unaddressed Violence**

The Portland Police Bureau is a well-studied police department. Despite this, lessons that could be drawn from history remain ensconced in reports and studies. Even the findings that do make definitive findings, like the USDOJ findings letter regarding the Bureau's pattern and

practice of excessive force, supervisors, trainers, and rank-and-file officers all either dismiss the findings or do not know about them. Baxter Dep. 15:10-21. Some of the most comprehensive reviews have been conducted by the OIR Group, a Los Angeles based consulting group. The OIR Group conducts comprehensive reviews of PPB lethal force incidents and provides recommendations to the City. These findings and recommendations are presented to City Council and entered into the City's records. The Chief of Police also provides a written response to the critiques in the reports.

Since 2010, the OIR Group issued nine numbered reports plus a stand-alone report on the 2006 in-custody death of James Chasse, together reviewing seventy-five critical incidents that occurred between 2004 and 2022. Ex. 17 at 4; Ex. 18 at 8; *see also* Renaud Dec. ¶ 8. Because the City commissioned, funded, and received these reports, and because they rest on the Bureau's own files, they are admissions of a party opponent, or, at minimum, put the City on notice of systemic problems with their police bureau.

In every cohort the City's reviewers examined, subjects in mental-health or addiction crisis made up a majority or near-majority of the people against whom PPB used deadly force. Ex. 17 at 72-83; Renaud Dec. ¶ 8. As of the Sixth Report, "[o]ver half of the 50 subjects at whom officers fired or who died in police custody had a history of mental health issues or were experiencing some type of mental health crisis (29 total)." Ex. 20 at 5. As of the Seventh Report, "33 of the 57 officer-involved shootings and in-custody deaths" reviewed over the prior decade "involved subjects who were apparently in some type of mental health crisis." Ex. 19 at 6. The Eighth and Ninth Reports describe the same commonality as "all too consistent across our years of work in Portland." Ex. 18 at 6; Ex. 17 at 2. Even after in early-2020 the USDOJ deemed the City in substantial compliance, they wrote, "Portland police officers continue to use deadly force

on people in crisis, leaving many to question how to make sense of the Department of Justice substantial compliance finding in conjunction with the number of people shot and killed by officers." Ex. 19 at 8.

The OIR Group reports feature officer after officer not following basic CIT principles, and putting themselves in the same position Defendant DeLong put himself in. Officers do not utilize time, distance, cover, and de-escalation, then engage subjects without adequate support.

Some examples in the decade prior to Mr. Delgado's death include:

***Aaron Campbell (2010)***. Officers shot an unarmed, suicidal man in the back with a rifle as he moved, hands on his head, after he had complied with commands. Ex. 22 at 55, 57-58 & FN 7. The Bureau's own Training Division and reviewing Commander found the shooting out of policy: the officer "did not adapt to the changing dynamics" and "never considered the possibility that Mr. Campbell was unarmed." *Id.* at 63.

***Terrell Johnson (2017)***. On a MAX platform a caller reported Johnson had chased a teenager. Ex. 20 at 87. Mr. Johnson had a history of mental illness. *Johnson v. City of Portland*, 3:19-cv-00735-JR, Dkt. 1, ¶ 8. A transit officer learned he had a knife, but maintained his composure because Johnson was not actively threatening anyone. *Id.* at ¶ 15. He calmly asked Mr. Johnson to not reach into his pockets, and Mr. Johnson complied. *Id.*; Ex. 20 at 88. When PPB Officer Ajir arrived at the scene, he approached Mr. Johnson while appearing to want to take Johnson into custody. *Id.* at ¶ 16. Johnson ran, and PPB Officer Ajir gave chase, contrary to Bureau training. Ex. 20 at 88, 91-93. Ajir sprinted roughly 200 yards after him onto the MAX Line tracks. *Id.* at 88-90. When Johnson turned, Ajir claimed that Johnson had a boxcutter, backpedaled, tripped on a curb, fell, and fired four rounds from the ground, killing him. *Id.* at 89, n.29-30; *see also id.* at 103. Training, the Commander, and the Police Review Board all found it

in policy, but OIR showed they mischaracterized the record, claiming cover officers were “on his heels” when the nearest was 60–70 feet back, and that Ajir "maintained distance" when he had closed to 7–8 feet, and never independently scrutinized a foot pursuit of an armed subject that the directive generally forbids. *Id* at 92-94.

***Chase Peeples (2017)***. Searching for a bank-robbery suspect with no report of a weapon, officers encountered Peeples, an unarmed man acting irrationally, and Officer Reagan fired six rounds when Peeples pointed a black object in a "shooting stance." Ex. 19 at 31, 37 n.12. The object was his wallet, and Peeples survived. *Id.* at 31, 37, 41. OIR's sharpest critique in the report was that no reviewer "identified one issue or advanced one question about the decision making," *id.* at 41; *see also id.* at 90, treating "action/reaction" as "both the beginning and the end," *id.* at 35-37, and a full section documented the Bureau sending Behavioral Health Unit officers to interview the hospitalized, Mirandized Peeples and then using that interview to help clear the shooting officer, *id.* at 38-40.

***Michael Grubbe (2017)***. Officers confronted Grubbe after a report of a man with a gun, and across two encounters three officers fired a dozen-plus rounds without hitting him. *Id.* at 13-16. The "gun" turned out to be a BB replica. *Id.* at 16. Training found the shootings in policy, but OIR pressed on the officer's dramatic misperception of his backstop. *Id.* at 16, 18-19.

***Quanice Hayes (2017)***. Officers cornered and fatally shot a subject while "plac[ing] themselves in a position with no available cover," despite a ballistic-paneled patrol car on scene that they used only after the shooting. Ex. 20 at 67-70; *see also id.* at 75. The review never asked "whether officers could have done anything to alter the rapidity with which this event unfolded." *Id.* at 70.

***Don Perkins (2017)***. Perkins called 911 twice saying he had taken 30 pills and was killing himself, and the ECIT-trained officers who eventually found him in a van took cover after he displayed what turned out to be a BB gun made to look like a handgun and taunted them to "shoot me… kill me." *Id.* at 79-81. The officers agreed they would fire if he reached for the gun he had thrown to the ground, and when he did, Officer Clark (AR-15) and Officer Walsh (pistol) fired ten rounds, wounding him in the abdomen and elbow. *Id.* at 80. He survived, and the "gun" was confirmed to be a replica. *Id.* at 81. The Training Division wrote that the suicidal subject "left the officers with no other option than to fire," which OIR condemned as "inaccurate and counter-productive" and formally recommended be stricken from Training's analyses (Rec. 25). *Id.* at 82-84.

***Sarah Brown (2018)***. During a nighttime prowler search, officers pried open a small steel storage door and found Brown, apparently delusional, pointing a handgun in a sergeant's face about two feet away. Ex. 18 at 45, 47, 50. Over roughly 20 minutes she intermittently extended the gun. *Id.* at 45. Officers Shaw and Webber fired about 26 rounds combined (22 from Webber's AR-15), wounding her hand before SERT took her into custody. *Id.* at 46. OIR found the Training Division never addressed the decision to pry the door open with incomplete knowledge of the threat, when time, distance, cover, and a SERT/negotiator call-out were all available, *id.* at 47-49, and the Chief ordered debriefings for the sergeants for going "hands on." *Id.* at 46; *see also id.* at 50-51.

***Patrick Kimmons (2018)***. After a parking-lot fight in which Kimmons shot two men, he ran, and his path happened to lead toward two officers who fired twelve rounds. *Id.* at 71, n.28, 72. The autopsy showed nine wounds, many entering from the side and back, and surveillance video showed the officers still firing after Kimmons changed direction and moved away from

them. *Id.* at 72-75; *see also id.* at 79. OIR found Training never addressed the video or "how the gradient of threat changed" during the volley, and the Commander's memo was a "form letter" rote concurrence with no analysis. *Id.* at 73-75, n.30.

***Lane Martin (2019)***. Officers responded to a man in crisis carrying an axe and knife and claiming to be a federal agent. Ex. 18 at 72; *see also id.* at 76, 82. An ECIT officer was requested, but Martin would not communicate and walked off, trailed by as many as ten officers. *Id.* at 72-73. After two 40mm less-lethal rounds, Martin ran into an apartment breezeway, turned toward a line of seven officers, and Officer Doran, perceiving a knife as Martin dug in his pocket, fired 11 rounds, killing him. *Id.* at 73-74, 77. Every review layer found all officers in policy, *id.* at 74, while OIR faulted the Training memo for stating no per-decision findings and for never analyzing the 11-round volley, the fact that one officer fired when peers with the same view held, or the ECIT/mental-health dimension. *Id.* at 75-76, 79-81, 82-83.

***Andre Gladen (2019)***. A partially blind man in a hospital gown, discharged hours earlier, was killed after a lone officer declined a cover officer and engaged him one-on-one. *Id.* at 46-49, 51, 56. The Training Division rated the officer's approach "not consistent with training or [an] unnecessary or serious risk." *Id.* at 50.

The reports further document two rhetorical devices the Bureau used to make these outcomes appear preordained. First, the “action/reaction” principle and the phrase “the subject left the officers with no other option” recurred as a “blanket” justification that ended analysis rather than beginning it. Ex. 19 at 5-11, 32-43. In the 2017 Perkins shooting of a self-identified suicidal man holding a replica gun, the Training Division wrote that the subject “left the officers with no other option than to fire.” OIR condemned that as “inaccurate and counter-productive” and formally recommended the phrase be eliminated from Training’s analyses. Ex. 20 at 83-84,

107 ¶ 25. Second, and repeatedly, on-scene sergeants abandoned their supervisory role to engage tactically—leaving no one to control the pace of a crisis scene at the very moment de-escalation was most needed—a failure OIR flagged across multiple reports. Ex. 21 at 72-75.

The OIR Group has repeatedly cited the need for pre-shooting tactical decision-making review. *Id.* at 70; Ex. 20 at 100; Ex. 19 at 91; Ex. 18 at 51; Ex. 17 at 33. The Bureau agreed each time and did not implement the fix. As of the most recent report, from January 2026, the Chief's own written response was that the reform is only "[a]gree[d]. Partially in practice," with Internal Affairs stating it "will develop" a review of individual officers' pre-shooting actions. Ex. 17 at 85.

To date, the Bureau's review process actively avoids questioning officer pre-shooting tactics in their totality of circumstances analysis. PPB structures its administrative review of every shooting around three "Areas of Review"—Application of Deadly Force, Operational Planning and Supervision, and Post-Shooting Procedures—none of which requires a finding on the pre-shooting tactical decisions that the reviewers identified as the actual cause of most crisis shootings. Ex. 18 at 85; Ex. 21 at 69-70. As a result, the reviewing Commander, the Police Review Board, and the Chief make no formal finding on whether the officer created the jeopardy that led to the killing.

The OIR reports ultimately catalogue a history of ratification and unaccountability for PPB officers. Across the seventy-five incidents the reviewers tabulated, the Bureau's own running appendix—its "Table of Critical Incidents," which records for each incident whether any officer was disciplined—reflects *no discipline in the overwhelming majority of cases***.** (See, *e.g.,* Ex. 19 at 107-111; Ex. 18 at 95-100. In the rare instance in which the Bureau sustained discipline against a shooting officer, the discipline did not hold. In *Campbell*—where the Bureau's own

Training Division and Commander found the killing of an unarmed, suicidal man out of policy—the Bureau moved to terminate the officer, but an arbitrator overturned the termination and the reinstatement was upheld on appeal. Ex. 22 at 63; Ex. 20. Comparable discipline in an earlier case was likewise reduced by an arbitrator. *E.g.*, Ex. 20.

The wealth of critical information about the Bureau should inspire a desire to improve. Instead, the PPB Captain in charge of training demonstrated his antipathy for OIR Group reports:

> Q. How would you characterize in your personal experience what the ambit of an OIR group report is?
> [objections]
> A: There were facts that they either missed or overlooked in characterizing some of their reports in reviewing officer involved shootings.

Jackson Dep. 55:13-24.

Just as Baxter said of the USDOJ findings, City officials believe criticism of the Bureau can be discounted and disregarded.

## III. STANDARDS OF LAW

### a. Summary Judgment

Summary Judgment is appropriate if the movant shows there is no genuine dispute as to a material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ P. 56(a). The moving party has the initial burden of establishing the bases for its motion and identifying the portions of the record that demonstrate the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Materiality is determined with reference to the substantive law and material facts are those which might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must "view the facts in the light most favorable to the nonmoving party," *Hughes v. Rodriquez*, 31 F.4th 1211,

1218 (9th Cir. 2022), and not weigh evidence or make credibility determinations because these are tasks for a jury." *Anderson* at 249.

**b. Excessive Force**

The touchstone of Excessive Force claims under the Fourth and Fourteenth Amendment is objective reasonableness. *Graham v. Connor*, 490 U.S. 386, 388 (1989). While the reasonableness of an officer's actions should not be judged "with the 20/20 vision of hindsight," the Constitution does not forgive an officer's every mistake. *Torres v. City of Madera*, 648 F3d 1119, 1124 (9th Cir. 2011) (citing *Graham* at 396 and *Maryland v. Garrison*, 480 U.S. 79, 87 n.11 (1987)). Determining whether the force used to affect a particular seizure is "reasonable" requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham at* 396 (internal quotations omitted). "The intrusiveness of a seizure by means of deadly force is unmatched." *Hart v. City of Redwood City*, 99 F.4th 543, 549 (9th Cir 2024) (citing *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). Thus, the government's interest in effecting the seizure by means of deadly force must also be "unmatched." *A. K. H by & through Landeros v. City of Tustin*, 837 F3d 1005, 1011 (9th Cir 2016) ("The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a "fundamental interest in his own life" and because such force "frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." (quoting *Garner* at 9)). A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury. *Deorle v. Rutherford*, 272 F3d 1272, 1281 (9th Cir 2001). Because the reasonableness standard "nearly always requires a jury to sift

through disputed factual contentions, and to draw inferences therefrom […] summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Torres,* 648 F3d 1119, 1125 (internal citations omitted).

The strength of the government's interest in the force used is evaluated by examining three primary factors: (1) "whether the suspect poses an immediate threat to the safety of the officers or others," (2) "the severity of the crime at issue," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. These factors are not exclusive. Courts must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*' *Id.* (quoting *Franklin v. Foxworth,* 31 F.3d 873, 876 (9th Cir.1994)). Other potentially relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed. *See, e.g.*, *Bryan v. MacPherson*, 630 F3d 805, 831 (9th Cir 2010); *Deorle,* 272 F.3d at 1282–83. The "most important" factor is whether the individual posed an immediate threat to the safety of the officers or others. *Glenn v. Washington Cnty.*, 673 F3d 864, 872 (9th Cir 2011) (internal citations omitted). In deadly force cases, the Court "cannot 'simply accept what may be a self-serving account by the police officer" especially because "the person most likely to rebut the officers' version of events—the one killed—can't testify[.]" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (citations omitted).

**c. Qualified Immunity**

Qualified immunity protects "government officials performing discretionary functions… from liability for civil damages." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity calls for a two-pronged analysis: 1) whether the rights and law establish that a protected right was violated; and 2) whether the rights were reasonably known at the time the defendant acted. *Pearson v. Callahan*, 555 U.S. 223, 234 (2009).

Under these prongs, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), citing *Brosseau v. Haugen*, 543 U.S. 194, 195 n. 2 (2004) (per curiam); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hope v. Pelzer*, 536 U.S. 730, n. 1 (2002). This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan*, 572 U.S. at 656 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Qualified immunity does not protect government officials who violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow* at 818. It is not a requirement for the action to have been previously held unlawful; rather, for the immunity to be inapplicable, a party need only show that in light of pre-existing law the unlawfulness is apparent. *Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020), citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); see also *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (the focus is on whether the status of the law gave "fair warning" to officials that their conduct was unconstitutional). Caselaw "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotations omitted). "[G]eneral

statements of the law are not inherently incapable of giving fair and clear warning to officers." *Id.* at 552 (internal quotations omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope* at 741. "If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Mattos v. Aragano*, 661 F.3d 433, 442 (9th Cir. 2012).

When adjudging qualified immunity, it is crucial for courts to draw "inferences in favor of the nonmovant, even when [. . .] a court decides only the clearly-established prong of the standard." *Tolan* at 657. Accordingly, courts must take care not to define a case's "context" in a manner that imports genuinely disputed factual propositions. *Id.*; see *Brosseau v. Haugen*, 543 U.S. 194, 195, 198 (2004) (inquiring as to whether conduct violated clearly established law "in light of the specific context of the case" and construing "facts [. . .] in the light most favorable to" the nonmovant).

## IV. ARGUMENT

Defendants Motion for Summary Judgment should be denied. There are disputed material factual disputes that must be reserved for jury. These facts could lead a reasonable jury to conclude that defendants' use of deadly force against Mr. Delgado violated the constitution. Because these are material facts, a grant of qualified immunity is improper and should be denied. First, viewing the facts in the light most favorable to plaintiff, as analyzed below, the defendants' interest in using deadly force was severely diminished and unreasonable. Second, it is well-established that "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F3d 1189, 1204 (9th Cir 1997).

**a. Defendants' Use of Deadly Force was Unreasonable.**

Viewing the facts in the light most favorable to plaintiff, the Graham factors weigh in plaintiff's favor.

**i. Mr. Delgado was not an Immediate Threat**

Mr. Delgado did not present an immediate threat to the officers' safety. Defendants liken this case *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614 (9th Cir. 2023) but they ignore the material factual disputes on whether Mr. Delgado was pointing what officers could reasonably believe to be a real gun, but was in fact a replica, "directly" at them when Defendant DeLong fatally shot him.

Although there was a video taken of the interaction between Defendant DeLong and Mr. Delgado, it does not capture Mr. Delgado's actions in the moments leading up to the shooting. Therefore, in order for the fact finder to understand what happened in those moments, it would need to rely on witness testimony, which starkly differs from each other and requires credibility determinations reserved for a jury. Several non-officer witnesses dispute whether Mr. Delgado ever had the replica gun in his hands and whether he ever made a furtive movement that Defendant DeLong could reasonably perceive as an immediate threat. Even the officer witnesses who described seeing Mr. Delgado with a gun disagree about key details: how Mr. Delgado produced the gun, what he was doing with the gun the moment Officer DeLong shot him, and his body positioning.

a. Defendant DeLong says that Mr. Delgado picked the gun "up off the ground." DeLong Dep. Vol 1 223:13. He says that when he shot, Mr. Delgado was "standing facing me with his arms outstretched pointing that gun at me, and I'm looking directly down the

barrel of that gun." DeLong Dep. Vol. II 48:15-18. He testifies that at that moment, Mr. Delgado was standing upright and facing him directly. DeLong Dep. Vol. I 212:21-213:1.

b. Officer Wuthrich says that she saw Mr. Delgado going through his items and then "literally just popped to the left side of the tree and he was in a shooter's stance already pointing the gun directly at me." Wuthrich Dep. 122:14-18. She says that Mr. Delgado had both of his arms outstretched, with "his feet shoulder width apart like you do when you shoot a gun." Wuthrich Dep. 122:19-24.

c. Office Le says he never saw Mr. Delgado crouch down. He says he saw Mr. Delgado produce a gun from his person, and was standing straight up holding a gun with one hand directed at Officers DeLong and Wuthrich. Le Dep. 66:13-67:21.

d. Officer Bailey says he saw Mr. Delgado's "arm was generally extended and he was generally pointing [the replica gun] in a southerly direction." Bailey Dep. 65:8-12.

e. Officer Vosu says he saw Mr. Delgado "uproot" a tent and search the porthole of the tent before "swiftly" walking approximately four to five steps, or about ten to twelve feet towards, towards Officers DeLong and Wuthrich, then "punch out" with one arm, a black, "Glock-style handgun" directly at Officers DeLong and Wuthrich. Vosu Depo 42:20-25, 43:1-5;17-19, 44:4, 7, 10-11, 24-25.

These accounts disagree on how Mr. Delgado allegedly produced a "gun" and the direction he was allegedly pointing it. He could not be pointing it "directly" at both officers because they were standing feet apart on opposite sides of a tree, about 90 to 96 feet from Mr. Delgado. Based on just the officers' discrepancies, a reasonable jury could find that Mr. Delgado was not pointing a gun at the officers and was not an immediate threat.

And this is not the only evidence that on which a reasonable jury could find Mr. Delgado was not an immediate threat. Consider the non-officer witnesses, *supra* § II.f.*i*. Three of the four non-officer percipient witnesses described seeing Mr. Delgado with nothing in his hands when Defendant DeLong shot him. The sole non-officer witness who described Mr. Delgado holding a gun when Defendant DeLong shot, described seeing Mr. Delgado holding a rifle and admitted he was not wearing his glasses at that time, which were necessary for seeing at a distance, and further admitted that what he saw could have been the tattoo on Mr. Delgado's arm.

Consider the trajectory of the fatal bullet. That bullet entered Mr. Delgado's "left lateral chest, 6 inches from the anterior midline and 22 inches below the top of the head." Ex. 14 at 2.

> The projectile passed through the skin and subcutis of the left lateral chest, followed by the left serratus anterior muscle, followed by the lateral aspect of the left eighth intercostal space. The projectile continued along a slightly inferiorly oriented course, passing through the spleen, the stomach, the left side of the diaphragm, and the lower lobe of the left lung. It then passed through the posterior aspect of the left twelfth rib, followed by the deep and superficial musculature of the left side of the back. A deformed fragment of a yellow metal jacket is embedded within the lower lobe of the left lung. A deformed, yellow metal jacket and the flattened gray metal core of a small caliber projectile are recovered from the soft tissues of the mid-back, just to the left of the posterior midline.

*Id.* Dr. Wobrock, plaintiffs' biomechanical expert, opines that based on this physical evidence, Mr. Delgado was turned about 35 degrees from facing Defendant DeLong head-on. Wobrock Depo. 23:12-16. This is inconsistent with Defendant DeLong's statement that Mr. Delgado was "standing facing me with his arms outstretched pointing that gun at me" when he shot him.

Viewing the facts in the light most favorable to Plaintiffs, Mr. Delgado did not present an immediate threat to the officers' safety. This factor weighs in plaintiffs' favor.

**ii. Mr. Delgado did not commit any serious crimes**

Defendants' assert as undisputed that Mr. Delgado "wielded" a gun, and argue his attempted crimes were therefore severe. They cite to potential murder, manslaughter, and assault

statutes. This again ignores the material factual disputes and again begs the question a jury must decide. Viewing the facts in the light most favorable to plaintiffs, the severity of any crime Mr. Delgado may have committed was minor.

Defendant DeLong was responding to a report that a man in a park was doing quick draws, but not threatening anyone. DeLong Dep. Vol. I 187:10-15; 171:1-4. [redacted] Ex. 23 at 3.[5] [redacted] The only element of that statute which arguably could have applied would have required Mr. Delgado to have "engaged in fighting or in violent, tumultuous or threatening behavior" with "intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." Or. Rev. Sec. § 166.025. It is a Class B misdemeanor. *Id.* When Defendant DeLong saw Mr. Delgado he did not see a man engaging in "disorderly conduct." He saw a man who was not wearing a shirt, not holding a weapon, and who was "nearly catatonic." DeLong Dep. Vol. I 189:2-3.

Defendant DeLong admits he did not have probable cause to believe Mr. Delgado had committed any serious felonies. DeLong Dep. Vol. I 211:18-22. He describes simply "trying to assess" if there was any danger or safety issues. He was not trying arrest or even handcuff Mr. Delgado but simply trying to "investigate as to whether or not the police need to be there." DeLong Dep. Vol. I 211:21-25; 212:1-4. This is not an officer investigating a serious crime.

Viewing the facts in the light most favorable to plaintiffs, the severity of any crime Mr. Delgado may have committed was minor and this factor weighs in plaintiffs' favor.

**iii. Mr. Delgado was not actively resisting arrest or attempting to flee**

---

[5] [redacted]

Viewing the facts in the light most favorable to Plaintiff, Mr. Delgado was not resisting arrest or attempting to flee. Defendants do not argue that Mr. Delgado was attempting to flee, they offer only a bald conclusion that his non-compliance amounted to "resisting arrest" for purposes of a *Graham* analysis. Defendants point to *Napouk v. Las Vegas Metro. Police Dep't*, 123 F4th 906, 920 (9th Cir. 2024) for support, but they fail to grapple with the material factual differences between *Napouk* and this case; differences which show this factor weighs in plaintiffs' favor.

In *Napouk,* two officers engaged Mr. Napouk, who they believed was wielding a machete. The officers gave repeated commands to Mr. Napouk to drop the machete. *Id.* at 913. After several minutes of commands and Mr. Napouk continuously advancing on them with the weapon, them retreating, further commands to drop the weapon, and several use of force warnings, the two officers fatally shot Mr. Napouk. *Id.* at 913-14. The Court there found Mr. Napouk "actively resisted the officers 'orders, satisfying Graham's [resisting arrest or attempting to flee] factor." *Id.* at 920. That is not this case.

Mr. Delgado was not in possession of a weapon when any commands were given, was not advancing on officers with a weapon, and was not "actively resisting." Defendant DeLong says he first, "very casually," asked Mr. Delgado to come talk to him, and shortly after gave commands for Mr. Delgado to "put his hands up and lay down." Dkt. 58 ¶16; ¶24.[6] The first "very casual" request was not a command. It is not clear from this record when the commands to "put his hands up and lay down" were given, if they were given more than once, or if Mr. Delgado understood the import of those commands. What is true is that Mr. Delgado did not have a weapon and was not a threat to anyone when commands may have been given. There is

[6] In his deposition Defendant Delong stated he did not know who gave the command for Mr. Delgado to get on the ground, DeLong Depo Vol 2 44:19-23, but now claims he gave that warning.

even witness testimony in this case that when officers told Mr. Delgado to put his hands up, he put his hands up, and officers shot him anyways. *See* J. Lehrman Dep. 23:4-16, 24:4-6.

Even if Mr. Delgado did not comply with the command to put his hands up, under PPB's own use of force policy, Mr. Delgado's "non-cooperation" would be "passive resistance." Ex. 2 at 4.[7] *See Glenn v. Washington Cnty.*, 673 F3d 864, 875 (9th Cir 2011) (considering Washington County's use of force policy when analyzing levels resistance and force used). Mr. Napouk did not respond to commands as he advanced towards the officers while wielding what they believed to be a weapon. Mr. Delgado did not respond to commands when he was not in possession of weapon and not a threat. Thus, viewing the facts in the light most favorable to plaintiffs, Mr. Delgado was not resisting in a manner that would satisfy this factor.[8] This factor weighs in plaintiffs' favor.

**iv. Less Intrusive Alternatives and Defendant DeLong's Escalation**

Viewing the facts in the light most favorable to plaintiffs, defendants did not use less intrusive means and, in fact, escalated this event into using deadly force. Events leading up to a shooting, including the officers' tactics, are encompassed in the facts and circumstances for the reasonableness analysis. *Vos v. City of Newport Beach*, 892 F3d 1024, 1034 (9th Cir 2018) (citing *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1087 (9th Cir. 2017) and *Bryan*, 630 F.3d at 831). As discussed, *supra* § II.e, defendants claim that Defendant DeLong used "de-escalation" tactics. That is misleading. Defendants ignore when Defendant DeLong abandoned

[7] "Members shall not use force against people who engage in passive resistance that does not impede a lawful objective." Ex. 2 at 8.
[8] Defendants also cannot rely on any claim that Mr. Delgado's resistance was ignoring commands to drop a weapon. Even if we assume, *arguendo*, that defendants' version of the disputed material facts is correct, no commands, or even warnings, were given after they alleged Mr. Delgado pointed a gun at either Defendant DeLong or Officer Wuthrich. At no point in the interaction do officers say anything along the lines of "drop the gun."

his de-escalation training and took escalatory actions. As discussed, *supra* § II.d, Defendant DeLong was a member of the ECIT and had undergone extensive training on de-escalatory tactics, with the intention to prevent or reduce the amount of force used to resolve confrontations. Despite Mr. Delgado being "nearly catatonic," presenting a situation that did not warrant immediate intervention, Defendant DeLong, knowing back-up and other resources where en route and bystanders were in the park, he did not use "time" and wait for the resources or clear the "50 to 100 people" in the park, Dkt. 58 ¶ 30, but decided to yet again operate on his own, grab his rifle, and confront Mr. Delgado. This alone creates a triable issue of fact for the jury. *See Torres*, 648 F.3d at 1126 (holding that a jury could find the circumstances that "forced" an officer to make a split-second judgment about firing their weapon were the result of their own poor judgment and lack of preparedness creating their own sense of urgency created a triable issue of fact).

While he used distance, cover, and claims he used a self-described "calm tone" when he first engaged with Mr. Delgado, this is where his use of de-escalation tactics ends. When Mr. Delgado reacted angrily, Defendant DeLong resorted to escalatory language yelling, "If you reach for a gun, I'm going to fucking shoot you." DeLong Dep. Vol. 1 199:1-2. *See supra* § II.e; Ex. 6 at 1-2. The situation only devolved from there. Defendant DeLong did not disengage. He "didn't not feel he could" because he believed Mr. Delgado had a gun, even though he had not seen one, Mr. Delgado was not holding one, and no one reported that Mr. Delgado had ever threatened anyone with one.

Plaintiffs' Crisis Intervention Team training and tactics expert Roy Taylor, Ph.D. opines that "[Defendant] DeLong did not employ key de-escalation techniques taught in ECIT […] The officer issued limited commands, including '*Listen man, if you reach for a gun I'm going to*

*fucking shoot you.*' from a significant distance, without any follow-up engagement. Officer DeLong also had his AR-15 rifle in a low ready position or pointed at Robert, which was visible to him." Ex. 4 at 9. As anyone would expect, "Pointing a firearm elevates the subject's level of anxiety and can make it impossible to communicate with the person. *Id.* He concludes that "Although officers were presented with a rapidly evolving and inherently dangerous situation, the available information, training history, and scene conditions supported the use of time, distance, communication, and coordinated crisis-response strategies rather than an immediate escalation to lethal force." And that the failure to employ de-escalation techniques "substantially increase the risk of a fatal outcome […]." *Id.* at 10.

Viewing the facts in the light most favorable to Plaintiff, defendants did not use less intrusive means and, in fact, escalated this event such that they substantially increased the risk that the encounter would devolve into necessitating deadly force. This factor weighs in Plaintiff's favor.

**v. It should have been apparent that Mr. Delgado was experiencing a mental health crisis**

Viewing the facts in the light most favorable to plaintiffs, it should have been apparent that Mr. Delgado was experiencing a mental health crisis. Defendants' argument again requires disputed material facts be resolved in their favor. They again do not grapple with any other scenario. Defendants point to the proposition that the 9th Circuit does not recognize "two tracks of excessive force analysis, one for the mentally ill and one for serious criminals[…]." Dkt 57 ¶ 34 (*citing Bryan*, 630 F3d at 829 (9th Cir 2010)). Defendants notably do not grapple with the remainder of that sentence. The Court continues, "[W]e have found that even 'when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the

officers are confronted ... with a mentally ill individual.'" *Bryan* at 829 (quoting *Deorle*, 272 F.3d at 1283). Understood within this context, defendants interest in the use of force was in fact "diminished."

Defendant DeLong dismissed the possibility that Mr. Delgado was experiencing a mental health crisis, attributing his behavior instead to "meth use," while also acknowledging that a mental health crisis was possible. DeLong Dep. Vol. I 190:1-7. But the facts DeLong relied on did not distinguish methamphetamine intoxication from a mental health crisis. He cited Mr. Delgado's sudden anger—testifying that Mr. Delgado "exploded in anger," DeLong Dep. Vol. I 189:6-17—even though his training identified "intense feelings or personal distress," including "anger, fear, [and] panic," as signs of a possible crisis. Ex. 2 at 3. DeLong further admitted that he "didn't have time to" apply that training or consider any explanation other than methamphetamine use. DeLong Dep. Vol. I 189:12-17. DeLong also failed to reassess when, after he threatened to "fucking shoot [him]," and Mr. Delgado reportedly responded, "Well, fucking shoot me." Rather than recognize that statement as additional evidence of a possible mental health crisis, DeLong treated it only as confirmation that Mr. Delgado "heard and understood what I just said to him." DeLong Dep. Vol. II 44:13-18. Plaintiffs' expert Roy Taylor, Ph.D. disagrees and concludes that Mr. Delgado's "behavior was consistent with someone experiencing a mental health crisis." Ex. 4 at 9.

Viewing the facts in the light most favorable to plaintiffs, it should have been apparent that Mr. Delgado was experiencing a mental health crisis. Thus, the interest in using force against him was diminished, and this factor likewise favors plaintiffs.

///

///

**b. The Law Was Well Established**

This court should deny defendants' request for qualified immunity because it is well established that an officer may not kill persons who do not pose an immediate threat to their safety. *Harris* 126 F.3d at 1204; *George v Morris*, 736 F.3d 829 (9th Cir. 2013) (denying qualified immunity because a jury could conclude the suspect, who was holding a shotgun, was not an immediate threat); *Glenn v. Washington Cnty.*, 673 F.3d 864 (9th Cir 2011) (denying qualified immunity because a jury could conclude that at the moment the officers shot the suspect he did not pose an immediate threat); *Estate of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1004 (9th Cir 2017) (denying qualified immunity because law was clearly established such that an officer would know that the use of deadly force is unreasonable where a suspect appeared to be carrying an AK-47, but had not expressed an intention to use the weapon, had not pointed the weapon at the officers or otherwise threatened them with it, did not 'come at' the officers or make any sudden movements towards the officers, and there were no reports of erratic, aggressive, or threatening behavior.); *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F2d 321, 325 (9th Cir 1991) (denying qualified immunity where disputes about facts on whether a feeling suspect pointed the gun at the officers and whether suspect was facing them when officers shot him). Thus, viewing the evidence in the light most favorable to the nonmoving party, the defendants-appellants are not entitled to qualified immunity.

**c. A Jury Can Conclude the City Has Been Deliberately Indifferent**

The City may be held liable under § 1983 if: "(1) [plaintiff] was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. Cnty. of L.A.*, 977 F.3d 737, 741 (9th Cir. 2020) (citing

*Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). The municipal policy need not be an official edict, and may instead be "a pervasive practice or custom" or "a failure to train, supervise, or discipline." *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019). Plaintiffs may support their *Monell* claim by showing official policies or established customs inflicted the alleged constitutional injury, or that omissions or failures to act reflected a local government policy of deliberate indifference to the constitutional rights at issue. *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010), *overruled on other grounds by Castro v. Cty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016).

Liability may be grounded in policies of inaction or omission, as well as policies of action or commission. *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). A policy of inaction or omission may be based on a municipality's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (citation omitted). The municipality will be liable because of its omissions "for a constitutional violation committed by one of its employees, even though its formal written policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind to prove the underlying violation." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185-86 (9th Cir. 2002), *overruled on other grounds*, *Castro v. Cnty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016). A policy is a cause or "moving force" behind the underlying violation of plaintiff's rights if an appropriate policy "could have prevented the violation." *Id.* at 1194.

"[I]t is sufficient under [Ninth Circuit] case law to prove a 'custom' of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity." *Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 803 (9th Cir. 2018) (citing cases).

Specifically, a policy or custom of failing to investigate and discipline officers who allegedly committed prior instances of excessive force can form the basis of *Monell* liability. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015); *see also L.F. by & through Brown v. City of Stockton*, No. 2:17-CV-01648-KJM-DB, 2020 WL 4043017, at *21 (E.D. Cal. July 17, 2020). That is, the mere fact that the City has a procedure to ostensibly receive and investigate complaints does not shield it from liability: "It is not enough that an investigative process be in place * * * [t]he investigative process must be real. It must have some teeth. * * * The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens." *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996). "[P]ost-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry." *Henry v. Cnty. of Shasta*, 132 F.3d 512, 518-519 (9th Cir. 1997), *as amended*, 137 F.3d 1372 (9th Cir. 1998), *cert. denied*, 525 U.S. 819 (1998).

The City has maintained the same practice for more than a decade now: When an officer uses excessive force, the Bureau uses the criminal inquiry to exculpate the officer; after no true bill is returned, the internal affairs division uses the criminal inquiry findings to conclude that no discipline should be imposed; and then the training division recommends no critical changes to the manner in which the officer approached the shooting. Systems that are meant to flag aberrations from normal use of force thresholds, like the EIS system, are ignored or, as here, rationalized as a sign that the officer is a valiant go-getter. A go-getter that does not want to use the resources, training, or other officers available to him. The training itself imposes no strict adherence to the materials while it's being trained or after. Despite failing to follow every

principle of ECIT, Defendant DeLong's response to Mr. Delgado prompted no scrutiny from PPB, per design.

The outcomes speak for themselves. Since the OIR Group has been documenting PPB's lethal force, only two incidents of lethal force against a person in a mental health crisis resulted in discipline, one of which features the asterisk that the discipline was reversed. Renaud Dec. — OIR Chart. The incidents described above, *supra* § II.h, charted the same course Mr. Delgado's case later took.

A jury could conclude, as Plaintiff does, that the City has maintained this pattern or has been deliberately indifferent to it to this very day. As its official policy official told the OIR Group in response to its most recent report, the Bureau has *yet* to develop a pre-shooting review process. Ex. 17 at 85. The OIR Group has consistently highlighted this deficiency since its First Report in 2012. Ex. 22 at 25 (Rec. 3 required that officers involved in the tactics "leading up to the shooting" be treated as subjects). The Bureau's training and discipline apparatuses flatly ignore this. Each OIR Group report commissioned, responded to by the City, and adopted by its City Council at minimum provides notice to the City that these deficiencies exist and have resulted in the needless death of people in mental health crises.

Lastly, a municipality's historical failure to meaningfully investigate officer misconduct can support *Monell* liability. *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011). That includes investigations that bypass available witnesses or credit officer accounts without explanation. *See Caldwell v. City of San Francisco*, No. 12-cv-01892, 2020 WL 7643124, at *16–17 (N.D. Cal. Dec. 23, 2020); *Forrest v. Parry*, 930 F.3d 93, 102 (3d Cir. 2019); *Hogan v. Franco*, 896 F. Supp. 1313, 1320–21 (N.D.N.Y. 1995) (finding "deliberate indifference to the truth" where investigators relied on the officer's own statement). The same

logic reaches information developed in litigation. A department that disregards what past lawsuits have shown is no less indifferent than one that never sought the evidence at all. *See* Joanna C. Schwartz, *Monell's Untapped Potential*, 125 Colum. L. Rev. 925, 948 (2025) *citing* U.S. Dep't of Justice, Office of Community Oriented Policing Services, *Standards and Guidelines for Internal Affairs* at 45 (2009) (recommending that agencies review, and consider reopening, internal investigations when litigation produces new information indicating misconduct).

The City has not revisited the Training Division analysis in this case, even though the training captain has authority to return a review for amendment. Jackson Dep. 81:1-82:9. The lieutenant who authored that review could not say whether the Bureau has ever reviewed lawsuits against training at all. Baxter Dep. 25:1-20. One of the officers in this case had killed a man in a mental health crisis as well. He could not recall any change to training following that death. Vosu Dep. 15:15–17:9. No other officer or command level staff could recall trainings changing after the officer-involved deaths. Le Dep. 89:3-90:2; Baxter Dep. 32:15-25 and 49:17-23; and Jackson Dep. 57:10-59:11. Dr. Gerritsen could not recall any changes to training following Aaron Campbell's death, Gerritsen 50:4-19, but could recall one scenario being adapted for "edged weapons" after the death of John Elifritz, who was killed in 2018. *Id.* at 89:3-90:11.

The record before the Court should provide it a sufficient basis to determine that a pattern and practice exists here, as the USDOJ did in 2012. But it need not do so to deny the Defendants' motion. Simply, the Court can conclude that there is a dispute of material fact present here. PPB officials such as Training Captain Jackson and Lt. Baxter disagree with the USDOJ's conclusions. A jury should decide whether the City should have known better.

Defendant DeLong's actions naturally flow from this history. The training he had did not stick, and the Bureau had no means to track his compliance with the training. As he had in the months prior to shooting Mr. Delgado, when the EIS system flagged his use of force after failing to utilize or wait for cover, he received positive feedback for it. PPB officers work under the assumption that their actions will never be critiqued, never be corrected, and never improved upon. He was free to do as he pleased, even if contrary to the words in the training materials.

**d. Shocks the Conscience**

The City's final motion for summary judgment likewise rests on the same disputed facts described above. Whether or not Defendant DeLong's actions amount to a due process violation should be left for a jury to ultimately conclude.

The threshold question in any shocks the conscience analysis is whether the circumstances allowed the officer actual deliberation. *Waid v. Cnty. of Lyon*, 87 F.4th 383 (9th Cir. 2023). The Ninth Circuit applies two different tests depending on the answer to that question.

"Where actual deliberation by the officers is practical, an officer's deliberate indifference may suffice to shock the conscience." *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 923 (9th Cir. 2024). When a law enforcement officer makes a snap judgment because of an escalating situation, then his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Id*. This purpose-to-harm standard applies to fast-moving, rapidly evolving encounters. *Id*.

Defendant DeLong deliberated and chose unreasonable violence. He only considered drawing his high-powered rifle. He only considered approaching the scene with hostility. He only considered escalating the situation, contrary to his training. He had every opportunity to

respond to a non-emergency call with the approaches described in his training. But he chose the most aggressive approach as quickly as possible. Even under the purpose-to-harm analysis, Defendant DeLong's approach demonstrates an intent to harm beyond what legitimate policing objectives would allow. Instead of following his training, he shouted violent threats towards Mr. Delgado and shot him in his side.

The non-officer witnesses were certainly shocked by their approach. As said in Ms. Lehrman's deposition, "It made me mad because I figured that they should have worked with him instead of shot him. To me, they're [. . .] trigger-happy. [. . . A]nything goes wrong, the first thing they do is hide behind a tree and then take a gun and shoot it." J. Lehrman Dep. 35:19-36:13. David Hernandez said he did not "believe [shooting Delgado] was warranted." Hernandez Dep. 69:13–17. "[T]he police took no time at all, whatsoever, to get to know the situation, to talk him down on anything. All they did was come out of the cars with their guns drawn, [. . .] and just barking and screaming demands." Hernandez Dep. 32:4-17.

Plaintiffs in no way fault Kaela Ingle, along with her spouse, for calling the non-emergency line. Her "intention was just to – for someone that had the authority and ability to come and handle the situation in case there was a person that was agitated with a gun." Ingle Dep. 35:2-5. She believed at the time that "Portland Street Response… could have possibly come out." *Id.* at 34:19-21. Unfortunately, despite this incident being one of Defendant DeLong's creation, Ms. Ingle feels personal guilt over what occurred.

> Q. Okay. And understanding that you're having trying times out there, living in that area, if you were to just think of this event, as you sit here today, I mean, how do you feel now about what had happened?
> A. I feel horrible, and I feel responsible for someone dying.
> Q. I'm sorry.

Ingle Dep. 37:10-16.

This event clearly shocked the conscience of everyone who witnessed it. It should shock the conscience of every member of the Bureau, but, unfortunately, as the pattern above shows, the behavior was excused and ultimately encouraged.

## V. CONCLUSION

For the reasons explained above, Defendants have not met their burden in their Motion for Summary Judgment. Accordingly, Defendants' Motion must be **DENIED**.

DATED: September 17, 2026.

Respectfully submitted,

*/s/ Juan C. Chavez*

Juan C. Chavez, OSB #136428
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
*Of Attorneys for Plaintiffs*

*/s/ Hannah Bland*

Hannah Bland, OSB #252404
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
*Of Attorneys for Plaintiffs*

*/s/ Walter Fonseca*

Walter Fonseca, OSB #136349
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
*Of Attorneys for Plaintiffs*